# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION NO. 1:13-CV-897

JAMES DILLON,
on Behalf of Himself and All
Others Similarly Situated,

      Plaintiffs,

vs.

BMO HARRIS BANK, N.A.,
FOUR OAKS BANK & TRUST, a
North Carolina-Chartered Bank,
GENERATIONS FEDERAL
CREDIT UNION, and BAY
CITIES BANK, a Florida State-
Chartered Bank,

      Defendants.

**<u>CLASS ACTION COMPLAINT</u>**

**RACKETEER INFLUENCED AND
CORRUPT ORGANIZATION ACT**

**JURY TRIAL DEMANDED**

      Plaintiff, James Dillon ("Plaintiff"), individually and on behalf of the Class

described below, by his attorneys, makes the following allegations based upon

information and belief, except as to allegations specifically pertaining to Plaintiff

and his counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

      Plaintiff brings this class action against Defendants BMO Harris Bank, N.A.

("BMO"), Four Oaks Bank & Trust Company ("Four Oaks"), Generations Federal

Credit Union ("Generations") and Bay Cities Bank ("Bay Cities")

(collectively "Defendants") to recover damages and other relief available at law and in equity on behalf of himself as well as on behalf of members of the class who have been injured by Defendants' participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts in violation of 18 U.S.C. § 1962, the common and statutory law of numerous states and North Carolina law.

2.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.     Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.     At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland,

2

Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.     Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the "Out-Of-State Payday Lenders"). These loans ("Out-Of-State Payday Loans") feature interest rates of 400%, 500%, and higher.

6.     Out-Of-State Payday Lenders' ability to defy state law rests on the cooperation of financial institutions like Defendants that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network"). These banks, known as Originating Depository Financial Institutions ("ODFIs") act as middlemen between illicit Out-Of-State Payday Lenders (many based offshore) and the mainstream electronic payments system.

7.     Indeed, it would be impossible for Out-Of-State Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendants' willingness to allow the Out-Of-State Payday Lenders to access the ACH Network.

8.     BMO Harris, Four Oaks, Generations and Bay Cities, acting as ODFIs, actively participate in this unlawful scheme by working at the request of Out-Of-State Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts they know to be unlawful.

9.     Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting at the request of Out-Of-State Payday Lenders and that the entries they originate on the ACH Network at the request of such Out-Of-State Payday Lenders will credit or debit funds in states in which the Out-Of-State Payday Lenders' loans are illegal and unenforceable. Defendants are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

10.     Defendants' illegal schemes with Out-Of-State Payday Lenders have victimized Plaintiff and millions of others. Unless enjoined, Defendants will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

11.     Plaintiff is a citizen and resident of North Carolina and resides in the City of Trinity and County of Randolph.

4

12.     Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

13.     Defendant Four Oaks is a North Carolina state-chartered bank with main offices at 6144 US Highway 301 South, Four Oaks, North Carolina.

14.     Defendant Generations is a federally-insured community credit union based in San Antonio, Texas, with main offices at 9311 San Pedro Avenue, Suite 100, San Antonio, Texas.

15.     Defendant Bay Cities is a state-chartered bank with main offices at 4301 Boy Scout Blvd., Tampa, Florida.

## OTHER PERSONS AND ENTITIES

16.     The "Out-Of-State Payday Lenders" include, but are not limited to, the following:

a.     CashCall, Inc. ("CashCall") is an entity located in Anaheim, California and maintains a website with an IP Address of 74.202.203.100 with an associated domain name of **www.cashcall.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, CashCall engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  CashCall is in the business of

5

making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

     ii.  incurred in connection with the business of lending money at an usurious rate; and

    iii.  the usurious rate was at least twice the enforceable rate.

    b.      Island Finance, LLC d/b/a White Hills Cash ("White Hills Cash") is an entity purportedly operating as a tribal online payday lender that maintains a website with an IP Address of 174.143.104.104 with an associated domain name of **www.whitehillscash.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, White Hills Cash engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  White Hills Cash is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

     ii.  incurred in connection with the business of lending money at an usurious rate; and

    iii.  the usurious rate was at least twice the enforceable rate.

c. Great Plains Lending, LLC ("Great Plains") is an entity located in Timber Lake, South Dakota and maintains a website with an IP Address of 66.55.41.140 with an associated domain name of **www.greatplainslending.com** for the purpose of making illegal Out-Of-State Payday Loans. At all times relevant hereto, Great Plains engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright. Great Plains is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

 i. unenforceable because of state or federal laws against usury;

 ii. incurred in connection with the business of lending money at an usurious rate; and

 iii. the usurious rate was at least twice the enforceable rate.

d. Western Sky Financial, LLC ("Western Sky") is an entity purportedly operating as a tribal online payday lender organized and existing under the laws of South Dakota with a principal place of business at 612 E Street, Timber Lake, South Dakota. Up until September 2, 2013, Western Sky maintained and operated a website with an IP Address of 74.202.203.70 with an associated domain name of **www.westernsky.com** for the purpose of

7

making illegal Out-Of-State Payday Loans.  Prior to suspending its online payday loan operations on September 2, 2013 amid multiple lawsuits and mounting pressure from state and federal regulators challenging Western Sky's lending practices, and at all times relevant hereto, Western Sky engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Western Sky was in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

     ii.  incurred in connection with the business of lending money at an usurious rate; and

    iii.  the usurious rate was at least twice the enforceable rate.

    e.     MNE Services, Inc. d/b/a USFastCash ("USFastCash") is an entity purportedly operating as a tribal online payday lender purportedly owned by the Miami Tribe of Oklahoma that maintains a website with an IP Address of 208.72.245.88 with an associated domain name of **www.usfastcash.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, USFastCash engaged in the practice of making and did make illegal payday loans to persons residing in the banned

8

states and the District of Columbia where such loans are prohibited outright. USFastCash is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

     ii.  incurred in connection with the business of lending money at an usurious rate; and

   iii.  the usurious rate was at least twice the enforceable rate.

      f.      On information and belief, "Vin Capital LLC" operates as an online payday lender through trade names or associated companies and/or serves as a collection company for various online payday lenders. At all times relevant hereto, Vin Capital LLC engaged in the practice of collecting illegal payday loans made to persons residing in the banned states and the District of Columbia where such loans are prohibited outright. Vin Capital LLC is in the business of making and/or collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

     ii.  incurred in connection with the business of lending money at an usurious rate; and

9

iii. the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

17.     Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.     Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendants.

