## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES DILLON, on behalf of     )
himself and all others         )
similarly situated,             )
                             )
         Plaintiff,        )
                             )        1:13cv897
         v.                 )
                             )
BMO HARRIS BANK, N.A., et al.,      )
                             )
         Defendants.       )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiff's Motion to Compel Bay Cities Bank to Produce Documents in Response to Plaintiff's Requests for Arbitration-Related Discovery" (Docket Entry 163) (the "Bay Cities Motion") and "Plaintiff's Motion to Compel Generations Federal Credit Union to Produce Documents in Response to Plaintiff's Requests for Arbitration-Related Discovery" (Docket Entry 161) (the "Generations Motion"). For the reasons that follow, the Court will grant in part and deny in part the Bay Cities Motion and the Generations Motion (collectively, the "Motions to Compel").

## BACKGROUND

On October 8, 2013, Plaintiff James Dillon ("Dillon") filed a class action complaint (the "Complaint") against Generations Federal Credit Union ("Generations"), Bay Cities Bank ("Bay Cities"), and two other banks for their alleged participation in a scheme to collect unlawful debts through the Automated Clearing

House network, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various North Carolina laws. (Docket Entry 1 at 1-2.)[1] The Complaint alleges that Generations and Bay Cities (the "Defendants") enabled certain out-of-state lenders to make and collect payments on payday loans that are illegal under North Carolina law (and the laws of various other states and the District of Columbia). (Id. at 2-4, 12-13, 15, 30-31, 33-34.) According to the Complaint, Generations debited Dillon's North Carolina bank account for payday loan fees and payments on behalf of CashCall, Inc. ("CashCall") and Western Sky Financial, LLC ("Western Sky") and Bay Cities did likewise on behalf of MNE Services, Inc. d/b/a USFastCash ("MNE Services") and Vin Capital LLC. (Id. at 5, 7-9, 30-31, 33-34.) Western Sky and MNE Services each "purportedly operat[ed] as a tribal online payday lender." (Id. at 7-8.)

On July 15, 2015, Generations renewed its motion to dismiss the Complaint, seeking to enforce an arbitration provision in the Western Sky loan agreement underlying Dillon's claims against Generations. (Docket Entry 152 at 2.) Bay Cities similarly moved to compel arbitration and stay litigation under the Federal Arbitration Act (the "FAA") on the basis of the arbitration

---

1 Citations herein to Docket Entry pages utilize the document's internal pagination if unified internal pagination exists. In the absence of such pagination, the Docket Entry page citations utilize the CM/ECF footer's pagination.

provisions in the agreements underlying Dillon's claims against Bay Cities. (Docket Entry 154.) Thereafter, the parties filed a joint motion to permit arbitration-related discovery (Docket Entry 157), which Dillon believed "would allow him to challenge the formation and enforceability of the arbitration agreements at issue and Defendants' right to invoke those agreements" (id. at 2). On August 3, 2015, United States District Judge Catherine C. Eagles authorized the requested discovery (the "Discovery Order"). (Docket Entry 158.)

In accordance with the Discovery Order, Dillon served Requests for Production of Documents (generally, the "Requests," and specifically, the "GRFP" and "BCRFP"), to which Defendants responded. (See Docket Entry 162 at 3; Docket Entry 164 at 3.)[2] The parties conferred regarding the Requests and objections thereto, leading to Dillon's withdrawal and narrowing of certain Requests and Defendants' Amended Responses. (See Docket Entry 162 at 3-4; Docket Entry 164 at 3; Docket Entry 166 at 5.) As part of this conferral process, the parties negotiated over privilege log parameters, but had not reached agreement on that subject before Dillon filed the Motions to Compel. (See Docket Entry 164-4 at 2-3; Docket Entry 165 at 9-10; Docket Entry 165-3 at 1.) Through the Motions to Compel, Dillon seeks to compel production from

---

2  Defendants also served discovery on Dillon. (See Docket Entries 165-1, 165-2; Docket Entry 166-1 at 10-48.)

3

Generations and Bay Cities, which Defendants oppose (see Docket Entries 165, 166).[3]

**DISCUSSION**

I.  Legal Framework

A.  Discovery Standards

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. Generally, therefore, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). Relevancy "essentially involves a determination of how substantively the information requested bears on the issues to be tried." Mills v. East Gulf Coal Preparation Co., LLC, 259 F.R.D. 118, 131 (S.D. W. Va. 2009) (internal quotation marks omitted); see also Cook v. Howard, 484 F. App'x 805, 812 (4th Cir. 2012) ("Relevance is thus the foundation for any request for production, regardless of the individual to whom a request is made.").

Parties must engage in discovery in good faith, without gamesmanship. See Mills, 259 F.R.D. at 130 ("The civil discovery process is to be engaged in cooperatively."); Wagner v. St. Paul

_____

3  To the extent the Motions to Compel challenge objections and responses from Defendants' initial responses that do not appear in Defendants' Amended Responses, the Motions to Compel are moot. The Court will only evaluate live issues in resolving the Motions to Compel.

<u>Fire & Marine Ins. Co.</u>, 238 F.R.D. 418, 422 (N.D. W. Va. 2006) (observing that "[g]amesmanship" in discovery "is not allowed"); M.D.N.C. LR 26.1(b)(1) ("The Court expects counsel to conduct discovery in good faith and to cooperate and be courteous with each other in all phases of the discovery process."). Accordingly, parties must respond with specificity to discovery requests, including by making particularized objections. <u>Hall v. Sullivan</u>, 231 F.R.D. 468, 474 (D. Md. 2005). General or "boilerplate" objections to discovery requests are invalid. <u>See</u> <u>Kinetic Concepts, Inc. v. ConvaTec Inc.</u>, 268 F.R.D. 226, 241 (M.D.N.C. 2010) (collecting cases). Similarly, promising to provide (i) documents "subject to" objections or (ii) only "relevant" documents is improper. <u>Id.</u> at 248-49 (observing that each such response "confuses more than it clarifies" and "hides the ball" (internal quotation marks omitted)). The party opposing discovery generally bears the burden on a motion to compel. <u>Id.</u> at 243-44 (collecting cases).

