# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:13-cv-897

| | |
|---|---|
| JAMES DILLON, on Behalf of Himself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>BMO HARRIS BANK, N.A., FOUR OAKS BANK & TRUST CO., a North Carolina Chartered Bank, GENERATIONS FEDERAL CREDIT UNION, and BAY CITIES BANK, a Florida State-Chartered Bank,<br><br>    Defendants. | Judge Catherine C. Eagles |

## PLAINTIFF JAMES DILLON'S BRIEF IN OPPOSITION TO

## DEFENDANT BAY CITIES BANK'S MOTION TO COMPEL ARBITRATION

F. Hill Allen
**THARRINGTON SMITH, L.L.P.**
P.O. Box 1151
Raleigh, NC 27602-1151
Telephone: 919-821-4711
Facsimile: 919-829-1583
hallen@tharringtonsmith.com

Darren T. Kaplan
**DARREN KAPLAN LAW FIRM, PC**
1359 Broadway, Suite 2001
New York, NY 10018
Tel: (212) 999-7370
Fax: (646) 390-7410
dkaplan@darrenkaplanlaw.com

*Other Attorneys for Plaintiff on Signature Page*

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.    THE MNE ARBITRATION AGREEMENT IS UNCONSCIONABLE AND
      UNENFORCEABLE ................................................................................................ 2

      A.    Plaintiff Specifically Challenges the Delegation Provision of the MNE
            Arbitration Agreement ................................................................................. 2

      B.    The MNE Arbitration Agreement Is Unconscionable and Unenforceable
            Because It Calls for the Arbitrator to Apply Non-Applicable Law and for
            Jurisdiction by a Court without Subject Matter Jurisdiction. ...................... 3

II.    BAY CITIES HAS STILL FAILED TO AUTHENTICATE THE PURPORTED
       LOAN AGREEMENTS. ........................................................................................ 12

       A.    The Purported VIN Loan Agreement Has not been Properly Authenticated. ... 12

       B.    Plaintiff Has Been Prevented From Testing the Assertions In the Muir
             Declaration That Purport to Authenticate the MNE Loan Agreement ...................... 17

III.    BAY CITIES CANNOT ENFORCE ARBITRATION UNDER ESTOPPEL OR
        THIRD-PARTY BENEFICIARY THEORIES ............................................................. 19

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A-1 Contractors v. Strate*,
76 F.3d 930 (8th Cir. 1996) (*en banc*), *aff'd*, 520 U.S. 438 (1997) ........................... 6, 7

*American Express Co. v. Italian Colors Rest.*,
133 S. Ct. 2304 (2013) ...................................................................................... 8, 10

*Antonio v. Barnes*,
464 F.2d 584 (4th Cir. 1972) ................................................................................ 16

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) .............................................................................................. 19

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................................................ 3

*Blis Day Spa, LLC v. Hartford Ins. Grp.*,
427 F. Supp. 2d 621 (W.D.N.C. 2006) ................................................................. 23

*Booth v. BMO Harris Bank, N.A.*,
No. 13-5968, 2014 WL 3952945 (E.D. Pa. Aug. 11, 2014) ........................................ 21

*Brantley v. Republic Mortgage Ins. Co.*,
424 F.3d 392 (4th Cir. 2005) ................................................................... 20, 21, 23

*Brown v. Western Sky Fin. LLC*,
84 F. Supp. 3d 467, 471 (M.D.N.C. 2015) ............................................................. 6

*Erichsen v. RBC Capital Markets, LLC*,
883 F. Supp. 2d 562 (E.D.N.C. 2012) .................................................................. 16

*F.T.C. v. AMG Servs., Inc.*,
29 F. Supp. 3d 1338, 1343 (D. Nev. 2014) ............................................................. 9

*Hayes v. Delbert Servs. Corp.*,
No. 3:14-CV-258, 2015 WL 269483 (E.D. Va. Jan. 21, 2015) ................................ 6

*Heldt v. Payday Fin., LLC*,
12 F. Supp. 3d 1170, 1186 (D.S.D. 2014) .......................................................... 5, 6

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) ................................................................ 18

*In re Humana Inc. Managed Care Litig.*,
    285 F.3d 971 (11th Cir. 2002) *rev'd sub nom. PacifiCare Health Sys.,
    Inc. v. Book,* 538 U.S. 401 (2003) ........................................................ 22

*Inetianbor v. CashCall, Inc.*,
    768 F.3d 1346 (11th Cir. 2014) *cert. denied*, 135 S. Ct. 1735 (2015) ........................ 11

*Jackson v. Payday Fin., LLC*,
    764 F.3d 765 (7th Cir. 2014) *cert. denied sub nom. W. Sky Fin. v.
    Jackson*, 135 S. Ct. 1894 (2015) ............................................................ 4

*Krusch v. TAMKO Bldg. Prods., Inc.*,
    34 F. Supp. 3d 584, 588 (M.D.N.C. 2014) ........................................ 17, 19

*M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*,
    681 F.2d 930 (4th Cir. 1982) ................................................................ 16

*Manguiat v. Bd. of Educ. of Prince George's Cty.*,
    No. GJH-13-1165, 2015 WL 2376008 (D. Md. May 18, 2015) .................... 18

*MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc.*,
    No. CIV.A. GLR-11-3767, 2013 WL 4086401 (D. Md. Aug. 12, 2013) .................... 18