19.     This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

20.     Alternatively, this Court has personal jurisdiction over BMO pursuant to N.C. Gen. Stat. § 1-75.4 in that BMO is engaged in substantial interstate activity which includes North Carolina, performed services for citizens residing in North Carolina, originated debit entries from bank accounts located in North Carolina and

held by citizens of North Carolina, facilitated payments to Out-of-State Payday Lenders from bank accounts located in North Carolina and held by citizens of North Carolina, and derived a benefit through the use and control of monies transferred from North Carolina.

21.     Alternatively, this Court also has personal jurisdiction over Four Oaks pursuant to N.C. Gen. Stat. § 1-75.4 in that Four Oaks is a domestic corporation and has engaged in substantial activity within North Carolina.  Four Oaks has participated in a continuous and systematic course of doing business in the state by, *inter alia,* maintaining a permanent office at 6114 U.S. 301 South, Four Oaks, North Carolina.

22.     Alternatively, this Court has personal jurisdiction over Generations pursuant to N.C. Gen. Stat. § 1-75.4 in that Generations is engaged in substantial interstate activity which includes North Carolina, performed services for citizens residing in North Carolina, originated debit entries from bank accounts located in North Carolina and held by citizens of North Carolina, facilitated payments to Out-of-State Payday Lenders from bank accounts located in North Carolina and held by citizens of North Carolina, and derived a benefit through the use and control of monies transferred from North Carolina.

23.     Alternatively, this Court has personal jurisdiction over Bay Cities pursuant to N.C. Gen. Stat. § 1-75.4 in that Bay Cities is engaged in substantial

11

interstate activity which includes North Carolina, performed services for citizens residing in North Carolina, originated debit entries from bank accounts located in North Carolina and held by citizens of North Carolina, facilitated payments to Out-of-State Payday Lenders from bank accounts located in North Carolina and held by citizens of North Carolina, and derived a benefit through the use and control of monies transferred from North Carolina.

24.     Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and because BMO, Four Oaks, Generations and Bay Cities are subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

25.     A payday loan is a short-term (typically a matter of weeks), high-fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck.  A borrower obtaining a payday loan must either provide a personal check to the lender or an authorization to electronically debit the borrower's deposit account for the loan amount and associated fee as security for the loan.  If the borrower does not repay the loan or make arrangements to extend the loan, the lender can deposit the borrower's check or initiate an electronic withdrawal from the borrower's deposit account.

12

26.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

27.     Payday loans feature exorbitant interest rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

28.     If a borrower is unable to repay the full amount of the loan on the due date, the lender typically gives the borrower the option to "roll over" the loan balance by paying another "fee," usually equal to the initial fee at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

29.      Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

30.     For these and other reasons, North Carolina and twelve other states and the District of Columbia have outlawed payday loans.

31.     Prior to 1997, payday lending was illegal within the state of North Carolina.  Payday lending became lawful upon the 1997 enactment of former N.C.

Gen. Stat. § 53-281. Former N.C. Gen. Stat. § 53-281 contained a July 31, 2001 expiration date or "sunset." On July 31, 2001, the General Assembly enacted a one month extension of the expiration date or "sunset" of N.C. Gen. Stat. § 53-281.

32. After expiration of the one month extension, N.C. Gen. Stat. § 53-281 was not re-enacted nor was its expiration date further extended. Thus, the North Carolina General Assembly affirmatively refused to renew authorization for payday lending and the legal authority for payday lending within the state of North Carolina expired on August 31, 2001.

33. Regulation of consumer loans is addressed in Chapter 24 of the General Statutes, N.C. Gen. Stat. § 24-1.1, and the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq.*

34. Pursuant to N.C. Gen. Stat. § 24-1.1, the maximum allowable rate of interest on consumer loans of $25,000 or less for a 31-day loan is the greater of sixteen percent (16%), or six percent (6%) above the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity. Additionally, under the North Carolina Consumer Finance Act, a consumer lender may not charge interest "greater than permitted by Chapter 24" on loans of $15,000 or less without first obtaining a license from the North Carolina Commissioner of Banks. N.C. Gen. Stat. §§ 53-166 and 53-168. Therefore, if an unlicensed lender charges a rate of interest on a small loan greater than the rates set forth above, it is

in violation of both the Consumer Finance Act and Chapter 24's prohibitions on usury.

35.    Out-Of-State Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process.  This scheme could not have been accomplished without the complicity of Defendants who provide Out-Of-State Payday Lenders with access to the ACH Network.

## The ACH Network

36.    The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.  Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

37.    The ACH Network processes two types of transactions: Direct Deposits via ACH and Direct Payments via ACH.  Direct Deposit via ACH is the deposit of funds for payroll, employee expense reimbursement, government benefits, tax and other refunds, and annuities and interest payments.  It includes any ACH credit payment from a business or government to a consumer.

38.    "Direct Payment" is the use of funds to make a payment via ACH. Individuals or organizations can make a Direct Payment via ACH as either an ACH credit or ACH debit.  A Direct Payment processed as an ACH credit puts funds into an account. An example of this is when a consumer initiates a payment through his/her bank or credit union to pay a utility bill.  A Direct Payment processed as an ACH debit takes funds from the customer's account and transfers those funds to the utility company's account.

39.    In 2012, the ACH Network processed more than 21 billion transactions, with a total dollar value of $36.9 trillion.  That year, the ACH Network processed 9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

40.    Rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve.  BMO is a "Direct Financial Institution Member of NACHA" and influences the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives. As a Direct Financial Institution Member of NACHA, BMO is eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

16

41.     An ACH transaction takes place in many steps.  First, an accountholder (called a "Receiver") authorizes a transaction with a merchant—the business or person providing a good or service.  That merchant (called an "Originator") then communicates the purported authorization to its ODFI.  The ODFI is a bank and a member of the ACH Network.  The ODFI then "originates" the ACH debit or credit through the pass-through "ACH Operator" to the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

42.     There are also "Third-Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

43.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

44.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

45.     NACHA Rules also require specific responsibilities for ODFIs, as discussed below.

## ODFIs Have Special Duties under NACHA Operating Rules and Guidelines

46.     NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator – such as Out-Of-State Payday Lenders – to initiate debit entries on the ACH Network, NACHA operating rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA 2012 Operating Rules, Section 2.2, Subsection 2.2.1.