### B. Common Interest Privilege

Entities with a similar interest in the prosecution or defense of a legal matter can qualify for the common interest privilege, which protects otherwise-privileged communications when shared among the common interest group. <u>See</u> <u>In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129</u>, 902 F.2d 244, 248-49 (4th Cir. 1990). To qualify for this protection, entities do not have to be parties

in the same litigation.  <u>Id.</u> at 249.  Moreover, they do not need a written common interest agreement; a meeting of the minds suffices. <u>American Mgmt. Servs., LLC v. Department of the Army</u>, 703 F.3d 724, 733 (4th Cir.), <u>cert. denied</u>, 134 S. Ct. 62 (2013).  Where the common interest protection applies, it cannot be waived unless all holders of the protection agree to the waiver.  <u>In re Grand Jury Subpoenas, 89-3 & 89-4</u>, 902 F.2d at 248.

C.  Arbitration Principles

Written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A party may move to compel arbitration in accordance with a written arbitration agreement.  9 U.S.C. § 4.  When a party petitions to compel arbitration, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  <u>Id.</u>  Conversely, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."  <u>Id.</u>

In ruling on a petition to compel arbitration or to stay litigation, a "court may consider only issues relating to the making and performance of the agreement to arbitrate."  <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 404 (1967).

6

Therefore, when evaluating the enforceability of arbitration provisions, courts should consider "generally applicable contract defenses, such as fraud, duress, or unconscionability." AT&T Mobility LLC v. Concepcion, 563 U.S. 333,    , 131 S. Ct. 1740, 1746 (2011) (internal quotation marks omitted); see also Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 78 (2010) ("'[Q]uestion[s] of arbitrability' thus include questions regarding the existence of a legally binding and valid arbitration agreement, as well as questions regarding the scope of a concededly binding arbitration agreement." (alterations in original)); Raglani v. Ripken Prof'l Baseball, 939 F. Supp. 2d 517, 521 (D. Md. 2013) ("Thus, although the judicial inquiry is 'highly circumscribed,' it is focused both on ensuring there was adequate contractual formation in the agreement, including valid consideration, and that the agreement itself is not unfair, unconscionable, or otherwise defective in ensuring the claimant can 'effectively . . . vindicate his or her statutory cause of action in the arbitral forum.'" (alteration in original) (quoting Murray v. United Food & Commercial Workers Int'l Union, 289 F.3d 297, 302 (4th Cir. 2002))).[4]  Courts must also

_____

    4  Even if the arbitration provision purports to delegate considerations of its validity to the arbitrator, this arbitrability principle applies as long as the resisting party directly challenges such delegation. See Rent-A-Ctr., 561 U.S. at 73-75. A party can simultaneously challenge both the delegation provision and the overall arbitration agreement. See id. at 74-75 (explaining that "[i]t may be that had Jackson challenged the delegation provision by arguing that these common procedures *as* (continued...)

consider whether, under state law, a nonsignatory to the agreement may enforce the arbitration provision. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-31 (2009) (explaining that nonsignatories may be eligible to enforce arbitration agreements).[5]

Accordingly, if a party challenges the enforceability of an arbitration agreement, courts generally permit discovery regarding the formation and performance of the arbitration provision. Blankenship v. Seventeenth St. Assocs., LLC, Civil Action No. 3:11-0627, 2012 WL 10008266, at *1 (S.D. W. Va. Feb. 1, 2012); Livingston v. Associates Fin., Inc., Civil Action No. 01 C 1659,

---

4(...continued)
*applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court," but concluding that "his unconscionability arguments made no mention of [the delegation provision]" (emphasis in original)); see also Parnell v. Western Sky Fin., LLC, No. 4:14-cv-24, Docket Entry 25, at 32 n.2, 73-75 (N.D. Ga. Apr. 28, 2014) (explaining that "[t]he [c]ourt interpret's [the p]laintiff's challenge as an attack on the forum selection clause itself, not merely an attack on the Parnell Loan Agreement as a whole," and upholding the plaintiff's unconscionability challenge because the nonexistence of the arbitral forum rendered the arbitration provision unenforceable).

5    State law also governs any contract formation issues. American Gen. Life & Acc. Ins. Co. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005) ("Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts. Specifically, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract. For instance, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." (internal quotation marks and citations omitted)).

8

2001 WL 709465, at *1-2 (N.D. Ill. June 25, 2001), <u>report and recommendation adopted</u>, 2002 WL 424352 (N.D. Ill. Mar. 6, 2002); <u>see also</u> <u>Green Tree Fin. Corp.-Ala. v. Randolph</u>, 531 U.S. 79, 90-91 & n.6 (2000) (refusing to invalidate arbitration provision where party failed to provide factual support for invalidity contention). Only discovery tailored to matters pertinent to the disposition of the petition to compel arbitration and/or stay litigation may occur.  <u>See</u> <u>THI of S.C. at Charleston, LLC v. Vance</u>, No. 2:13-CV-01483, 2014 WL 896717, at *1-2 (D.S.C. Feb. 26, 2014) (noting authorization of arbitration discovery, but quashing subpoenas as seeking information irrelevant to party's anticipated defenses to motion to compel arbitration).