*Miami Tribe of Oklahoma v. James Dillon, et al.*,
    No. 4:15-mc-09024-NKL (W.D. Mo.) ...................................................... 17

*Mitsubishi Motors Corp. v. Soler Chrysler- Plymouth, Inc.*,
    473 U.S. 614 (1985) ...................................................................... 7, 10

*Montana v. United States*,
    450 U.S. 544 (1981) .......................................................................... 4

*Moses v. CashCall, Inc.*,
    781 F.3d 63 (4th Cir. 2015) ............................................................ 11, 12

*Murphy v. DirecTV, Inc.*,
    724 F.3d 1218 (9th Cir. 2013) .............................................................. 22

*Murray v. United Food & Commercial Workers Int'l Union*,
    289 F.3d 297 (4th Cir. 2002) .............................................................. 12

iii

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
   769 F.3d 105 (2d Cir. 2014)...........................................................................5

*Pearson v. Gardere Wynne Sewell LLP*,
   814 F. Supp. 2d 592 (M.D.N.C. 2011) ................................................22, 23

*Pearson v. United Debt Holdings, LLC*,
   No. 14 C 10070, 2015 WL 4960315 (N.D. Ill. Aug. 19, 2015)....................16

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
   554 U.S. 316 (2008)....................................................................................4, 5

*R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*,
   384 F.3d 157 (4th Cir. 2004) .........................................................................21

*Rent–A–Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010)..............................................................................2, 3, 11

*Todd v. Steamship Mut. Underwriting Ass'n (Bermuda)*,
   601 F.3d 329 (5th Cir. 2010) .........................................................................20

*United States v. Oriach*,
   222 F. App'x 312 (4th Cir. 2007) ..................................................................15

*Versatile v. Johnson*,
   No. 3:09CV120, 2011 WL 1167440 (E.D. Va. Mar. 28, 2011) ...................19

**State Cases**

*Goodwin v. Century Care of Cherryville Inc.*,
   215 N.C.App. 389, 2011 WL 3890971 (2011) ..............................................17

*King v. King*,
   442 S.E.2d 154 (N.C. Ct. App. 1994) .............................................................8

*Rite Color Chemical Co. v. Velvet Textile Co.*,
   411 S.E.2d 645 (N.C. Ct. App. 1992) .............................................................8

*Tillman v. Commercial Credit Loans, Inc.*,
   655 S.E.2d 362 (N.C. 2008).....................................................................8, 10

*Truck Ins. Exch. v. Palmer J. Swanson, Inc.*,
   189 P.3d 656 (Nev. 2008) .............................................................................20

iv

**Federal Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*....................................................................... 3

**Rules**

Fed.R.Evid. 602 ............................................................................................................... 16

Fed.R.Evid. 803 ............................................................................................................... 19

Fed.R.Evid. 804 ............................................................................................................... 19

Fed.R.Evid. 901(b)(1) ...................................................................................................... 15

Fed.R.Evid. 901(b)(4) ...................................................................................................... 15

Fed.R.Evid. 901(b)(9) ...................................................................................................... 15

## NATURE OF THE MATTER

Payday loans are very high interest rate short-term loans made to desperate and vulnerable borrowers. Recognizing the unfairness of these loans, North Carolina state legislators effectively banned payday lending in 2001. While brick and mortar payday loan stores shuttered in North Carolina, out-of-state payday lenders, began using the Internet to prey upon North Carolina's citizens.

Internet payday lenders' ability to peddle their product in states where payday loans are illegal rests on two rickety foundations. The first is the ACH payments network and the small number of financial institutions—called "Originating Depository Financial Institutions" ("ODFI's")—willing to debit borrowers' bank accounts via ACH on behalf of payday lenders in states where payday loans are illegal and unenforceable. This litigation asks this Court to end that practice by these Defendants.

The second foundation for Internet payday lending is arbitration agreements inserted into the loan documents which prevent class action challenges to the payday lenders' conduct. Without the class action mechanism, individual lawsuits over the small dollar loan amounts are cost-prohibitive and, even if brought, are quickly ended by the payday lenders forgiving the modest individual loan. This motion provides the Court with the opportunity to hold one of these egregious arbitration agreements unenforceable.

## STATEMENT OF FACTS

The facts here are essentially undisputed. Bay Cities Bank ("Bay Cities") concedes that Mr. Dillon, from his home in North Carolina, electronically signed an

Internet webpage that acted as a Loan Agreement for a loan from illegal payday lender MNE Services Inc. doing business as USFastCash ("MNE"), a supposed arm of the Miami Tribe of Oklahoma; that the Loan Agreement contained an ACH authorization to debit Mr. Dillon's account for loan payments; and that, acting as MNE's ODFI, Bay Cities debited Mr. Dillon's checking account in North Carolina at least once in repayment of that MNE loan. Bay Cities concedes the same facts with respect to a loan from VIN Capital, LLC ("VIN").

Bay Cities' motion to compel arbitration is premised on language in the loan agreements that purport to mandate arbitration of all disputes (the "Arbitration Agreements"). Doc.s 123-1 and 123-2.