18

47. An ODFI undertakes critical responsibilities under the NACHA Rules that reflect the reliance of the ACH Network on appropriate underwriting and monitoring of Originators by ODFIs.

48. Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules." NACHA 2012 Operating Rules, Section 2.1.

49. NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk." *See* NACHA Operating Guidelines, Chapter 4.

50. The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries." NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

51. When an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that—among other things—the entry has been properly authorized. NACHA 2012 Operating Rules Section 2.4, Subsection 2.4.1.1 (a).

52.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Out-Of-State Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.  NACHA 2012 Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

53.     Further, Subsection 2.2.1.1-2 of the NACHA Rules requires ODFIs to enter into a written agreement with every Third-Party Sender or Originator for whom they originate ACH entries.  That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

54.     Further, ODFIs have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle. NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

55.     On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:  "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its

name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, among other things, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.' **If a purported authorization is invalid under applicable law, it does not meet this standard**." (Emphasis added).

56.     NACHA went on to say: "Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs, among other things, should (i) exercise appropriate risk-based diligence when bringing on new Originators and Third Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action. For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities."

57.     The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

58.     In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Out-Of-State Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

## The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties

59.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

60.     On February 25, 2005, the FDIC issued guidance regarding payday lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders initiate through Third-Party Senders.  The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

61.     On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk"  which began by noting that:

An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks arising from such relationships, to the same extent as if the activity were handled within the institution.

62.     Among the risks to banks the FDIC identified in its June 6, 2008

"Guidance for Managing Third-Party Risk" was:

Compliance risk.  Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards. This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . .Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

63.     Accordingly, the FDIC advises banks to engage in "Due Diligence in

Selecting a Third Party"

Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program.  The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course

23

of the relationship, particularly when considering a
renewal of a contract.

\*\*\*\*\*

Comprehensive due diligence involves a review of all
available information about a potential third party,
focusing on the entity's financial condition, its specific
relevant experience, its knowledge of applicable laws and
regulations, its reputation, and the scope and effectiveness
of its operations and controls.

64.     On January 31, 2012, the FDIC issued revised guidance describing

potential risks associated with relationships with third-party entities that process

payments for telemarketers, online businesses, and other merchants.  In a footnote

to the guidance, the FDIC provided, "[e]xamples of telemarketing, online

businesses, and other merchants that may have a higher incidence of consumer

fraud or potentially illegal activities or may otherwise pose elevated risk" which

included "payday  or subprime loans."

65.     The FDIC advised banks that:

 . . . payment processors that deal with telemarketing and
online merchants may have a higher risk profile because
such entities have tended to display a higher incidence of
consumer fraud or potentially illegal activities than some
other businesses. Given this variability of risk, payment
processors must have effective processes for verifying
their merchant clients' identities and reviewing their
business practices. Payment processors that do not have
such processes can pose elevated money laundering and
fraud risk for financial institutions, as well as legal,
reputational, and compliance risks if consumers are
harmed.

24

66. The FDIC made clear that banks faced potential liability if they failed to adequately manage their relationships with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers. These include increased operational, strategic, credit, compliance, and transaction risks. In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices. ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.*** In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act. (Emphasis added.)

### The OCC Has Issued Guidance to All Banks On Managing the Risks of ACH Activity

67. The OCC supervises national banks.

68. On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "National banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

25

69. The guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-Risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

70. In a footnote to the guidance, the OCC made the risk to banks even clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's reputation *when originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added).

71. On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity initiated by Third-Party Processors, cautioning that:

Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. *Banks that do not have the appropriate controls to*

26

*address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity*. (Emphasis added)

72.     The guidance reminded banks that they:

 . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.

*****

By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

73.     The guidance concludes that:

The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue.  However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities.  At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and

27

monitor processor relationships for activity indicative of fraud.

**Defendants Knew the Out-Of-State Payday Lenders Were Engaged In Unlawful Activities**

74.     At the time Defendants originated the entries on the ACH Network referenced herein, they knew the identity of the Out-Of-State Payday Lenders, they knew the lenders were engaged in the business of making payday loans, and they knew the Out-Of-State Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

75.     Characteristics of Out-Of-State Payday Lender transactions themselves also notified ODFIs of unlawful activity.

76.     Whether ODFIs contract with Out-Of-State Payday Lenders or their Third-Party Senders, ACH debits originated at the request of Out-Of-State Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

77.     Chief among these "red flags" are high return rates on ACH debit transactions.  An ACH debit transaction may be returned for numerous reasons including, *inter alia¸* the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

78.     ACH debits originated at the request of the Out-Of-State Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

28

79.     On May 20, 2013, Bay Cities entered into a Consent Order with the FDIC in which it consented to, *inter alia*, the "termination of its ACH origination activity for all TPPP relationships and their associated accountholders, customers, and clients."

80.     Bay Cities also consented in the Order that it would:

> Within 90 days from the effective date of this ORDER, the Bank shall review, enhance, and implement its ACH Risk and Credit Policy, which shall address the criticisms enumerated in the Report. The ACH Risk and Credit Policy shall include specific parameters for reviewing Bank customer activities, including but not limited to:
>
> (i)     Transaction volume;
>
> (ii)    Expected payment characteristics;
>
> (iii)   ***Acceptable levels of returns*** for each type of Standard Entry Code; (emphasis added).

## FACTS AS TO PLAINTIFF JAMES DILLON

81.     On or about December 10, 2012, Plaintiff applied for and received a payday loan in the amount of $500 from Great Plains by completing an application on the www.greatplainslending.com website.  As part of the application process, Plaintiff authorized Great Plains to debit his checking account with Wells Fargo in order to repay the loan.

82.     On or about January 2, 2013, January 15, 2013, and January 29, 2013, Great Plains initiated debit transactions in the amount of $109.05 from Plaintiff's

checking account in North Carolina through the ACH Network. The ODFI originating these transactions was Defendant BMO.

83. On or about February 12, 2013, Great Plains initiated a debit transaction of $564.11 from Plaintiff's checking account in North Carolina through the ACH Network in order to pay off the loan. The ODFI originating this transaction was Defendant BMO.

84. As a result, Plaintiff paid $891.26 in a period of approximately 9 weeks to satisfy a $500 loan. Thus, the annual percentage rate on the loan was in excess of 400%.