## D.  Tribal Jurisdiction Issues

### 1.  Indian Tribe Jurisdiction

Bay Cities and Generations seek to enforce arbitration agreements that purport to be governed by the laws – and to subject Dillon to the jurisdiction – of certain Indian tribes (respectively, the Miami Indian Tribe and Cheyenne River Sioux Tribe).  (Docket Entry 106-1 at 4; Docket Entry 123-1 at 21.)[6]

---

6 The Western Sky agreement that Generations seeks to enforce states, "This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.  By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to
(continued...)

Indian tribes have "a unique and limited" sovereignty "center[ed] on the land held by the tribe and on tribal members within the reservation." Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327 (2008). Indian "tribes do not, as a general matter, possess authority over non-Indians who come within their borders: '[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" Id. at 328 (alteration in original) (quoting Montana v. United States, 450 U.S. 544, 565 (1981)).

Only via two "limited" exceptions may tribes exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id. at 329-30 (internal quotation marks omitted). Under the so-called Montana exceptions, id. at 330, "'[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements,'" id. at 329

---

        6(...continued)
this Loan Agreement, its enforcement or interpretation." (Docket Entry 106-1 at 4.) The MNE Services agreement that Bay Cities seeks to enforce provides "that this Note and Your account shall be governed by all applicable federal laws and all laws of the Miami Tribe of Oklahoma, the regulatory authority of MNE Services, Inc. dba USFastCash, regardless of the state or jurisdiction in which You may reside, and Your electronic signature below is your consent to the exclusive exercise of regulatory and adjudicatory authority of the Miami Tribe of Oklahoma over all matters related to this Note and Your account, expressly and forever forsaking any other jurisdiction which either party may claim by virtue of any reason, including residency." (Docket Entry 123-1 at 21.)

(quoting Montana, 450 U.S. at 565). Additionally, a tribe "may exercise 'civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'" Id. at 329-30 (quoting Montana, 450 U.S. at 566).[7] "By their terms, the exceptions concern regulation of 'the *activities* of nonmembers' or 'the *conduct* of non-Indians on fee land.'" Id. at 330 (emphasis in original).[8]

Put simply, tribal "laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." Id. at 337.

As the Supreme Court has emphasized, "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are presumptively invalid." Id. at 330 (internal quotation marks

---

7  The second Montana exception only applies if the conduct "'imperil[s] the subsistence' of the tribal community." Plains Commerce Bank, 554 U.S. at 341 (quoting Montana, 450 U.S. at 566). In other words, the second Montana exception applies only in circumstances where "tribal power [is] necessary to avert catastrophic consequences." Id. (internal quotation marks omitted).

8  A tribe's adjudicatory jurisdiction extends no farther than its legislative jurisdiction. Plains Commerce Bank, 554 U.S. at 330.

11

omitted).  The party advocating tribal jurisdiction has the burden of establishing that one of the <u>Montana</u> exceptions applies.  <u>See</u> <u>id.</u>  Notably, these "limited" exceptions "cannot be construed in a manner that would swallow the rule or severely shrink it."  <u>Id.</u> (internal quotation marks and citations omitted).  After all,

> it should be remembered[ that tribal sovereignty] is a sovereignty outside the basic structure of the Constitution.  The Bill of Rights does not apply to Indian tribes.  Indian courts differ from traditional American courts in a number of significant respects.  And nonmembers have no part in tribal government - they have no say in the laws and regulations that govern tribal territory.

<u>Id.</u> at 337 (internal quotation marks and citations omitted).

### 2.  Tribal Exhaustion Doctrine

Where a colorable claim of tribal court jurisdiction arises, the tribal exhaustion doctrine comes into play.  "[A] product of comity and related considerations," "[t]he tribal exhaustion doctrine holds that when a colorable claim of tribal court jurisdiction has been asserted, a federal court may (and ordinarily should) give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over [particular claims]."  <u>Ninigret Dev. Corp. v. Narragansett</u> <u>Indian Wetuomuck Hous. Auth.</u>, 207 F.3d 21, 31 (1st Cir. 2000).  Three principles animate this doctrine: (i) giving tribal courts an initial opportunity to evaluate the legal and factual bases underlying the challenge to their jurisdiction promotes tribal self-determination and self-government; (ii) tribal exhaustion

promotes administrative efficiency insofar as "a full record [is] developed in the Tribal Court" before federal judicial review; and (iii) exhaustion "will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review." <u>National Farmers Union Ins. Cos. v. Crow Tribe of Indians</u>, 471 U.S. 845, 856-57 (1985).

### 3. Relevant Jurisdictional and Exhaustion Evaluations

Numerous cases have been brought in state and federal courts in recent years regarding payday loans made by purported tribal entities. <u>See, e.g.</u>, <u>Moses v. CashCall, Inc.</u>, 781 F.3d 63, 67-68 (4th Cir. 2015) (collecting cases); <u>State ex rel. Cooper v. Western Sky Fin., LLC</u>, No. 13 CVS 16487, 2015 WL 5091229, at *9-10 (N.C. Super. Ct. Aug. 27, 2015) (discussing such cases). These courts have differed in their treatment of tribal jurisdiction and tribal exhaustion contentions. Some courts have flatly rejected such assertions, emphasizing that the nonmember payday loan recipients did not engage in any activity on an Indian reservation. <u>See, e.g.</u>, <u>Jackson v. Payday Fin., LLC</u>, 764 F.3d 765, 782 (7th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1894 (2015) (rejecting jurisdictional claim because "Plaintiffs have not engaged in *any* activities inside the reservation" (emphasis in original)); <u>Parnell v. Western Sky Fin., LLC</u>, No. 4:14-cv-24, Docket Entry 25 at 36-44,

73-74 (N.D. Ga. Apr. 28, 2014) (concluding that "the Cheyenne River Sioux Tribal Court would not have jurisdiction to entertain this dispute" because, inter alia, "the events at issue clearly did not occur on the Cheyenne River Indian Reservation, and Plaintiff did not engage in activity on the reservation"); Cooper, 2015 WL 5091229, at *8 (concluding that loan agreements were formed in North Carolina when – and where – the borrowers signed the agreements).