## ARGUMENT

### I. THE MNE ARBITRATION AGREEMENT IS UNCONSCIONABLE AND UNENFORCEABLE.

#### A. Plaintiff Specifically Challenges the Delegation Provision of the MNE Arbitration Agreement.

*Plaintiff hereby specifically challenges the delegation provision of the MNE Arbitration Agreement.*[1] The delegation provision states, "Disputes include … all claims, disputes, or controversies … including the validity and scope of this Arbitration Provision …." Doc. 123-1, p. 22. The delegation provision does not set forth any separate or special arbitral procedures or law and is dependent on the other arbitration provisions

---

[1] "The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent-A-Center*, 561 U.S. at 68.

to flesh out the mechanics of arbitration. In *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), the Supreme Court held that "unless [plaintiff] challenged the delegation provision specifically, we must treat it as valid under § 2 (of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*), and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." 561 U.S. at 72. However, a delegation provision, like any other arbitration agreement "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* at 68 (quotations omitted). *See also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (same).

As will be shown *infra¸* the MNE Arbitration Agreement is unconscionable and unenforceable and, *because those same unconscionable provisions apply to the delegation provision, the delegation provision is also unconscionable and unenforceable.*

> **B. The MNE Arbitration Agreement Is Unconscionable and Unenforceable Because It Calls for the Arbitrator to Apply Non-Applicable Law and for Jurisdiction by a Court without Subject Matter Jurisdiction.**

The MNE Arbitration Agreement contains a host of misrepresentations and spurious claims regarding the supposed exclusive applicability of Miami Tribe of Oklahoma Tribal law and the supposed jurisdiction of the Miami Tribe of Oklahoma Tribal Court over non-Indian borrowers entering into loan agreements a thousand miles from the Miami Tribe reservation. For example, the MNE Loan Agreement includes the following provision (which is incorporated into the MNE Arbitration Provisions):

3

> **Governing Law:** Both parties agree that this Note and Your account shall be governed by all applicable federal laws and all laws of the Miami Tribe of Oklahoma, the regulatory authority of MNE Services, Inc. dba USFastCash, regardless of the state or Jurisdiction in which You may reside, and Your electronic signature below is your consent to the exclusive exercise of regulatory and adjudicatory [sic] authority of the Miami Tribe of Oklahoma over all matters related to this Note and Your account, expressly and forever forsaking any other jurisdiction which either party may cla1m by virtue of any reason, including residency.

Doc. 123-1, p. 21.

But Indian[2] tribes have "limited" sovereignty "center[ed] on the land held by the tribe and on tribal members within the reservation." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008). Indian "tribes do not, as a general matter, possess authority over non-Indians who come within their borders: '[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" *Id.* at 328 (alteration in original) (quoting *Montana v. United States*, 450 U.S. 544, 565 (1981)). "A nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 783 (7th Cir. 2014) *cert. denied sub nom. W. Sky Fin. v. Jackson*, 135 S. Ct. 1894 (2015).

The provisions of the MNE Arbitration Agreement asserting tribal jurisdiction and the application of tribal law over Internet borrowers and any claims they might have against MNE are, to say the least, highly suspect. *See, e.g.*, *Heldt v. Payday Fin., LLC*, 12

---

[2] The term "Indian" is used herein because it is the term used in the precedential authorities surrounding the law that governs Native-Americans in the United States.

4

F. Supp. 3d 1170, 1186 (D.S.D. 2014) ("This Court is equally skeptical that the borrowers' on-reservation conduct is sufficient to justify a *Montana* exception to the general principle that the tribe lacks legal authority over non-members.") (citing *Plains*). *See also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014) ("In any event, plaintiffs provided insufficient evidence to establish that they are likely to succeed in showing that the internet loans should be treated as on-reservation activity. As the district court noted, plaintiffs 'built a wobbly foundation for their contention that … activity that occur[ed] on the Tribes' lands.'"). Yet, the MNE Arbitration Agreement goes even further and claims that a dispute between borrowers and *non-tribal entities like Bay Cities* is also subject to tribal law and tribal jurisdiction:

> all claims asserted by You individually against Us, and/or … any of our agents or servicers and/or any of their employees, directors, officers, shareholders, governors, managers, members, parents, subsidiaries, or any affiliated entities (hereinafter collectively referred to as "related third parties").

Doc. 123-1, p. 22. *See also* Bay Cities' Brief in Support of Arbitration ("…the arbitration agreements expressly cover not only the lenders but various 'related third parties,' including 'agents' and/or 'servicers.'"). Doc. 155, p. 27.

Where, as here, a case arises "between two non-Indians" and involves "ordinary run-of-the mill" claims, "th[e] dispute is distinctively non-tribal in nature" *A-1 Contractors v. Strate*, 76 F.3d 930, 941 (8th Cir. 1996) (*en banc*), *aff'd*, 520 U.S. 438 (1997). Even courts that have enforced tribal arbitration provisions in claims against

5

tribal entity lenders have rejected arguments that related claims against non-tribal third parties are also subject to tribal law or tribal court jurisdiction. *See, e.g., Hayes v. Delbert Servs. Corp.*, No. 3:14-CV-258, 2015 WL 269483, at *3 (E.D. Va. Jan. 21, 2015) (construing identical arbitration agreement and holding that tribal exhaustion does not apply to non-tribal loan servicer).[3] Those courts that have found assertions of tribal jurisdiction "colorable" with respect to non-tribal loan servicers and collection agencies have done so only in cases where at least one of the parties to the dispute was arguably a member of the tribe. *See Brown v. Western Sky Fin. LLC*, 84 F. Supp. 3d 467, 471 (M.D.N.C. 2015) (suit against Western Sky itself); *Heldt, supra* (same).