85. On or about December 10, 2012, Plaintiff applied for and received a payday loan in the amount of $300 from USFastCash by completing an application on the www.usfastcash.com website. As part of the application process, Plaintiff authorized USFastCash to debit his checking account with Wells Fargo in order to repay the loan.

86. On or about December 28, 2012 and January 28, 2013, USFastCash originated debit transactions in the amount of $90 for Plaintiff's checking account in North Carolina through the ACH Network. The ODFI originating these transactions was Defendant Bay Cities.

87. On or about February 12, 2013, USFastCash originated a debit transaction of $390 for Plaintiff's checking account in North Carolina through the

30

ACH Network in order to pay off the loan. The ODFI originating this transaction was Defendant Bay Cities.

88.     As a result, Plaintiff paid $570 in a period of approximately 9 weeks to satisfy a $300 loan. Thus, the annual percentage rate on the loan was in excess of 500%.

89.     On or about December 14, 2012, Plaintiff applied for and received a payday loan in the amount of $250 from a website affiliated with or operated by Vin Capital LLC. As part of the application process, Plaintiff authorized Vin Capital LLC, or an affiliate company, to debit his checking account with Wells Fargo in order to repay the loan.

90.     On or about January 15, 2013, January 29, 2013, and February 12, 2013, Vin Capital LLC initiated debit transactions in the amount of $75 from Plaintiff's checking account in North Carolina through the ACH Network. The ODFI originating these transactions was Defendant Bay Cities.

91.     On or about February 12, 2013, Vin Capital LLC initiated a debit transaction of $250 from Plaintiff's checking account in North Carolina through the ACH Network in order to pay off the loan. The ODFI originating this transaction was Defendant Bay Cities.

92.     As a result, Plaintiff paid $475 in a period of less than 9 weeks to satisfy a $250 loan.  Thus, the annual percentage rate on the loan was in excess of 500%.

93.     On or about December 26, 2012, Plaintiff applied for and received a payday loan in the amount of $305 from White Hills Cash by completing an application on the www.whitehillscash.com website.  As part of the application process, Plaintiff authorized White Hills Cash to debit his checking account with Wells Fargo in order to repay the loan.

94.     On or about January 10, 2013, January 24, 2013, and February 7, 2013, White Hills Cash initiated debit transactions in the amount of $91.50 from Plaintiff's checking account in North Carolina through the ACH Network.  The ODFI originating these transactions was Defendant Four Oaks.

95.     On or about February 12, 2013, White Hills Cash initiated a debit transaction of $331.12 from Plaintiff's checking account in North Carolina through the ACH Network in order to pay off the loan.  The ODFI originating this transaction was Defendant Four Oaks.

96.     As a result, Plaintiff paid $605.62 in a period of approximately 7 weeks to satisfy a $305 loan.  Thus, the annual percentage rate on the loan was in excess of 700%.

97.     On or about May 30, 2013, Plaintiff applied for and received a payday loan in the amount of $2,525 from Western Sky by completing an application on the www.westernsky.com website.  As part of the application process, Plaintiff authorized Western Sky to debit his checking account with Wells Fargo in order to repay the loan.

98.     On information and belief, amid mounting pressure from state and federal regulators, Western Sky either sold Plaintiff's debt to CashCall, or began collecting Plaintiff's debt through CashCall as an affiliated entity.  Plaintiff did not authorize CashCall to debit his checking account with Wells Fargo.

99.     Pursuant to Plaintiff's agreement with Western Sky, the finance charge on the loan was $11,332.12.  The entirety of the interest plus principal, which equaled $13,859.12, was due to be paid over the course of 46 months.  The nominal annual interest rate on the loan was set forth in the agreement as 139.02%.

100.    On or about July 1, 2013, CashCall initiated a debit transaction in the amount of $313.96 from Plaintiff's checking account in North Carolina through the ACH Network.  The ODFI originating this transaction was Defendant Generations.

101.    On or about August 2, 2013, and September 20, 2013, CashCall initiated debit transactions in the amount of $294.46 from Plaintiff's checking account in North Carolina through the ACH Network.  The ODFI originating these transactions were Defendant Generations.

33

102.   CashCall has subsequently sold Plaintiff's debt to another third-party collection company which continues to initiate unauthorized debits from Plaintiff's checking account through ACH debit entries originated by Defendant Generations.

103.   Defendants BMO, Four Oaks, Generations and Bay Cities derived a benefit through the receipt of fees for their initiation of debit entries on the ACH Network originated by Great Plains, USFastCash, Vin Capital LLC, White Hills Cash, Western Sky and CashCall, or Third-Party Senders acting on their behalf, and received by Plaintiff.

## CLASS ACTION ALLEGATIONS

104.   <u>Description of the Class and Sub-Class</u>:  Plaintiff brings this class action on behalf of himself and a Class and Sub-Class defined as follows:

    i.    All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by either BMO, Four Oaks, Generations, or Bay Cities as an ODFI on behalf of an Out-Of-State Payday Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit (the "Class").

    ii.    All natural persons within the state of  North Carolina whose accounts were debited via an ACH entry originated by either BMO, Four Oaks, Generations, or Bay Cities as an ODFI on behalf of an Out-Of-State Payday Lender in repayment of a loan which was illegal under North Carolina law (the "Sub-Class").

105.    Excluded from the Class and Sub-Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class and Sub-Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

106.    Numerosity:  The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable pursuant to Fed. R. Civ. P. 23(a)(1).

107.    Common Questions of Law and Fact Predominate:  There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members pursuant to Fed. R. Civ. P. 23(a)(2).  Common questions of fact and law include (a) whether payday loans are usurious and unenforceable under state or federal law; (b) whether debts owed to payday lenders are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate was at least twice the enforceable rate under the law of the states in which class members reside; (d) whether Defendants' collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (e) whether Defendants' collection of the illegal debt was the proximate cause of the Class's injuries; (f) whether the Class and Sub-Class suffered an injury to

35

property by the debiting of their accounts by Defendants; and (g) should the running of the statute of limitations for the Class's claims be equitably tolled.

108. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class pursuant to Fed. R. Civ. P. 23(a)(3). Plaintiff and all members of the Class and Sub-Class have been similarly affected by BMO, Four Oaks, Generations, or Bay Cities' actions.