Conversely, some courts have concluded that tribal jurisdiction may exist and, thus, that tribal exhaustion must occur. See Brown v. Western Sky Fin., LLC, 84 F. Supp. 3d 467, 479-81 (M.D.N.C. 2015); Heldt v. Payday Fin., LLC, 12 F. Supp. 3d 1170, 1186-87, 1192-93 (D.S.D. 2014). In reaching such conclusions, these courts have questioned the necessity of a nonmember's physical presence on the reservation for the first Montana exception to apply. Heldt, 12 F. Supp. 3d at 1186 ("The borrower certainly does not enter onto a reservation, but in today's modern world of business transactions through internet or telephone, requiring physical entry on the reservation particularly in a case of a business transaction with a consent to jurisdiction clause, seems to be requiring too much."); see also Brown, 84 F. Supp. 3d at 479 ("Plaintiffs in the current action base a portion of their argument asserting that North Carolina is implicated because Defendants' payday loans were offered in North Carolina.

Using the *Heldt* analysis, however, Plaintiffs' logic can be used to assert a colorable claim of tribal jurisdiction, because some of Defendants' actions involved alleged tribal entities and/or tribal members."). Operating against that backdrop, these courts mandated tribal exhaustion where the record did not establish (i) the nature of the payday lenders' relationship to each other and/or the tribe; (ii) the unavailability of the specified tribal arbitral forum; and (iii) for purposes of the Western Sky agreement, (A) who constitutes an "authorized representative of the Cheyenne River Sioux Tribal Nation" and (B) whether any such authorized representative "is a JAMS or AAA arbitrator," Heldt, 12 F. Supp. 3d at 1193 (internal quotation marks omitted). See id. at 1184-87, 1190-93; see also Brown, 84 F. Supp. 3d at 480-81 (following Heldt).

As discussed below, Dillon bases his Requests and Motions to Compel in significant part on a need to develop a factual record sufficient to overcome the concerns in the Heldt line of cases. (See, e.g., Docket Entry 162 at 1-2; Docket Entry 162-2 at 4-6.)

## II. Plaintiff's Motions to Compel

Dillon maintains that the loan agreements' arbitration procedures do not exist and that their tribal jurisdiction assertions are false. (See, e.g., Docket Entry 162 at 1-2, 19; Docket Entry 162-2 at 2-6.) As noted in his initial letter to Defendants regarding discovery, Dillon seeks factual evidence to

15

support his contentions and avoid evidentiary deficiencies that led to the dismissal of other plaintiffs' lawsuits against tribal payday lenders. (<u>See generally</u> Docket Entry 162-2.) As Dillon explained:

> All three tribal agreements represent that borrowers are subject to the exclusive laws and jurisdiction of the tribes:
>
> * * * * *
>
> It is [Dillon's] position that the representations that the tribal agreements and the borrowers themselves (by execution of the agreements) are subject to tribal jurisdiction and law is false. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 783 (7th Cir. 2014) *cert. denied sub nom. W. Sky Fin. v. Jackson*, 135 S. Ct. 1894 (2015) ("a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court"). . . . . .
>
> Other courts however have found the question of tribal jurisdiction to be a closer call. *See, e.g.*, *Brown v. W. Sky Fin., LLC*, No. 1:13CV255, 2015 WL 413774, at *10 (M.D.N.C. Jan. 30, 2015) (finding a potential "colorable claim of tribal jurisdiction, because some of [d]efendants' actions involved alleged tribal entities and/or tribal members."). Given the possibility, however slim, of a "colorable" claim of tribal jurisdiction," Mr. Dillon has no choice but to take discovery on this issue unless Defendants are prepared to concede that there is no jurisdiction by the Indian tribal courts premised on these transactions. That discovery necessarily entails examination of these lenders' operations on the reservation and their interactions with off-reservation third-parties. *See Heldt v. Payday Fin., LLC*, 12 F. Supp. 3d 1170, 1185 (D.S.D. 2014) ("Ultimately, to sustain tribal court jurisdiction, the tribe or tribal member must show that the activities or conduct sought to be regulated through adjudication occurred "inside the reservation.") (citations omitted). *See also, Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014) ("In any event, plaintiffs provided insufficient evidence to establish that they are likely to succeed in showing that

16

the internet loans should be treated as on-reservation activity.").

Accordingly, we will seek leave of the Court to take discovery on the issue of how and where these lenders operate, with whom they operate (including their Third-Party Senders and Originating Depository Financial Institutions) and the actual financial interest of the tribes in these lenders.

Additionally, all three tribal agreements represent that any arbitration will be conducted pursuant to tribal rules and law:

\* \* \* \* \*

It is [Dillon's] position that tribal laws and rules relating to arbitration and consumer debt disputes do not exist and that therefore, the arbitral forums provided for in the tribal agreements are unavailable. *See, e.g.*, *Jackson* ("[p]laintiffs could not have ascertained or understood the arbitration procedure to which they were agreeing because it did not exist." 764 F.3d at 781; *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014) *cert. denied*, 135 S. Ct. 1735 (2015) ("Finally, the fact that the arbitration clause calls for the arbitration to be conducted according to consumer dispute resolution rules that do not exist supports the conclusion that the Tribe is not involved in private arbitrations."). Nevertheless, at least two district courts have required an individual showing by the plaintiff of the tribal laws and rules' non-existence even post-*Jackson* and *Inetianbor*, *see, Chitoff v. CashCall, Inc.*, No. 0:14-CV-60292, 2014 WL 6603987, at *1 (S.D. Fla. Nov. 17, 2014) ("Plaintiff has attempted to rely upon citations to other cases where the forum has been found to be unavailable in lieu of providing his own evidence. The Court therefore finds that Plaintiff has failed to meet his evidentiary burden to prove that the arbitration forum is unavailable or otherwise invalid"); *Brown*, *supra*, 2015 WL 413774, at *11 ("Plaintiffs in the present action have not attempted to actually arbitrate or file any action in a CRST court"). Consequently, Mr. Dillon has no choice but to seek discovery on this issue. Again, discovery could be avoided if Defendants were prepared to stipulate that there is no tribal law or rules specifically applicable to payday loans or the conduct of arbitrations.