Here, not only do the provisions of the Loan Agreement insist that the non-applicable "Miami Tribe of Oklahoma tribal law" will apply in any arbitration between Mr. Dillon and Bay Cities, but the Loan Agreement attempts to vest ultimate jurisdiction over that dispute with a body of law that could not possibly have subject matter jurisdiction ("the exclusive exercise of regulatory and [adjudicatory] authority of the Miami Tribe of Oklahoma"). The MNE Arbitration Agreement even specifically provides that: "[i]f a final, non-appealable judgment of a court having competent jurisdiction over this transaction finds, for any reason, that the FAA does not apply to this transaction, then

---

[3] While the court in *Hayes v. Delbert* granted the motion to compel arbitration, the *Hayes* court did not consider the broader question of whether an agreement requiring arbitration be conducted under Indian laws with review of the arbitral award by a tribal court was enforceable under Virginia law. *Hayes* is currently on appeal in the Fourth Circuit. *See Hayes v. Delbert Services Corp.*, Case Nos. 15-1170 & 15-1217.

our agreement to arbitrate shall be governed by the arbitration law of the Miami Tribe of Oklahoma." Doc. 123-1, p. 22.

These provisions cannot lawfully apply in an arbitration between Mr. Dillon and Bay Cities arising from Bay Cities' wrongful debiting of Mr. Dillon's bank account more than a thousand miles away from the Miami Tribe reservation in Miami, Oklahoma. This case has nothing to do with the Miami Tribe's "ability to govern its own affairs under tribal laws and customs. It deals only with the conduct of non-Indians and the tribe's asserted ability to exercise plenary judicial authority over a decidedly non-tribal matter." *A-1 Contractors*, 76 F.3d at 940.

In addition, the "governing law" provision which claims, "this Note and Your account shall be governed by all applicable federal laws and all laws of the Miami Tribe of Oklahoma, the regulatory authority of MNE Services, Inc. dba USFastCash, regardless of the state or jurisdiction in which You may reside" is a *per se* impermissible prospective waiver of state statutory remedies. An arbitration agreement will not be enforced if its terms, "prospective[ly] waive" a "party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler- Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (warning that "we would have little hesitation in condemning" such an agreement as "against public policy"). *See also American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (An arbitration agreement that "forbid[s] the assertion of certain statutory rights" cannot be enforced under the FAA.). On its face, the

7

MNE Arbitration Agreement violates this rule.

An arbitration agreement awash with so many unfair and untruthful provisions is unconscionable and unenforceable under North Carolina law. "A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability." *Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 370 (N.C. 2008). "Procedural unconscionability involves 'bargaining naughtiness' in the formation of the contract, i.e., fraud, coercion, undue influence, misrepresentation, inadequate disclosure." *King v. King*, 442 S.E.2d 154, 157 (N.C. Ct. App. 1994) (quoting *Rite Color Chemical Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992)). "Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms." *Tillman*, 655 S.E.2d at 370 (quoting *Rite Color*). Further, under North Carolina law, as in most states,

> while the presence of both procedural and substantive problems is necessary for an ultimate finding of unconscionability, such a finding may be appropriate when a contract presents pronounced substantive unfairness and a minimal degree of procedural unfairness, or vice versa.

*Id.*

MNE's use of false representations of applicable tribal law and jurisdiction within the MNE Arbitration Agreement to compel borrowers to arbitration under false pretenses and immunize itself from liability is procedurally unfair.

What is more, other courts have already concluded that the MNE Arbitration Agreement on the MNE website was actually hidden from borrowers when they agreed to

8

their loans:

> In order to receive the loan proceeds, the borrower is required to select the desired loan amount, click four separate boxes accepting the Lending Defendants' terms and conditions, type his or her name in an electronic signature box, and click a button that reads: "I AGREE Send Me My Cash!" The borrowers, however, are not actually required to read the terms and conditions of their loans in order to receive the loan proceeds. On the contrary, the webpage format discourages the reading of the terms and conditions because it breaks the terms and conditions up into nine separate hyperlinks in eight or nine point font …. The boxes and disclosure links appear on the websites as follows:
>
> ☑ I have read and accept the terms of the Application, including the terms and provisions of the LIMITED WAIVER OF SOVEREIGN IMMUNITY and the ARBITRATION PROVISION contained therein.
>
> > ☑ I have read and accept the terms of the Privacy Policy & Electronic Disclosure and Consent Agreement.
> >
> > ☑ I have read and accept the terms of the Authorization Agreement.
> >
> > ☑ I have read and accept the terms of the Loan Note and Disclosure, including the terms and provisions of the LIMITED WAIVER OF SOVEREIGN IMMUNITY and the ARBITRATION PROVISION contained therein.

*F.T.C. v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1343 (D. Nev. 2014).

This factual finding by the United States District Court for Nevada is identical to the website printout Bay Cities filed with this Court. Doc. 123-1, p. 11. When MNE's false assertions of tribal law and jurisdiction are combined with the fact that the arbitration agreement was actually hidden from borrowers when they agreed to their loans, the test for procedural unconscionability is easily satisfied. *See Tillman*, 655 S.E.2d at 370 ("We therefore conclude that plaintiffs made a sufficient showing to

establish procedural unconscionability.").