109. <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class pursuant to Fed. R. Civ. P. 23(a)(4). Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

110. <u>Superiority of Class Action</u>: Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy pursuant to Fed. R. Civ. P. 23(b)(3). Individual joinder of all members of the Class and Sub-Class is impractical. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and

36

expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by BMO**
**(On behalf of the Class and Sub-Class)**

111.   Plaintiff incorporates by reference the preceding paragraphs.

112.   BMO is a "person" as defined by 18 U.S.C. § 1961(3).

113.   The ACH Network is comprised of  the following participants:

    a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

    b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including BMO;

37

c. "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d. "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e. "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f. "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

114. The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact"

enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

  a. Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

  b. To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

  c. The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

115. The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce. BMO is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

116. BMO, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise. Under the NACHA Operating Rules, BMO serves the critical function of "gatekeeper of the ACH Network" and is responsible

for all entries originated through BMO, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf.

117. In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit. Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Operating Rules and state and federal laws.

118. BMO has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a. unenforceable because of state or federal laws against usury;

    b. incurred in connection with the business of lending money at an usurious rate; and

    c. the usurious rate was at least twice the enforceable rate.

40

119.   BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

120.   Pursuant to the fraudulent scheme, BMO participated in the collection of unlawful debts in that:

a.   Out-Of-State Payday Lenders, or Third-party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request

41

of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

121. Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

122. As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by BMO**
**(On behalf of the Class and Sub-Class)**

123. Plaintiff incorporates by reference the preceding paragraphs.

124. BMO and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a. unenforceable because of state or federal laws against usury;

b. incurred in connection with the business of lending money at an usurious rate; and

c. the usurious rate was at least twice the enforceable rate.

125. In furtherance of their agreement, BMO and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a. Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b. BMO agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c. BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

43

126.   Accordingly, BMO intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

127.   As a direct and proximate result of BMO and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

### THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by Four Oaks
### (On behalf of the Class and Sub-Class)

128.   Plaintiff incorporates by reference the preceding paragraphs.

129.   Four Oaks is a "person" as defined by 18 U.S.C. § 1961(3).

130.   The ACH Network is comprised of the following participants:

a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI

44

agreement with its customers and agree to abide by the NACHA Operating Rules, including Four Oaks;

c.      "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

131.  The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. §
1961(4) as an association of multiple legal entities operating under NACHA.
Alternatively, participants in the ACH network constitute an "association-in-fact"
enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**)
in that:

    a.    Participants in the ACH Enterprise share a common purpose of
facilitating large volume batch processing of electronic
payments (credit and debit transactions) for and between
participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH
Enterprise preserve close business relationships and maintain
established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is
still ongoing, and has longevity sufficient to permit the
participants to achieve their common purpose.

132.  The ACH Enterprise is an enterprise engaged in and whose activities,
including daily volume batch processing of electronic payments across the United
States, affect interstate commerce.  Four Oaks is associated with the ACH
Enterprise through its role as an ODFI within the ACH Enterprise.

133. Four Oaks, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise. Under the NACHA Operating Rules, Four Oaks serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Four Oaks, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

134. In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit. Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Operating Rules and state and federal laws.

135. Four Oaks has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.     unenforceable because of state or federal laws against usury;

47

b.      incurred in connection with the business of lending money at an usurious rate; and

c.      the usurious rate was at least twice the enforceable rate.

136.    Four Oaks, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

137.    Pursuant to the fraudulent scheme, Four Oaks engaged in the collection of unlawful debts in that:

a.      Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.      Four Oaks then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.      Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia,

48

Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states at the request of the Out-Of-State Payday Lenders in

violation of 18 U.S.C. §1962(c).

138.   Accordingly, Four Oaks has directly and indirectly conducted and

participated in the conduct of the affairs of the ACH Enterprise through the

collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

139.   As a direct and proximate result of Four Oaks' violations of 18 U.S.C.

§ 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in

their property by the debiting of their bank accounts by Four Oaks and such injury

was reasonably foreseeable.

### FOURTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by Four Oaks
### (On behalf of Class and Sub-Class)

140.   Plaintiff incorporates by reference the preceding paragraphs.

141.   Four Oaks and Out-Of-State Lenders, or Third-Party Senders acting on

their behalf, reached an agreement to use their respective roles within the ACH

Enterprise to facilitate payday loans to consumers residing in states that banned the

practice and collect usurious interest rates in violation of state law.  Their endeavor,

49

if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

142.   In furtherance of their agreement, Four Oaks and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.    Four Oaks agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.    Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

143. Accordingly, Four Oaks intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

144. As a direct and proximate result of Four Oaks and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Four Oaks and such injury was reasonably foreseeable.

## FIFTH CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(c) by Generations
## (On behalf of the Class and Sub-Class)

144. Plaintiff incorporates by reference the preceding paragraphs.

145. Generations is a "person" as defined by 18 U.S.C. § 1961(3).

146. The ACH Network is comprised of the following participants:

    a. "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

51

b.      "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including Generations;

c.      "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with

the Originator, and the ODFI's ACH agreement is with the
Third-Party Sender and not the Originator.

147.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. §
1961(4) as an association of multiple legal entities operating under NACHA.
Alternatively, participants in the ACH network constitute an "association-in-fact"
enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**)
in that:

a.      Participants in the ACH Enterprise share a common purpose of
facilitating large volume batch processing of electronic
payments (credit and debit transactions) for and between
participating depository financial institutions;

b.      To achieve this common purpose, participants in the ACH
Enterprise preserve close business relationships and maintain
established and defined roles within the enterprise;

c.      The ACH Enterprise has been in existence for many years, is
still ongoing, and has longevity sufficient to permit the
participants to achieve their common purpose.

148.   The ACH Enterprise is an enterprise engaged in and whose activities,
including daily volume batch processing of electronic payments across the United

53

States, affect interstate commerce.  Generations is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

149.   Generations, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, Generations serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Generations, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

150.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Operating Rules and state and federal laws.

151.   Generations has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states

54

in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.     unenforceable because of state or federal laws against usury;

    b.     incurred in connection with the business of lending money at an usurious rate; and

    c.     the usurious rate was at least twice the enforceable rate.

152.   Generations, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

153.   Pursuant to the fraudulent scheme, Generations engaged in the collection of unlawful debts in that:

    a.     Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.     Generations then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c. Generations knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

154. Accordingly, Generations has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

155. As a direct and proximate result of Generations' violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Generations and such injury was reasonably foreseeable.

**SIXTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by Generations**
**(On behalf of Class and Sub-Class)**

156. Plaintiff incorporates by reference the preceding paragraphs.

157. Generations and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH

56

Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

  a.  unenforceable because of state or federal laws against usury;

  b.  incurred in connection with the business of lending money at an usurious rate; and

  c.  the usurious rate was at least twice the enforceable rate.

158.  In furtherance of their agreement, Generations and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

  a.  Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

  b.  Generations agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

  c.  Generations knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and

unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

159.   Accordingly, Generations intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

160.   As a direct and proximate result of Generations and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Generations and such injury was reasonably foreseeable.

### SEVENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by Bay Cities
### (On behalf of the Class and Sub-Class)

161.   Plaintiff incorporates by reference the preceding paragraphs.

162.   Bay Cities is a "person" as defined by 18 U.S.C. § 1961(3).

163.   The ACH Network is comprised of  the following participants:

a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including Bay Cities;

c.   "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.   "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the

59

processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

164. The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a. Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b. To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c. The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

60

165.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  Bay Cities is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

166.   Bay Cities, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, Bay Cities serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Bay Cities, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

167.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Operating Rules and state and federal laws.

168.   Bay Cities has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party

Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

169. Bay Cities, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

170. Pursuant to the fraudulent scheme, Bay Cities engaged in the collection of unlawful debts in that:

    a.    Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.      Bay Cities then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.      Bay Cities knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

171.    Accordingly, Bay Cities has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

172.    As a direct and proximate result of Bay Cities' violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Bay Cities and such injury was reasonably foreseeable.

63

## EIGHTH CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by Bay Cities
## (On behalf of Class and Sub-Class)

173.   Plaintiff incorporates by reference the preceding paragraphs.

174.   Bay Cities and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

175.   In furtherance of their agreement, Bay Cities and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

64

b.    Bay Cities agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.    Bay Cities knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

176.   Accordingly, Bay Cities intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

177.   As a direct and proximate result of Bay Cities and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Bay Cities and such injury was reasonably foreseeable.

## NINTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of North Carolina Usury Statute
### (On Behalf of the Sub-Class)

178.   Plaintiff incorporates by reference the preceding paragraphs.

179.   Pursuant to N.C. Gen. Stat. § 24-1.1, the maximum allowable rate of interest on consumer loans of $25,000 or less for a 31-day loan is the greater of sixteen percent (16%), or six percent (6%) above the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity.

180.   The Out-Of-State Payday Lenders made loans to Plaintiff and members of the Sub-Class with an understanding that the money owed would be paid, and the interest charged would be at a rate greater than allowed by North Carolina law.  As set forth more fully above and incorporated by reference herein, the Out-Of-State Payday Lenders made loans to Plaintiff and members of the Sub-Class featuring interest in excess of 16% for a 31-day loan, in violation of N.C. Gen. Stat. § 24-1.1.

181.   By intentionally charging more for money lent than allowed by North Carolina law, Out-Of-State Payday Lenders had a corrupt intent to receive more in interest than the legal rate permits for use of the money loaned.

182.   BMO, Four Oaks, Generations, and Bay Cities aided and abetted the Out-Of-State Payday Lenders' violations of the North Carolina usury law by providing the necessary access to the ACH Network to carry out the Out-Of-State

66

Payday Lenders' illegal scheme and then originating debit entries on behalf of the Out-Of-State Payday Lenders that Defendants knew were in violation of the NACHA Operating Rules and FDIC and OCC guidelines.

183.   In providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

184.   At the time Defendants provided the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

185.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

186.   Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

187.   As a result of Defendants' conduct, the Sub-Class was harmed. Pursuant to N.C. Gen. Stat. § 24-2, Plaintiff and members of the Sub-Class are entitled to recover twice the amount of interest paid on all payday loans made by Out-Of-State Payday Lenders, and are entitled to a release from any further obligation to make payments to Out-Of-State Payday Lenders on outstanding loans.

188.   As a result of BMO, Four Oaks, Generations, and Bay Cities' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the North Carolina usury law referenced herein.

## TENTH CLAIM FOR RELIEF
## Violations of the North Carolina Consumer Finance Act
### (On Behalf of the Sub-Class)

189.   Plaintiff incorporates by reference the preceding paragraphs.

190.   The North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq*., prohibits persons from being engaged in the "business of lending" loans of less than $15,000 except pursuant to a license issued by the North Carolina Commissioner of Banks.  N.C. Gen. Stat. § 53-166(a).

191.   Since August 31, 2001, Great Plains, USFastCash, Vin Capital LLC, White Hills Cash, Western Sky and CashCall have been engaged in the "business of lending" loans of less than $15,000 within the state of North Carolina.  During that time, none of the foregoing Out-Of-State Payday Lenders have been licensed by the North Carolina Commissioner of Banks.

192.   N.C. Gen. Stat. § 53-166(b) is entitled "Evasions" and provides: "The provisions of subsection (a) of this section shall apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever."  The North Carolina Consumer Finance Act defines "Person" to include "any person, firm, partnership, association or corporation."  N.C. Gen. Stat. § 53-165.

193.   BMO, Four Oaks, Generations, and Bay Cities are "persons" under the Act and have each sought to avoid the provisions of N.C. Gen. Stat. § 53-166(a) by originating debit entries from bank accounts located in North Carolina and held by citizens of North Carolina on the ACH Network that BMO, Four Oaks, Generations, and Bay Cities knew were originated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) operating without a license in North Carolina.

194.   Additionally, BMO, Four Oaks, Generations, and Bay Cities have each sought to avoid the provisions of N.C. Gen. Stat. § 53-166(a) by providing the necessary access to the ACH Network to allow Out-Of-State Payday Lenders to collect loans in North Carolina without a license and then originating debit entries on behalf of the Out-Of-State Payday Lenders that BMO, Four Oaks, Generations, and Bay Cities knew were in violation of the NACHA Operating Rules and FDIC and OCC guidelines.

195.   As a result of BMO, Four Oaks, Generations, and Bay Cities' violations of the North Carolina Consumer Finance Act, the Sub-Class has been harmed in that Out-Of-State Payday Lenders have charged fees not permitted because of its lack of licensure.

196.   Defendants have each sought to avoid the provisions of N.C. Gen. Stat. § 53-166(a) by providing the necessary access to the ACH Network to allow Out-

Of-State Payday Lenders' to collect loans in North Carolina despite being unlicensed and then originating debit entries on behalf of the Out-Of-State Payday Lenders that Defendants knew were in violation of the NACHA Operating Rules and FDIC and OCC guidelines.

197. Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures. But for Defendants' substantial assistance in originating debits from the checking accounts of consumers located in North Carolina, and agreements with the Out-Of-State Payday Lenders or Third-Party Senders operating on their behalf to do the same, Out-Of-State Payday Lenders would not have been able to avoid application of N.C. Gen. Stat. § 53-166(a) and circumvent North Carolina law in order to make unlicensed loans within the state.

198. As a result of BMO, Four Oaks, Generations, and Bay Cities' knowing violations of the North Carolina Consumer Finance Act referenced herein, the Sub-Class is entitled to recover back all amounts which were received by BMO, Four Oaks, Generations, and Bay Cities in connection with loans made by unlicensed lenders that were originated by BMO, Four Oaks, Generations, and Bay Cities pursuant to N.C. Gen. Stat. § 53-166(d)'s provision that any party in violation of the Act "shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan."

# ELEVENTH CLAIM FOR RELIEF
## Aiding and Abetting Violations of the North Carolina Consumer Finance Act
### (On Behalf of the Sub-Class)

199.   Plaintiff incorporates by reference the preceding paragraphs.

200.   The North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq*., prohibits persons from being engaged in the "business of lending" loans of less than $15,000 except pursuant to a license issued by the North Carolina Commissioner of Banks.  N.C. Gen. Stat. § 53-166(a).

201.   Since August 31, 2001, Great Plains, USFastCash, Vin Capital LLC, White Hills Cash, Western Sky and CashCall have been engaged in the "business of lending" loans of less than $15,000 within the state of North Carolina.  During that time, none of the foregoing Out-Of-State Payday Lenders have been licensed by the North Carolina Commissioner of Banks.

202.   N.C. Gen. Stat. § 53-166(b) is entitled "Evasions" and provides: "The provisions of subsection (a) of this section shall apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever."  Out-Of-State Payday Lenders are not only in direct violation of N.C. Gen. Stat. § 53-166(a), but have sought to avoid the application of the North Carolina Consumer Finance Act by operating through the Internet.

203.   As a result of the Out-Of-State Payday Lenders' violations of the North Carolina Consumer Finance Act, the Sub-Class has been harmed in that Out-

71

Of-State Payday Lenders have charged fees not permitted because of its lack of licensure. Pursuant to N.C. Gen. Stat. § 53-166(d), persons in violation of the North Carolina Consumer Finance Act may not retain "any principal or charges whatsoever with respect to such loan."

204. Defendants have aided and abetted the Out-Of-State Payday Lenders' violations of the North Carolina Consumer Finance Act by providing the necessary access to the ACH Network to allow Out-Of-State Payday Lenders' to collect loans in North Carolina despite being unlicensed and then originating debit entries on behalf of the Out-Of-State Payday Lenders that Defendants knew were in violation of the NACHA Operating Rules and FDIC and OCC guidelines.

205. In providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the unlicensed Out-Of-State Payday Lenders within the state of North Carolina.

206. At the time Defendants provided the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity of making loans within the state of North Carolina without a license.

207.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans made by unlicensed payday lenders within the state of North Carolina.

208.   Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.  But for Defendants' substantial assistance in originating debits from the checking accounts of consumers located in North Carolina, and agreements with the Out-Of-State Payday Lenders or Third-Party Senders operating on their behalf to do the same, Out-Of-State Payday Lenders would not have been able to circumvent North Carolina law in order to make unlicensed loans within the state.

209.   As a result of BMO, Four Oaks, Generations, and Bay Cities' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the North Carolina Consumer Finance Act referenced herein, and the Sub-Class is entitled to recover back from Defendants all amounts which Defendants have received in connection with aiding and abetting Out-Of-State Payday Lenders' unlawful loans in North Carolina.

## TWELFTH CLAIM FOR RELIEF
### Violations of North Carolina Unfair Trade Practices Act
**(On Behalf of the Sub-Class)**

210.   Plaintiff incorporates by reference the preceding paragraphs.

211. North Carolina's Unfair and Deceptive Trade Practices Act (the "UDTPA") makes unlawful "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

212. Defendants committed multiple unfair or deceptive acts within the state of North Carolina by facilitating usurious loan collection practices that the state of North Carolina has declared immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, including:

    a.   Facilitating payday loans made to persons residing in North Carolina after the law authorizing payday lending expired;

    b.   Originating debit entries from bank accounts located in North Carolina and held by citizens of North Carolina on the ACH Network that Defendants knew were originated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) operating without a license in violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq*.;

    c.   Originating debit entries from bank accounts located in North Carolina and held by citizens of North Carolina on the ACH Network that Defendants knew were usurious loan payments in violation of N.C. Gen. Stat. § 24-1.1 and the public policy of

North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws;

d. Originating debit entries from bank accounts located in North Carolina and held by citizens of North Carolina on the ACH Network that Defendants knew were in violation of the NACHA Operating Rules and FDIC and OCC guidelines; and

e. Intentionally disregarding disproportionly high return rates on ACH debits initiated by Out-Of-State Payday Lenders from bank accounts located in North Carolina and held by citizens of North Carolina that should have alerted Defendants to potential unlawful activity.

213. With the sunset of N.C. Gen. Stat. § 53-281, payday lending is no longer authorized under North Carolina law, and the foregoing practices are contrary to North Carolina's public policy. Nevertheless, Defendants willfully facilitated payday loans to North Carolina consumers in order to collect ODFI fees for originating debit entries initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) on the ACH Network.

214. These practices, including originating debit entries from bank accounts located in North Carolina and held by citizens of North Carolina on the ACH Network, affect commerce in North Carolina and nationwide.

215.   Defendants' participation in the unfair or deceptive practices set forth above proximately caused actual injury to Plaintiff and members of the Sub-Class who are entitled to recover all fees or interest paid in connection with Out-Of-State Payday Lender loans in North Carolina.  But for Defendants' origination of debit entries from the bank accounts of consumers located in North Carolina, and agreements with the Out-Of-State Payday Lenders or Third-Party Senders operating on their behalf to do the same, Out-Of-State Payday Lenders would not have been able to make unlawful and usurious payday loans to North Carolina consumers.