17

> Finally, because all movants are seeking to enforce
> arbitration agreements as non-signatories under theories
> of equitable estoppel, third-party beneficiary and agency
> theories, it is [Dillon's] position that pre-arbitration
> discovery is required as to the circumstances and facts
> of the relationships between Defendants and the payday
> lenders and/or the payday lenders' third-party senders.
> *See, e.g.*, *Pearson v. Gardere Wynne Sewell LLP*, 814 F.
> Supp. 2d 592, 601 (M.D.N.C. 2011) (for plaintiff to
> assert a claim based on the third-party beneficiary of
> contract doctrine "[i]t is not enough that the contract,
> in fact, benefits the plaintiff, if, when the contract
> was made, the contracting parties did not intend it to
> benefit the plaintiff directly"); *Indem. Ins. Co. of N.
> Am. v. Am. Eurocopter LLC*, No. 1:03CV949, 2005 WL
> 1610653, at *8 (M.D.N.C. July 8, 2005) ("[u]nless there
> is but one inference that can be drawn from the facts,
> whether an agency relationship exists is a question of
> fact for the jury.").

(Docket Entry 162-2 at 2, 4-7.) The parties' joint motion to permit arbitration-related discovery confirms Dillon's arbitration-discovery approach. (Docket Entry 157 at 2 ("After reviewing Defendants' renewed motions, [Dillon] wishes to take discovery from Defendants and certain third parties in order to prepare oppositions to those renewed motions. In [Dillon's] view, the anticipated discovery would allow him to challenge the formation and enforceability of the arbitration agreements at issue and Defendants' right to invoke those agreements.").)

As relevant for the Motions to Compel, Bay Cities objects to certain Requests as seeking (i) information protected by the common interest privilege (BCRFPs 6, 7, 9-12) and/or improper merits discovery (BCRFPs 9, 10, 15). (<u>See, e.g.</u>, Docket Entry 165 at 10,

18

17-18.) Generations likewise objects to the Requests as seeking protected privileged information and irrelevant materials. (See, e.g., Docket Entry 166-1 at 57.) Generations also asserts a variety of general objections. (Id. at 54-55.) The Court will begin its analysis of the Motions to Compel with the Bay Cities Motion and will then resolve any remaining issues from the Generations Motion.[9]

### A. Common Interest Privilege

Defendants have withheld certain documents on the basis of privilege, including the common interest privilege. (Docket Entry 165 at 10, 16-20; Docket Entry 166 at 16-17.) Dillon has countered that the common interest privilege does not apply. (Docket Entry 162 at 12; Docket Entry 164 at 5-10.) Bay Cities and Generations have asserted the common interest privilege in connection with entities identified in the Complaint as their respective RICO coconspirators. (See Docket Entry 165 at 20; Docket Entry 166 at 17.) According to Generations, "the only documents withheld on the basis of the common interest privilege are communications between

---

9 The briefing reflects that the parties have entered into a confidentiality order and that Defendants have ceased withholding information on the basis of confidentiality. (See, e.g., Docket Entry 162 at 10 n.4; Docket Entry 166 at 14.) Accordingly, the Court will not address the confidentiality objections. Additionally, Generations has withdrawn its harassment objections (see, e.g., Docket Entry 166-1 at 55; cf. Docket Entry 162 at 9), and Bay Cities has committed to producing all materials responsive to Request 17 (Docket Entry 164-1 at 20-21), so the Court will not address those matters.

counsel for Generations and counsel for Western Sky and/or Cash Call." (Docket Entry 166 at 17.) Bay Cities similarly confirmed that the only documents it has withheld on this basis are (i) legal memoranda regarding nonsignatory enforcement of arbitration agreements and sovereign immunity; (ii) drafts of the Muir Declaration; and (iii) associated email communications between Bay Cities' counsel and MNE Services' counsel. (Docket Entry 165 at 17-18.)

In light of the foregoing considerations, Defendants have made a prima facie showing that the common interest privilege applies to the withheld materials. First, the identified documents appear to merit work product protection. See Hickman v. Taylor, 329 U.S. 495, 510-11 (1947). Second, Dillon's Complaint names the other entities involved in these transmissions as Defendants' coconspirators in a RICO scheme to collect unlawful debts. (Docket Entry 1 at 30-31, 33-34, 51-65.) Third, as entities with a shared interest in compelling the arbitration of these RICO claims, Defendants and their alleged coconspirators appear to fit within the common interest rubric. See In re Grand Jury Subpoenas, 89-3 & 89-4, 902 F.2d at 248-49. Accordingly, the Court will not grant Dillon's request to overrule Defendants' common interest privilege assertions at this time.

Nevertheless, Defendants must produce within five business days a privilege log for all documents withheld on the basis of the

common interest protection.[10]  If, after reviewing those privilege logs, Dillon believes that specific withheld items do not qualify for protection, he may present a particularized challenge.