The Loan Agreement's requirements (incorporated into the MNE Arbitration Agreement) that the arbitrator apply inapplicable tribal law to an arbitration between Mr. Dillon and a non-tribal entity like Bay Cities are also substantively unconscionable. The same is true for the Loan Agreement's provisions (incorporated into the MNE Arbitration Agreement) subjecting Mr. Dillon's claims against Bay Cities to "the exclusive exercise of regulatory and adjudicatory authority of the Miami Tribe of Oklahoma"—an entity without subject matter jurisdiction and located more than one thousand miles away. Finally, the Agreement's provisions waiving any and all state law remedies borrowers have against *any entity* are both substantively unconscionable and, *by themselves*, make the MNE Arbitration Agreement unenforceable on its face. *Am. Exp. Co.*, 133 S. Ct. at 2310 ("As we have described, the exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies,'…. That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights.") (quoting *Mitsubishi Motors*, 473 U.S. at 637, n. 19) (emphasis in original).

Since the commencement of this action, several courts of appeal have found arbitration agreements comparable to the MNE Arbitration Agreement unenforceable. *See Jackson supra* (refusing to enforce identical Western Sky arbitration agreement); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346 (11th Cir. 2014) *cert. denied*, 135 S. Ct. 1735

(2015) (same). *See also Moses v. CashCall, Inc.*, 781 F.3d 63, 67-68 (4th Cir. 2015) ("Courts that have considered loan agreements similar to the one at issue here have found that the Cheyenne River Sioux Tribe has no laws or facilities for arbitration and that the arbitration procedure specified is a 'sham from stem to stern.'").

And while the arbitration agreements rejected by the circuit courts of appeal differed from the one here in that those agreements called for a member of the tribe to actually conduct the arbitration under non-existent arbitral procedures, the fact that the MNE Arbitration Provision states instead that the arbitration will be "before the" American Arbitration Association (Doc. 123-1, p. 22) does nothing to cure the unconscionability of the other incorporated provisions. Bay Cities' brief quotes liberally from the MNE Arbitration Agreement (Doc. 155, pp. 9-12) but fails to include the other onerous and unfair provisions about the inapplicable law and regulatory body that would govern that arbitration. Indeed, there is a distinct possibility that *no laws of the Miami Tribe of Ohio applicable to arbitration or payday lending actually exist.* Bay Cities claims not to have any such law in its possession and a subpoena seeking those documents from the company that employed the declarant of the supporting declaration was the subject of a motion to quash by the Miami Tribe of Oklahoma (see discussion *infra*).

Parties that agree to arbitration "do not agree to forego" entirely "their right to have their dispute fairly resolved." *Murray v. United Food & Commercial Workers Int'l*

*Union*, 289 F.3d 297, 303 (4th Cir. 2002) (internal quotation marks omitted). The MNE

Arbitration Agreement is similar enough to the one Senior Circuit Judge Andre M. Davis

saw in *Moses* as to earn the same level of opprobrium: "I do not hesitate to observe the

odiousness of CashCall's apparent practice of using tribal arbitration agreements to prey

on financially distressed consumers, while shielding itself from state actions to enforce

consumer protection laws." *Moses*, 781 F.3d at 94. This Court should not enforce the

unconscionable MNE Arbitration Agreement.

## II.   BAY CITIES HAS STILL FAILED TO AUTHENTICATE THE PURPORTED LOAN AGREEMENTS.

The Court previously denied Bay Cities' first motion to compel arbitration,

holding that the loan agreements submitted by Bay Cities in support of its motion were

not properly authenticated. Doc. 100. Bay Cities then filed a renewed motion with

declarations that purported to authenticate the loan agreements. Doc. 123-1, 123-2. But

those declarations were not made by persons with knowledge and Bay Cities still has not

properly authenticated the loan agreements.

### A. The Purported VIN Loan Agreement Has not been Properly Authenticated.

Bay Cities attempts to authenticate the VIN Loan Agreement via a declaration

from Richard Knowles. But Mr. Knowles is an employee of a "Third Party Sender"

named Billing Tree, not VIN. Doc. 123-2, p. 2. And as discovery has borne out, Mr.

Knowles has no idea whether the document he attached to his declaration is authentic.

In March of 2014 Bay Cities asked Billing Tree (and specifically, Billing Tree

12

employee Knowles), to procure a copy of the loan agreement from VIN. *See* Declaration of J. Austin Moore (the "Moore Decl."), ¶ 9, Ex. C. Mr. Knowles tried unsuccessfully to get a copy of Mr. Dillon's loan agreement from VIN. *Id.*, ¶ 10, Ex. C. Mr. Knowles repeatedly tried to do so by "email and phone," and "got no response" when he emailed and "the phone would just ring" when he repeatedly tried to call. *See* Transcript of Knowles Deposition (the "Knowles Transcript") attached to Moore Decl. as Exhibit K, 39:16-25 – 40:1. Mr. Knowles was in touch with Bay Cities the entire time, providing status reports on his efforts. *Id.*, 41: 9-15. Eventually, Mr. Knowles gave up and informed Bay Cities that he was not able to get in touch with VIN:

> **Q. …Is it fair to say that at some point in March of 14, after repeated attempts to contact VIN Capital, you informed Bay Cities by e-mail that you didn't believe you would be able to get in touch with VIN Capital?**
>
> A.   That's correct.
>
> **Q.   Okay. So after you sent that e-mail to Bay Cities, then what happened?**
>
> A.   They asked me to sign [the Knowles Declaration].