216.   As a result of BMO, Four Oaks, Generations, and Bay Cities' willful violations of the UDTPA, Plaintiff and members of the Sub-Class are entitled to recover all fees or interest paid in connection with Out-Of-State Payday Lender loans in North Carolina, permanent injunctive relief as set forth below, and are further entitled to treble damages and attorneys' fees pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1.

## THIRTEENTH CLAIM FOR RELIEF
## Money Had and Received Against All Defendants
## (On behalf of the Sub-Class)

217.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

218.   Plaintiffs incorporate by reference the preceding paragraphs.

219.   Defendants BMO, Four Oaks, Generations, and Bay Cities received funds belonging to Plaintiff and the Sub-Class.

220.   Defendants BMO, Four Oaks, Generations, and Bay Cities' receipt of money belonging to Plaintiff and the Sub-Class was improper because the money represented repayments of debts that were illegal and unenforceable.

221.   Defendants BMO, Four Oaks, Generations, and Bay Cities benefited from receipt of the funds.

222.   Plaintiff and the Sub-Class are entitled to return of the funds received by BMO, Four Oaks, Generations, and Bay Cities.

223.   Because the funds received from Plaintiff and the Sub-Class are, upon information and belief, no longer in the possession of BMO, Four Oaks, Generations, and Bay Cities, Plaintiffs have a right to restitution at law from BMO, Four Oaks, Generations, and Bay Cities.

<u>**FOURTEENTH CLAIM FOR RELIEF**</u>
<u>**Unjust Enrichment**</u>
**(On Behalf of the Sub-Class)**

224.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

225.   BMO, Four Oaks, Generations and Bay Cities in their roles as ODFIs, originated debit entries on the ACH Network initiated by Out-Of-State Payday

Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

226.   Defendants charged and retained a transaction fee for each debit entry they originated on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

227.   Plaintiff and the Sub-Class conferred a benefit on Defendants, consciously accepted by Defendants, that was not conferred gratuitously. Defendants received and retained wrongful benefits from Plaintiff and the Sub-Class in the form of such transaction fees.

228.   As a result of Defendants' wrongful conduct as alleged herein Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Sub-Class.

229.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

230.   It is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from originating debit entries on the ACH Network originated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf).  Defendants' retention of such

funds under circumstances making it inequitable to do so constitutes unjust enrichment.

231.   The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Sub-Class.  Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Sub-Class all wrongful or inequitable proceeds received from them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BMO, Four Oaks, Generations and Bay Cities traceable to Plaintiff and the members of the Sub-Class.

232.   Plaintiff and members of the Sub-Class have no adequate remedy at law.

**FIFTEENTH CLAIM FOR RELIEF**
**Permanent Injunctive Relief**
**(On behalf of the Class and Sub-Class)**

233.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

234.   Defendants BMO, Four Oaks, Generations, and Bay Cities should be enjoined and prohibited from serving as the ODFI for Out-Of State Payday Lenders and directed to immediately credit to all Out-Of-State Payday Lender borrowers, any money it has debited from borrowers' accounts but has not yet remitted to Out-Of-State Payday Lenders.

79

**WHEREFORE**, Plaintiff on her behalf and on behalf of the Class and Sub-Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a) Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(b) Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(c) Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Four Oaks for Four Oak's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which Four Oaks was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(d)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Four Oaks for Four Oaks' violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which Four Oaks was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(e)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Generations for Generations' violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which Generations was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(f)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Generations for Generations' violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which Generations was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(g)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Bay Cities for Bay Cities' violations

81

of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which Bay Cities was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(h) Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Bay Cities for Bay Cities' violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which Bay Cities was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(i) Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the North Carolina usury law;

(j) Awarding the Sub-Class damages against all Defendants for their violations of the North Carolina Consumer Finance Act;

(k) Awarding the Sub-Class damages against all Defendants as aiders and abettors to Out-Of-State Payday Lenders' violations of the North Carolina Consumer Finance Act;

(l) Awarding the Sub-Class damages against all Defendants for their violations of the North Carolina Unfair Trade Practices Act;

(m)     Permitting each member of the Sub-Class to recover damages in restitution *at law* from all Defendants consisting of a refund of every ACH debit from their account in which Defendants were the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender;

(n)     Compelling BMO, Four Oaks, Generations, and Bay Cities to disgorge in a common fund for the benefit of Plaintiffs and members of the Sub-Class all wrongful or inequitable proceeds received from them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BMO, Four Oaks, Generations, and Bay Cities traceable to Plaintiffs and the members of the Sub-Class;

(o)     Granting a permanent injunction enjoining and prohibiting BMO, Four Oaks, Generations and Bay Cities from serving as the ODFI for Out-Of-State Payday Lenders and directing BMO, Four Oaks, Generations and Bay Cities to immediately credit to all Out-Of-State Payday Lenders' borrowers, any money they have  debited from borrowers' accounts but have not yet remitted to Out-Of-State Payday Lenders;

(p)     Awarding Plaintiff attorneys' fees and costs in pursuing this

        action; and

(q)     Awarding such other and further relief as this Court deems just,

        proper and equitable.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in the instant action.

Dated:  October 8, 2013                 Respectfully submitted,

                                        /s/ F. Hill Allen
                                        F. Hill Allen
                                        North Carolina State Bar No. 18884
                                        E-mail:  hallen@tharringtonsmith.com
                                        **THARRINGTON SMITH, L.L.P.**
                                        P.O. Box 1151
                                        Raleigh, NC 27602-1151
                                        Telephone:  919-821-4711
                                        Facsimile:   919-829-1583

                                        **STUEVE SIEGEL HANSON LLP**
                                        Norman E. Siegel
                                        Steve Six
                                        J. Austin Moore
                                        460 Nichols Road, Suite 200
                                        Kansas City, MO 64112
                                        Tel:    (816) 714-7100
                                        Fax:   (816) 714-7101
                                        siegel@stuevesiegel.com
                                        six@stuevesiegel.com
                                        moore@stuevesiegel.com

                                        **CHITWOOD HARLEY HARNES LLP**
                                        Darren T. Kaplan
                                        1350 Broadway, Suite 908
                                        New York, NY 10018

84

Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow
Jason H. Alperstein
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel:   (954) 525-4100
Fax:   (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei
Jeffrey D. Kaliel
Anna C. Haac
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel:   (202) 973-0900
Fax:   (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

**Counsel for Plaintiff and the Class**