## B.  Alleged Merits Discovery

### 1.  Tribal Sovereignty

Defendants object to the Request seeking tribal sovereign immunity materials.  (Docket Entry 164-1 at 15-16 (BCRFP 10); Docket Entry 166-1 at 61 (GRFP 16).)  Bay Cities objects to this Request primarily on the basis that Bay Cities has not asserted any tribal immunity defense and neither Dillon nor Bay Cities is "asserting that this action is subject to the jurisdiction of a tribal court." (Docket Entry 164-1 at 15; <u>see</u> Docket Entry 165 at 14-15.)  Generations' objection to this Request appears to center on the idea that only tribal sovereign immunity materials regarding arbitration are relevant.  (Docket Entry 166 at 26-27.)

Bay Cities' position is understandable, as a lawsuit against non-Indian banks based on their withdrawal of money from a non-Indian North Carolinian's bank account in North Carolina evidently

_____

10  Because the parties have been negotiating regarding the privilege log specifications, the Court does not find that Defendants waived their privilege claims by failing to produce a privilege log to date.  If the parties have not yet agreed on privilege log parameters, Defendants will need to produce a log in conformity with Federal Rule of Civil Procedure 26(b)(5)(A) for withheld materials.  To the extent the Requests' instructions purport to require greater detail in the privilege log than Rule 26(b)(5)(A) imposes, Defendants need not comply with those instructions.

cannot create a colorable claim of tribal jurisdiction. See, e.g., Jackson, 764 F.3d at 781-82; see also id. at 783 ("[A] tribal court's authority to adjudicate claims involving nonmembers concerns its subject matter jurisdiction, not personal jurisdiction. Therefore, a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court." (internal citations omitted)). This position has even more force when considered in the context of Plains Commerce Bank, where even on-reservation conduct failed to trigger the first Montana exception. See Plains Commerce Bank, 554 U.S. at 345-46 (Ginsburg, J., dissenting) ("The discrimination claim here at issue rests on the allegedly unfair conditions the Bank exacted from the Longs when they sought loans to sustain the operation of their ranch. . . . Negotiating sessions for these arrangements were held at the Tribe's on-reservation offices and were facilitated by tribal officers and [Bureau of Indian Affairs] employees. . . . Their claim, all courts prior to this one found, fit within the [first] Montana exception . . . .").

Nevertheless, Generations raised the issue of tribal jurisdiction and the tribal exhaustion doctrine in its renewed motion to dismiss. (Docket Entry 153 at 16 & n.8.) Moreover, Dillon has challenged the arbitration provisions on the ground that they purport to confer jurisdiction on tribal courts that lack jurisdiction over him as a nonmember. (See, e.g., Docket Entry 162

22

at 19; Docket Entry 162-2 at 2, 4.) At least one judge in this District has found such challenges to the subject matter jurisdiction of a tribal court sufficient (in the absence of other countervailing evidence) to trigger the tribal exhaustion doctrine. See Brown, 84 F. Supp. 3d at 478-81.

As Bay Cities tacitly agrees, tribal sovereign immunity and tribal jurisdiction are interrelated concepts. (See Docket Entry 164-1 at 15 (objecting to tribal sovereign immunity Request on basis "that MNE Services is not a party to this lawsuit, and that neither Bay Cities nor Plaintiff are asserting that this action is subject to the jurisdiction of a tribal court").) Moreover, tribal sovereign immunity information may bear on the existence of a colorable claim of tribal jurisdiction. For instance, such information could help inform the analysis of whether any of the purported tribal payday lenders or Defendants can "somehow qualif[y] as a [tribal] member." Heldt, 12 F. Supp. 3d at 1184; see also Cooper, 2015 WL 5091229, at *7 (noting nontribal defendants' contention that sovereign immunity protects them because they "'stand in the shoes' of [the tribal payday lender]").

In light of Brown and Heldt, the Court will permit the requested discovery to enable the development of a factual record upon which to evaluate whether a colorable claim of tribal jurisdiction exists. See, e.g., Toppings v. Meritech Mortg. Servs., Inc., 140 F. Supp. 2d 683, 685 (S.D. W. Va. 2001)

23

(permitting factual development on party's challenges to arbitral forum so court can "discharge its obligation to assure there is a valid arbitration agreement"); see also Moses, 781 F.3d at 87 (Gregory, J., concurring) (acknowledging "the 800-pound gorilla lurking in the litigation, namely, the enforceability of the arbitration agreement itself," but rejecting party's new appellate contention "that the tribal arbitration provisions specified in the agreement are illusory" on the basis that, inter alia, the lower "courts did not make any relevant factual findings about the nature of the loan agreement or its arbitration provisions," and "[w]ithout . . . a more developed record, we simply cannot reach the enforceability of the agreement"); id. at 94 (Davis, J., concurring in the judgment in part and dissenting in part) ("[T]his case does not call upon us to determine whether Moses's arbitration agreement is unenforceable on its face. Because Moses never raised this issue in the proceedings below, we lack any factual record upon which to make such a ruling. I note that nothing contained in this opinion would impair Moses's ability to raise the issue of unconscionability . . . upon further proceedings in any action against CashCall.").[11] Accordingly, the Court overrules Defendants'

---

11 Under North Carolina law, a party asserting an unconscionability challenge to a contract must prove procedural and substantive unconscionability, which operate on "more of a sliding scale than a true dichotomy." U.S. ex rel. TGK Enters., Inc. v. Clayco, Inc., 978 F. Supp. 2d 540, 544 (E.D.N.C. 2013). "Procedural unconscionability involves bargaining naughtiness" and

(continued...)

24

relevance objections to the tribal sovereign immunity Requests. Defendants must produce all responsive, nonprivileged materials for BCRFP 10 and GRFP 16 within five business days and must provide within the same period a privilege log for any materials withheld on the basis of privilege.