*Id.*, 41: 21-15 – 42:1-7.

The Knowles Declaration claims that Billing Tree received a purported copy of the VIN Loan Agreement from "CWB, a shared services provider" for VIN. Doc. 123-2, p. 3. However, during his deposition, Knowles admitted he only *assumed* CWB was a loan servicer for VIN, but he could not be sure:

> **Q.   I know, but I am asking specifically how you know CWB is or was**

**supposedly a loan servicer for VIN Capital?**

[…]

A.   I made the assumption there were loan servicers working, and it is not uncommon to have a loan servicer provide those documents.

**Q.  To put it more bluntly, are you aware of any information anywhere that says there is a relationship of loan servicing between CWB and VIN Capital?**

A.  I mean there could be. I didn't research it.

*Id.*, 53: 9-12.

Knowles does not know what the relationship is or was between CWB and VIN; he has no idea what CWB's business practices are; or even where the company is located:

**Q.   Are you aware of –do you know what CWB's business practices are?**

A.  I do not.

**Q.  Do you know what—do you know where CWB is located?**

A.  I do not.

**Q.   Do you know what CWB's practices are with respect to the retention of business records?**

A.  I do not.

**Q.  Do you know what CWB's relationship is to VIN Capital?**

A.  I do not.

*Id.*, 51: 4-15. In short, Knowles cannot authenticate the document provided by CWB because he has no idea how CWB got the document, if it got it at all, from VIN.

Bay Cities argues that "a proponent's obligation is to produce sufficient evidence that the document is "what it is claimed to be," not to produce a particular witness Doc. 155, pp. 21-22 (citing Fed.R.Evid. 901(b)(1)). It also argues that "Fed.R.Evid. 901(b)(4) allows for evidence to be authenticated by '[a]ppearance, contents, substance, internal

14

patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *Id*. But evidence that a document is "what it is claimed to be" requires, "[t]estimony of a witness with knowledge" Fed.R.Evid. 901(b)(1), or by "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result," Fed.R.Evid. 901(b)(9)." *United States v. Oriach*, 222 F. App'x 312, 314-15 (4th Cir. 2007) (ellipses in original). Knowles' declaration is not based on personal knowledge, and there is no evidence of a process or system in place that would produce an accurate copy of any VIN loan agreement. As such, Bay Cities' arguments ring hollow. Indeed, the declarant upon whom Bay Cities relies admits he has no idea whether the agreement attached to his declaration is authentic or not:

> **Q.  [D]o you know whether those documents are authentic or not?**
>
> A.  I do not.
>
> **Q.   Do you know how CWB obtained the documents that are attached to your declaration as Exhibit 1?**
>
> A.  I do not.
>
> **Q.   Do you know whether the documents attached to your declaration as Exhibit 1 have been altered in any way from their original form?**
>
> A.  I do not.
>
> **Q.   Do you know whether the plaintiff in this litigation, Mr. Dillon, ever assented to the terms that are reflected in the documents in Exhibit 1?** […]
>
> A:  I do not.

*Id*., 66: 15-25 – 67:1-8.

The Court should not consider the Knowles Declaration because it is not competent evidence. Lacking all personal knowledge of the document, Mr. Knowles

15

cannot authenticate it. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Fed.R.Evid. 602. Evidence is inadmissible under this rule if "in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982). "The absence of an affirmative showing of personal knowledge of specific facts vitiates the sufficiency of [an] affidavit[] and, accordingly, summary disposition based thereon [i]s improper." *Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir. 1972). The same standard applies in the context of motions to compel arbitration. *See*, *e.g.*, *Erichsen v. RBC Capital Markets, LLC*, 883 F. Supp. 2d 562, 568 (E.D.N.C. 2012) (granting motion to strike declaration in support of motion to compel arbitration).

Without an authenticated arbitration agreement, Bay Cities cannot compel arbitration. *See Pearson v. United Debt Holdings, LLC,* No. 14 C 10070, 2015 WL 4960315 at *2-3 (N.D. Ill. Aug. 19, 2015) (After defendant "failed to provide sufficient evidence to authenticate the purported [payday loan] agreement[,]" court held it was "without sufficient evidence to find that there exists an agreement to arbitrate."). As Bay Cities recognizes, "[a] party seeking to compel arbitration bears the initial burden of showing the existence of a written arbitration agreement." Doc.155, p. 19 (citing *Krusch v. TAMKO Bldg. Prods., Inc.*, 34 F. Supp. 3d 584, 588 (M.D.N.C. 2014); *Goodwin v.*

*Century Care of Cherryville Inc.*, 215 N.C.App. 389 (table), 2011 WL 3890971, *3 (2011)). Bay Cities has not done so here.

### B. Plaintiff Has Been Prevented From Testing the Assertions In the Muir Declaration That Purport to Authenticate the MNE Loan Agreement.

With respect to the MNE Loan Agreement, Bay Cities submits the Declaration of Christopher Muir, a representative of AMG Services, Inc. ("AMG") — a separate entity that is purportedly a "shared services" provider for MNE—in an attempt to authenticate the MNE Loan Agreement. As with the VIN loan, Bay Cities was apparently unable to procure an authenticating declaration from the lender itself. Plaintiff sought to test the truth of the Muir Declaration by issuing a subpoena for Mr. Muir's deposition.