## 2. Other Litigation

Bay Cities and Generations next object to the class action lawsuit Requests (i.e., BCRFPs 8, 9; GRFP 7) as seeking merits discovery irrelevant to the arbitration proceedings at issue. (See Docket Entry 164-1 at 13-14; Docket Entry 166 at 20; Docket Entry 166-1 at 57-58.) Dillon attempts to justify these Requests on the theory that this discovery might uncover other arbitration agreements that courts have refused to enforce. (See, e.g., Docket Entry 164 at 12.) Dillon has propounded separate Requests for documents "relating to arbitration and/or the arbitration procedures in [the relevant] consumer loan agreements." (Docket Entry 164-1 at 11-12 (BCRFPs 6, 7); Docket Entry 166-1 at 56 (GRFP 5).) Given the arbitration-specific Requests, the Court deems the class action Requests improper at this stage of the litigation. Thus, the Court upholds Defendants' relevance objections to the class action Requests.

---

11(...continued)
substantive unconscionability involves "harsh, one-sided, and oppressive contract terms." Id. (alterations and internal quotation marks omitted).

Finally, Bay Cities objects to BCRFP 15, which seeks information regarding "MNE Services' litigation or settlement with the Federal Trade Commission as a result of deceptive lending practices." (Docket Entry 164-1 at 18.) Dillon defends the relevance of this discovery on the theory that, pursuant to a stipulated permanent injunction, "MNE Services is no longer permitted to collect on existing loans" and thus "can no longer legally enforce its contract against [Dillon, so] neither can a non-signatory such as Bay Cities." (Docket Entry 164 at 15; see Docket Entry 164-5.) In response, Bay Cities disputes the effect of the order on the arbitration agreements, states that it has no documents responsive to this Request, and reiterates its objection that this Request seeks irrelevant merits discovery. (Docket Entry 165 at 13, 16.) Setting aside the correctness of Dillon's interpretation of this order, the Court notes that this contention rests entirely upon the terms of a stipulated protective order already in Dillon's possession. As such, the Court concludes that the Federal Trade Commission (the "FTC") litigation Request constitutes merits discovery, and upholds Bay Cities' relevance objections to this Request.

C.  Generations' Overarching Objections

Having addressed Bay Cities' at-issue Requests, the Court turns to Generations' remaining objections. The Court begins this analysis with Generations' overarching objections.

26

## 1. General Approach

Generations proffers a series of general objections, makes all productions "[s]ubject to [its] objections," and qualifies many of its responses with the caveat that it will produce "reasonably responsive" materials. (See, e.g., Docket Entry 166-1 at 54-55, 57 (emphasis added).) None of these actions is acceptable. Objections must be stated with specificity and based on particularized facts. See Kinetic, 268 F.R.D. at 241, 247. Moreover, courts have long rejected responses made "subject to" objections and/or with unilaterally determined responsiveness qualifiers, as such responses "serve[] only to obscure potentially discoverable information and provide[] no mechanism for either [opposing parties] or the Court to review [the responding party's] decisions." Id. at 248 (internal quotation marks omitted). Thus, with the exception of general objection four,[12] the Court strikes all general objections, as well as all of the "subject to Generations' objections" and "reasonably responsive" qualifiers in Generations' Amended Responses. Accordingly, Generations must produce all nonprivileged responsive materials for each extant Request for which Generations did not lodge a specific objection;

_____

12    General objection four concerns the privilege log requirements specified in instruction 11 of the Requests. (See Docket Entry 166-1 at 54 ("Generations objects to Instruction 11 to the extent it seeks to impose burdens on Generations beyond those required by Federal Rule of Civil Procedure 26(b)(5)."); Docket Entry 166 at 9-11 (discussing instruction 11).)

Generations must also produce a privilege log for any materials withheld on the basis of privilege.[13]

## 2. Time and Person Objections

Generations objects to the majority of Requests as lacking a limit to Dillon's arbitration agreement and the time period since Dillon obtained his Western Sky loan. (<u>See, e.g.</u>, Docket Entry 166 at 12-14; Docket Entry 166-1 at 55-56.) Dillon seeks to oppose Generations' dismissal motion on the grounds, <u>inter alia</u>, that the arbitration procedure specified in the Western Sky agreement does not exist. (Docket Entry 162 at 1-2; Docket Entry 162-2 at 6.) Because Dillon challenges the existence of the arbitral forum, information predating his loan agreement and information about arbitration proceedings for individuals other than Dillon may inform his opposition to the arbitration clause's enforcement. Accordingly, the Court overrules these relevancy objections.

## D. Relational Discovery

Generations objects to the first two Requests, which seek various "Origination Agreements," on the grounds that they "seek[] documents unrelated to the arbitration clause at issue before the Court." (Docket Entry 166-1 at 55-56.)[14] These Origination

---

13 Dillon withdrew GRFPs 10 and 14 (Docket Entry 162 at 4), so Generations does not need to produce any materials in response to those Requests.

14 Generations makes this relevance objection to most Requests, but provides only conclusory support in its opposition
(continued...)

Agreements are relevant to the relationship between Generations and other alleged actors in the RICO scheme, including Western Sky and CashCall.  As such, they are relevant to Generations' ability to enforce the Western Sky arbitration clause and to invoke tribal exhaustion.  The Court overrules these relevance objections to GRFPs 1 and 2.