On September 10, 2015, the Miami Tribe of Oklahoma ("Tribe") filed a motion to intervene in this action in the Western District of Missouri in order to quash the subpoena of Muir as an "improper attempt to compel disclosure about the internal matters and business of the Miami tribe and its enterprises." *See Miami Tribe of Oklahoma v. James Dillon, et al.*, No. 4:15-mc-09024-NKL (W.D. Mo.). Moore Decl., ¶ 18, Ex. M. The Tribe's motion was filed just days before the deposition of Mr. Muir was to take place on September 16, 2015. On September 14, counsel for Mr. Muir, Sean Colligan of Stinson Leonard Street LLP, informed Plaintiff's counsel that Mr. Muir would not be appearing for his deposition. Moore Decl., ¶ 19, Ex. N. The Tribe's motion was filed despite the fact that the deposition was narrowly tailored to topics directly relevant to his declaration, which had been further limited pursuant to an agreement between Plaintiff's counsel and

17

Mr. Colligan. *Id*., ¶ 17, Ex. L. In light of the Tribe's motion, Plaintiff was forced to withdraw the subpoena. *Id*., ¶¶ 20, 21, Ex. O.

Accordingly, Plaintiff has been unable to test the veracity of Mr. Muir's assertions. In such circumstances, courts routinely strike, or refuse to consider, declarations where an opposing party is not allowed the opportunity to depose the declarant. *See*, *e.g., Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011) (finding district court did not abuse its discretion when it struck declaration of declarant that defendant was deprived of opportunity to depose); *Manguiat v. Bd. of Educ. of Prince George's Cty.*, No. GJH-13-1165, 2015 WL 2376008, at *4 (D. Md. May 18, 2015) (granting defendant's motion to strike declarations where defendant was deprived of opportunity to depose the declarants); *MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc.*, No. CIV.A. GLR-11-3767, 2013 WL 4086401, at *10 (D. Md. Aug. 12, 2013) (declaration of plaintiff's witness struck where plaintiff thwarted defendant's opportunity to depose witness on information that was basis of declaration).

What is more, because the Miami Tribe of Oklahoma has blocked all relevant testimony by Muir on tribal sovereign immunity grounds, Muir can no longer be a testifying witness and his declaration is inadmissible hearsay that fails to qualify for any of the enumerated exceptions to the hearsay rule. *See* Fed.R.Evid. 803-04; *Versatile v. Johnson*, No. 3:09CV120, 2011 WL 1167440, at *4 (E.D. Va. Mar. 28, 2011) ("Because [affiant] did not testify at the evidentiary hearing as to the contents of the affidavit, which

18

was offered to prove the truth of the statements therein, [] Affidavit constitutes hearsay.")

Accordingly, the Court should not consider the untested assertions in the Muir Declaration. Because Bay Cities has no other evidence regarding the purported authenticity of the MNE loan agreement, it has no basis upon which to move to compel Mr. Dillon's claims to arbitration. Bay Cites has not shown "the existence of a written arbitration agreement." *Krusch v. TAMKO*, 34 F. Supp. 3d 584, 588.

## III.  BAY CITIES CANNOT ENFORCE ARBITRATION UNDER ESTOPPEL OR THIRD-PARTY BENEFICIARY THEORIES.

In *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), the Supreme Court held that non-signatories to arbitration agreements can sometimes compel parties to arbitrate under the FAA, "if the relevant state contract law allows him to enforce the agreement." *Id*. at 632. The loan agreements Bay Cities seeks to enforce here state they are to be governed by the laws of the Miami Tribe of Oklahoma (Doc. 123-1, p. 21) and Nevada state law (Doc. 123-2, p10), respectively. With regard to the MNE Arbitration Agreement, Bay Cities has not met its burden of showing that the law of the Miami Tribe of Oklahoma would permit non-party enforcement of a contract under estoppel or third-party beneficiary theories. *See, e.g.*, *Todd v. Steamship Mut. Underwriting Ass'n (Bermuda)*, 601 F.3d 329, 336 (5th Cir. 2010) ("during this appeal, the parties have not addressed what law should apply to determine whether [plaintiff] must arbitrate as a nonsignatory . . . on remand, the parties should address the effect of the clause in the [agreement] selecting English law to govern"). Second, with regard to the VIN

19

Arbitration Agreement, under Nevada law, estoppel is only applicable where the party attempting to compel arbitration derives a "direct benefit" from the agreement. *See Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 661 (Nev. 2008). As discussed below, Bay Cities never received any such benefit.

Even assuming *arguendo* North Carolina law governs this analysis, however, equitable estoppel is not appropriate because (1) Plaintiff's claims do not "rely" on the loan agreements—they arise independently and do not seek to enforce any obligation contained in the agreements themselves; and (2) allegations of "substantially interdependent and concerted misconduct" alone are inadequate to invoke estoppel in the absence of reliance on the underlying agreement. *See Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005).

***First***, Bay Cities relies heavily on orders in related cases (almost all outside the Fourth Circuit) compelling arbitration where the courts generally found that defendants could invoke the arbitration agreements because plaintiffs' claims "rely on the terms of the Loan Agreements being illegal." *Booth v. BMO Harris Bank, N.A.*, No. 13-5968, 2014 WL 3952945, at *6 (E.D. Pa. Aug. 11, 2014). But, in compelling arbitration under similar facts, these cases take an overbroad (and too-literal) interpretation of the term "reliance" and fail to consider the public policy underlying the equitable estoppel doctrine. "In the context of arbitration, the [equitable estoppel] doctrine applies when one party attempts 'to hold [another party] to the terms of [an] agreement' while

simultaneously trying to avoid the agreement's arbitration clause." *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160-61 (4th Cir. 2004).