Generations also objects to GRFPs 3 and 4, which solicit documents underlying Generations' claimed entitlement to enforce the Western Sky arbitration provision.  (Docket Entry 166-1 at 56.) Primarily, Generations contends that these Requests seek attorney work product by requesting documents Generations' attorneys believe support its "third-party beneficiary" and "servicer" arguments. (Id.; see also Docket Entry 166 at 14-15.)  Generations represents to the Court, however, that it relies only on the Complaint and Dillon's Western Sky agreement in support of these contentions. (Docket Entry 166 at 14-15 ("Because Generations bases the argument solely on the terms of [Dillon's] Complaint and loan agreement, and because those documents have been produced, no additional documents exist.").)  As such, Generations should have no qualms about

_____

14(...continued)
papers.  Generations generally asserts, without elaboration, either that "Generations is not required to produce documents relating to [the Requests] outside of how they relate to arbitration between Generations and [Dillon]" or that "Documents without reference to the Arbitration Provisions would be irrelevant due to the fact that the only discovery allowed presently is arbitration-related discovery."  (Docket Entry 166 at 21, 26.)

producing any documents responsive to these Requests. Therefore, the Court orders Generations to produce any nonprivileged documents on which it relies for its "servicer" and "third-party beneficiary" arguments and to provide a privilege log for any materials it withholds on the basis of privilege.

E. Relevancy Objections

Generations objects to all remaining Requests except for GRFP 9 on the basis that they seek information "unrelated to the arbitration clause at issue before the Court." These Requests fall into two categories, which the Court addresses in turn.

1. Arbitrational and Jurisdictional Discovery

The first category encompasses GRFPs 5, 6, 11, 12, 13, 17, and 18. For the same reasons that Generations' time, person, and tribal sovereign immunity objections failed, its relevance objections for these Requests fail. In the absence of a meaningfully developed opposition, the Court will not belabor this analysis. Suffice to say, the information sought in GRFPs 5, 6, 11, 12, 13, 17, and 18 is relevant to the existence and contours of any arbitration under the Western Sky agreement, the existence of tribal jurisdiction, and/or the propriety of tribal exhaustion. The Court thus overrules Generations' relevance objections to GRFPs 5, 6, 11, 12, 13, 17, and 18. Generations must produce any nonprivileged materials responsive to GRFPs 5, 6, 12, 13, 17, and 18. Because Dillon and Generations apparently agree that GRFP 11

30

should be limited to documents relating to arbitration, however, the Court narrows GRFP 11 accordingly and orders Generations to produce any nonprivileged materials relating to the Indian Commerce Clause in "the context of arbitration proceedings under the [Western Sky] agreement." (Docket Entry 162 at 16; <u>see</u> <u>id.</u> at 15-16.) Generations should also produce a privilege log for any materials withheld on the basis of privilege for these Requests.

### 2. General Dillon, CashCall, and Kohles Materials

By contrast, Generations' relevance objections to GRFP 8 and GRFP 15 are well-founded. GRFP 8 seeks all documents relating to Dillon or his loan agreement and GRFP 15 seeks all documents relating to CashCall or Jean Kohles. To the extent that these Requests are relevant to the arbitration dispute, they are effectively addressed in other Requests. Specifically, any relevant materials for GRFP 8 would be responsive to GRFPs 3-6, 9, 11-12, and 17-18, and any relevant materials for GRFP 15 would be covered by GRFPs 1-2, 9, 11, and 16-18. Therefore, the Court will not order Generations to produce materials in response to GRFPs 8 and 15.

Finally, Generations responded to GRFP 9 as follows: "Subject to Generations' objections, and without waiver of same, no non-privileged documents exist." (Docket Entry 166-1 at 58.) The Court accepts Generations' implicit privilege objection and orders

Generations to produce a privilege log for all materials withheld on the basis of privilege in response to GRFP 9.

### III. Expense-Shifting

Federal Rule of Civil Procedure 37(a)(5)(C) provides that the Court may apportion expenses when a motion to compel is granted in part and denied in part, as happened here. Neither Dillon nor Defendants has asked the Court to shift expenses on the Motions to Compel. Accordingly, particularly given that the parties had substantial justification for their substantive positions and diligently attempted to reconcile their discovery differences in a compressed time period, the Court declines to award expenses on the Motions to Compel.

## **CONCLUSION**

Defendants have made a prima facie showing in support of their common interest privilege contentions, but must produce a privilege log for all materials withheld on the basis of privilege. Generations' general objections and its qualified promises of production are improper. With the exception of general objection four, Generations' general objections, "subject to [its] objections" qualifier, and "reasonably" responsive caveat are stricken from its Amended Responses. Moreover, because Dillon has challenged the existence of the arbitral forum, Generations' time and person objections cannot stand. Because they seek merits discovery, however, Requests relating to class action lawsuits, FTC

32

litigation, and Dillon, Kohles, and CashCall generally are improper. The remaining disputed Requests are relevant to the making and performance of the arbitration agreements and/or the applicability of a federal abstention doctrine.

**IT IS THEREFORE ORDERED** that Dillon's Bay Cities Motion (Docket Entry 163) and Generations Motion (Docket Entry 161) are **GRANTED IN PART** and **DENIED IN PART** as follows: on or before November 6, 2015, with the sole exception of materials withheld on the basis of privilege as identified on the privilege logs detailed below (i) Bay Cities must produce all materials responsive to BCRFP 10; (ii) Generations must produce all materials responsive to GRFPs 1, 2, 5, 6, 9, 12, 13, 16, 17, 18; (iii) Generations must produce all materials on which it relies for its "third-party beneficiary" and "servicer" arguments, as specified in GRFPs 3 and 4; and (iv) Generations must produce all materials related to arbitration responsive to GRFP 11.

**IT IS FURTHER ORDERED** that, on or before November 6, 2015, Bay Cities and Generations must each serve on Dillon a privilege log specifying any documents withheld on the basis of privilege, including the common interest privilege. Defendants must explicitly identify any documents withheld under the common interest privilege. Dillon may renew his challenge to Defendants'

33

common interest privilege assertions if he has a good-faith basis
for doing so after reviewing the privilege logs.


October 30, 2015                    _____/s/ L. Patrick Auld_____
                                        **L. Patrick Auld**
                                **United States Magistrate Judge**