The key factor in this case is that Plaintiff is (a) not claiming the benefits of the loan agreements; (b) not attempting to hold Bay Cities or any other entity to the terms of the loan agreements; and (c) not alleging that any entity breached the loan agreements or violated duties arising from the loan agreements. Fourth Circuit law is clear that under these circumstances, a party is not equitably estopped from avoiding a contract's arbitration provision.

**Second**, allegations of conspiracy (such as the RICO conspiracy alleged here) do not, on their own, give rise to the "interdependent conduct" needed to justify equitable estoppel. In similar circumstances, the court in *Brantley* denied arbitration, finding there was no "interdependent conduct," since plaintiffs' "statutory claims" were "wholly unrelated" to the contract. *Brantley*, 424 F.3d at 396. Cases from other circuits applying this standard agree that concerted misconduct alone is not enough to invoke equitable estoppel. *See, e.g.*, *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002) *rev'd sub nom. PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401 (2003), ("[t]he plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel."); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013) ("Mere allegations of collusion are insufficient to trigger equitable

estoppel," the allegations "must also establish that the plaintiff's claims against the nonsignatory are intimately founded in and intertwined with the *obligations imposed by the contract* containing the arbitration clause") (emphasis added). Bay Cities cannot compel arbitration under an estoppel theory.

Bay Cities also argues it is a third-party beneficiary of the loan agreements because they "expressly cover not only the lenders but various 'related third parties,' including 'agents" and/or "servicers'" which, along with Plaintiff's ACH authorization, "reflects a clear intent to benefit . . . any party that provides an essential service in connection with the transaction" including Bay Cities. Doc. 155, p. 27. However, the contractual language in the loan agreements does not evince a clear intent that the contracts were "executed for the direct, and not incidental, benefit" of Bay Cities. *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 601 (M.D.N.C. 2011) (citations omitted). While the disputes provisions in the loan agreements encompass "related third parties" including non-tribal entities, *Brantley* recognizes the principle that a broad disputes provision alone does not evince a clear intent that the agreement was "executed for the direct, and not incidental, benefit" of a *specific* non-party like Bay Cities. *Pearson*, 814 F. Supp. 2d at 601 (citations omitted). In determining the intent of the parties, this Court should look not only to the language of the contracts, but also the "circumstances surrounding the transaction." *Blis Day Spa, LLC v. Hartford Ins. Grp.*, 427 F. Supp. 2d 621, 637 (W.D.N.C. 2006) (noting third-party beneficiary status should

be "construed strictly against the party seeking enforcement."). Here, documents produced in discovery indicate that Bay Cities *expressly disclaimed* that it was an "agent" "servicer" or "related third party" of the lenders. Indeed, in the origination agreements between Bay Cities and Billing Tree and Intercept Corp., the Third-Party Senders for VIN and MNE, the parties agreed:

> <u>Relationship of Parties</u>. Third-Party Sender and Financial Institution intend for their relationship to be that of independent contractors. In no event shall either party be or be deemed to be an agent, employee, partner or joint venturer of the other party. Financial Institution has no fiduciary or special relationship with Third-Party Sender as a consequence of entering into this Agreement . . .

> Moore Decl., ¶ 14, Exs. F and G.

What is more, Billing Tree and VIN had their own separate agreement providing that "The parties hereunder intend that their relationship is that of independent contractors. In no event shall either party be deemed an agent, employee, partner or joint venturer of the other or have the power or authority to bind the other in any way."[4] *Id*., ¶13, Ex. E. It is disingenuous for Bay Cities and its Third-Party Senders to contractually disclaim any type of "related party" relationships with the payday lenders and then in the same breath argue they are "related third parties," "agents" and/or "servicers" entitled to enforce the agreements under a third-party beneficiary theory. At best Bay Cities "incidentally" benefited through the Loan Agreements because it agreed to process unlawful payday loan debits with Third-Party Processors.

---

[4] Presumably MNE and Intercept had a similar agreement.

23

## CONCLUSION

For the foregoing reasons, Bay Cities' Motion to Compel Arbitration should be denied.

Dated: November 30, 2015

Respectfully submitted,

/s/ F. Hill Allen
F. Hill Allen
North Carolina State Bar No. 18884
E-mail: hallen@tharringtonsmith.com
**THARRINGTON SMITH, L.L.P.**
P.O. Box 1151
Raleigh, NC 27602-1151
Telephone: 919-821-4711
Facsimile: 919-829-1583

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel
Steve Six
J. Austin Moore
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**DARREN KAPLAN LAW FIRM, PC**
Darren T. Kaplan
1359 Broadway, Suite 2001
New York, NY 10018
Tel: (212) 999-7370
Fax: (646) 390-7410
dkaplan@darrenkaplanlaw.com

**TYCKO & ZAVAREEI LLP**

24

Hassan A. Zavareei
Jeffrey D. Kaliel
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow
One West Las Olas Blvd., Ste. 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
ostrow@KOlawyers.com

**Counsel for Plaintiff and the Class**

25

## CERTIFICATE OF SERVICE

I certify that on this 30th day of November 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of the filing to the attorneys on that system.

By: */s/ F. Hill Allen*
F. Hill Allen