IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JAMES DILLON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-CV-897 |
| | ) | |
| BMO HARRIS BANK, N.A., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The defendant Bay Cities Bank has moved to compel arbitration based on documents purporting to be loan agreements between the plaintiff, James Dillon, and a pair of non-party payday loan lenders. (Doc. 154). The parties agree that Mr. Dillon and the lenders entered into loan contracts online after Mr. Dillon provided information requested by each lender. Mr. Dillon agreed to the contracts not by physically signing a written agreement, but by clicking boxes on a website accepting terms required by the lenders. At issue is whether the lenders presented and Mr. Dillon accepted an arbitration provision as part of the loan agreement.

If the lender did not present an arbitration provision to Mr. Dillon during the click-through process, then there was no mutual assent to arbitrate, and he cannot be forced to arbitrate claims arising from the loans. If, however, the lender did present an arbitration provision to Mr. Dillon and Mr. Dillon clicked through and accepted that provision, then

the arbitration provisions shown to him are arbitration agreements enforceable by the lenders under the Federal Arbitration Act ("FAA"), subject to any equitable defenses.

Bay Cities has provided no evidence from the lenders showing that the arbitration provisions in the documents were presented to Mr. Dillon. The other evidence, including the testimony of non-party witnesses, Mr. Dillon's testimony, and the proffered documents themselves, is insufficient to satisfy the Court that Mr. Dillon and the lenders mutually agreed to the arbitration provisions. The motion will be denied.

## BACKGROUND

Mr. Dillon alleges that he borrowed money at usurious rates from several online lenders in different transactions. (Doc. 1 at ¶¶ 81-103). To electronically deposit the loan proceeds and to debit Mr. Dillon's bank account for repayments, the lenders needed access to the Automated Clearing House ("ACH") Network. (*Id.* at ¶ 6). Bay Cities and the other defendants are banks that allegedly provided that access by "originating" debits and credits on the ACH Network for the lenders. (*Id.* at ¶¶ 6, 8).

Bay Cities allegedly originated transactions in connection with loans Mr. Dillon received from USFastCash and VIN Capital. (*Id.* at ¶¶ 86-87, 90-91). The complaint alleges that Bay Cities, by providing this access, violated the Racketeer Influenced and Corrupt Organization Act. (*Id.* at ¶ 174). Mr. Dillon also asserts claims pursuant to North Carolina law. (*E.g.*, *id.* at ¶ 188). The lenders are not parties to this lawsuit.

Bay Cities moved to compel arbitration and to stay this action until arbitration is completed. (Doc. 154). It proffered documents it contends are the loan agreements with USFastCash and VIN Capital that Mr. Dillon referenced in his complaint; these

2

documents contain arbitration provisions. (Doc. 123-1 at 15-25; Doc. 123-2 at 7-12). Bay Cities further contends it is entitled to enforce the arbitration provisions. (Doc. 155 at 22-28). Mr. Dillon contends the loan agreements proffered by Bay Cities have not been properly authenticated. (Doc. 173 at 18-25). In the alternative, Mr. Dillon asserts that the USFastCash arbitration provision is unconscionable, (*id*. at 9-18), and that Bay Cities is not a party to and cannot enforce either arbitration provision. (*Id.* at 25-29).

It is undisputed that Mr. Dillon applied online for loans from USFastCash and VIN Capital by providing information requested by the lenders and by clicking through various terms and conditions, that Mr. Dillon did not read the terms except those about the loan amounts, and that USFastCash and VIN Capital accepted Mr. Dillon's online applications and lent him money. Thus, there is no dispute that Mr. Dillon and the lenders entered into contracts. It is also undisputed that Mr. Dillon never viewed the documents proffered here by Bay Cities in their current format and that neither document bears Mr. Dillon's physical signature. The questions are whether the lenders presented the arbitration provisions in the proffered documents to Mr. Dillon during the online loan process and, therefore, whether the proffered documents accurately reflect the terms to which Mr. Dillon and the lenders mutually agreed.

## STANDARD

The party seeking to compel arbitration under the FAA has the burden to prove several elements, including, as relevant here, a written agreement that includes an arbitration provision that purports to cover the dispute. *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002); *see also Hightower v. GMRI, Inc.*, 272 F.3d 239, 242

3

(4th Cir. 2001); *Erichsen v. RBC Capital Mkts., LLC*, 883 F. Supp. 2d 562, 568

(E.D.N.C. 2012).[1]  Arbitration is "a matter of consent, not coercion."  *Volt Info. Scis., Inc.*

*v. Stanford Univ.*, 489 U.S. 468, 479 (1989).  "[A] party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit."  *Am. Bankers Ins. Grp.,*

*Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (quotation omitted).  If the parties agreed

to arbitrate, then "courts must place arbitration agreements on an equal footing with other

contracts and enforce them according to their terms."  *AT&T Mobility LLC v.*

*Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

Whether a party agreed to arbitrate is a question decided by state law governing

contract formation.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995);

*Adkins*, 303 F.3d at 501.  The contract enforceability principles of the forum state apply.

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009).

Before a valid contract can exist under North Carolina law,[2] the parties must

"assent to the same thing in the same sense, and their minds meet as to all terms."

*Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985).  The party seeking to

compel arbitration has the burden to prove a valid arbitration agreement exists.  *Slaughter*

*v. Swicegood*, 162 N.C. App. 457, 461, 591 S.E.2d 577, 581 (2004).  The agreement need

not be signed if the parties otherwise commit themselves by act or conduct.  *Krusch v.*

---

[1] The other elements are: a dispute between the parties, the relationship of the transaction to interstate or foreign commerce, and the failure of the party to arbitrate the dispute.  *Adkins*, 303 F.3d at 500-01.  These are not in dispute here.

[2] The arbitration agreements were entered into, if at all, in North Carolina, and both parties applied North Carolina law in their briefs.  (*E.g.*, Doc. 173 at 14; Doc. 183 at 5).

4

*TAMKO Bldg. Prods., Inc.,* 34 F. Supp. 3d 584, 589 (M.D.N.C. 2014); *Real Color Displays, Inc. v. Universal Applied Techs. Corp.*, 950 F. Supp. 714, 717 (E.D.N.C. 1997); *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 120, 516 S.E.2d 879, 882 (1999).

Although there is a legal presumption in favor of arbitrability, that presumption applies only when a "validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," not when there is a question as to whether an agreement exists between the parties in the first place. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301-02 (2010); *see also Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013). Compelling arbitration is appropriate under the FAA only when there is "a judicial conclusion" that there is a validly formed, express agreement to arbitrate. *Granite Rock*, 561 U.S. at 303. The language of the FAA itself says the district court will enter an order to arbitrate only "upon being satisfied" there is an agreement to arbitrate. 9 U.S.C. § 4. If there is an unresolved dispute over the existence of an arbitration agreement, the court conducts a "restricted inquiry into factual issues." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983); *see also Dillon v. BMO Harris Bank*, 787 F.3d 707, 716 (4th Cir. 2015); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997).

Where a proponent of an arbitration agreement offers credible, admissible evidence to support a finding of an agreement to arbitrate, the opponent cannot rely on mere unawareness of whether it had made an arbitration agreement. *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945) (holding that when the proponent had shown, *inter alia*, that all sales contracts contained the arbitration

5

agreement, that the opponent had accepted two such contracts in writing, and that the opponent merely asserted it "lacked sufficient knowledge" to determine whether it had agreed to arbitrate, the district court "had ample ground for being satisfied" there was an arbitration agreement). In disputed cases, the party opposing arbitration must unequivocally deny that there was an arbitration agreement and produce evidence to substantiate the denial. *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001). This burden on the opponent only arises, however, after the proponent produces credible, admissible evidence which satisfies the Court that there was an arbitration agreement.[3] *See* 9 U.S.C. § 4.

## DISCUSSION

### I.    The USFastCash Loan

In support of its position that there is a written arbitration agreement between Mr. Dillon and USFastCash, Bay Cities proffers two pieces of evidence to authenticate the agreement: a declaration from Christopher Muir, an employee of an entity that provided services to USFastCash, and deposition testimony from Mr. Dillon. (Doc. 183 at 13, 11). Bay Cities also points to the proffered document itself. (Doc. 155 at 21-22).

Mr. Muir's declaration is silent as to how USFastCash created, acquired, maintained, and preserved, if at all, the electronically created and electronically stored document, making his testimony insufficient to establish that the proffered document is

---

[3] District courts within the Fourth Circuit routinely apply summary judgment standards to motions to compel arbitration, requiring the proponent to submit admissible evidence in support of the agreement to arbitrate. *E.g.*, *Erichsen*, 883 F. Supp. 2d at 566-67.

6

what it purports to be.  Mr. Dillon's lack of knowledge about the terms of the loan agreement proves nothing about whether USFastCash included the arbitration provision in the terms and conditions it presented to him when he applied for a loan online.  The document itself does not contain Mr. Dillon's physical signature nor any specific indication that Mr. Dillon agreed to the arbitration provision.  This evidence fails to authenticate the purported agreement, and the evidence is not sufficiently credible to satisfy the Court that USFastCash presented this arbitration provision to Mr. Dillon during the online loan application process.

### A. Mr. Muir's Declaration

Mr. Muir affirms that he is employed with AMG Services, Inc., ("AMG"), which until recently provided services to USFastCash, including customer service, collections, and accounting.  (Doc. 123-1 at ¶¶ 1-2).  Mr. Muir affirms that he has access to USFastCash's loan documents.  (*Id.* at ¶ 3).  He affirms he has personal knowledge of the USFastCash online loan application process and explains how that process worked: potential borrowers provided information requested, checked boxes, and clicked on buttons.  (*Id.* at ¶¶ 3-10).  He further affirms that "[c]ustomers who applied and received a loan from UsFastCash agreed to an arbitration provision first in their application and again in their loan note and disclosure."  (*Id.* at ¶ 13).  Finally, he affirms that when he reviewed AMG's records for loan applications from and agreements with Mr. Dillon, he located the proffered loan application and loan agreement.  (*Id.* at ¶¶ 11-12).

There are reasons to be wary of Mr. Muir's declaration and the evidence from USFastCash's files.  First, AMG admits that the Miami Tribe of Oklahoma, which is the

7

owner of USFastCash and the purported source of the document attached to the declaration, has a history of dishonesty in court proceedings. In connection with criminal proceedings in New York, AMG admitted that the Miami Tribe of Oklahoma submitted false declarations to other courts about its payday lending operations. (Doc. 212-2 at 7 ¶ 4). Second, Mr. Muir and AMG refused to participate in a deposition where Mr. Dillon could ask questions about USFastCash's recordkeeping systems and about deficiencies in Mr. Muir's declaration, despite Mr. Muir's sworn statement that he would testify if called upon to do so. (*Compare* Doc. 123-1 at ¶ 1 *with* Docs. 174-8, 174-13, 174-14); *see Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 562 (D. Md. 2007) (order of Grimm, Mag. J.) (noting the importance of cross-examination to evaluate whether an appropriate foundation has been laid for admitting digital photographs).[4]

---

[4] Neither party cited a case where the evidence used to prove an arbitration agreement was a declaration from a witness who refused to be deposed. The closest case the Court located is *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, where, in connection with a motion to transfer venue, the court quashed a subpoena to an ambassador based on diplomatic immunity but indicated a willingness to disregard statements about the merits in the ambassador's affidavit. 683 F. Supp. 2d 1, 12-13 (D.D.C. 2010). It appears well established that, absent collusion, it is unfair to punish a party whose non-party witness refuses to be deposed by excluding that witness from testifying *at trial*, but those cases do not speak to the admissibility of declarations in connection with motions. *See, e.g.*, *SEC v. BIH Corp.*, No. 2:10-cv-577, 2014 WL 3384777, at *3 (M.D. Fla. July 10, 2014) ("[S]anctions . . . , such as preventing non-appearing witnesses from testifying at trial, are unlikely absent evidence that the witnesses were under [the party's] control or that [the party] took any action to procure their failure to appear."); *accord Francois v. Blandford*, No. 10-1330, 2012 WL 777273, at *3 (E.D. La. Mar. 7, 2012) (order of Roby, Mag. J.); *Hernandez v. Tregea*, No. 2:07-cv-149, 2008 WL 3157192, at *3 (M.D. Fla. Aug. 4, 2008); *Taylor v. Hart*, No. 1:02-cv-446, 2007 WL 1959211, at *1 (S.D. Ohio June 29, 2007) (order of Black, Mag. J.). It also is established that a refusal to be deposed is relevant to credibility. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, No. 2:13-cv-39, 2015 WL 4065219, at *3 (D. Me. July 2, 2015) (noting that witness could be cross-examined at trial on failure to attend deposition). The Court has considered AMG's and Mr. Muir's refusal to submit to a deposition and finds it a strong basis to infer a lack of trustworthiness about AMG's records and Mr. Muir's testimony. While it might be unfair to exclude the declaration when Bay Cities is not responsible for the

Moreover, while touching on some points relevant to authentication, Mr. Muir is silent as to others. He does not explain how the electronic document purporting to memorialize the loan agreement was created. (*See* Doc. 123-1 at ¶¶ 10-11). He cannot affirm that the document presented to the Court was presented to Mr. Dillon in the same format. (*See id.* at ¶¶ 12-13). He is silent about how USFastCash maintained its electronic records or ensured that loan agreements were preserved without alteration or change. (*See id.* at ¶¶ 1-13). While Mr. Muir says that USFastCash customers generally were directed to a page from which they could print their electronic loan documents for retention, (*id.* at ¶ 10), he does not affirm that this page was presented to Mr. Dillon. He does not purport to work for USFastCash and does not explain how he became familiar with its online loan practices. (*See id.* at ¶¶ 1, 3). He does not identify his position with AMG and says nothing about how his work related to USFastCash's online lending procedures. (*See id.*) He does not affirm he worked for AMG at any relevant time. (*See id.* at ¶ 1). None of the screenshots of the USFastCash homepage attached to Mr. Muir's declaration bear Mr. Dillon's name, personal information, or the relevant dates. (*See id.* at pp. 7-13).

These are not abstract, unimportant concerns. Click-wrap contracts like the one at issue here pose special risks of fraud and error. When one of the contracting parties has exclusive control of the electronic record, (*see* Doc. 180-1 at 11, 36:22-37:20), which is

_____

witness's recalcitrance, it would also be unfair to Mr. Dillon if the Court accepted, without caveat, questionable evidence from a declarant who refused to be deposed. The Court has considered the affidavit but finds it not to be credible, in part because of the refusal of AMG to submit to a deposition.

the case in many consumer online transactions, that party is in a position to produce a document that meets its current preferences and needs.[5] Even absent fraud, there is risk of error in the production of a document from the bowels of an electronic record-keeping system, which may include agreements whose terms and electronic click-through procedures varied over time. *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 670 (4th Cir. 2016) (noting a provision was not present in earlier versions of a payday lender's arbitration agreement); *McMillan v. Wells Fargo Bank, N.A.*, No. C 08-05739, 2009 WL 1686431, at *4 (N.D. Cal. June 12, 2009) (discussing factual issues with online banking forms "as to whether certain forms were ever agreed to—or even received—in the first place and whether there was fraud in the inducement"). That risk is even higher when the party maintaining the records and the party producing the records are not the same.

North Carolina courts do not enforce arbitration provisions that were not presented to the plaintiffs or were added after the fact. In *Sciolino v. TD Waterhouse Investor Services,* the plaintiffs signed an application in which they agreed to be bound by an "enclosed Customer Agreement" that "contains a pre-dispute Arbitration clause;" however, the plaintiffs testified that no customer agreement was ever provided. 149 N.C. App. 642, 643-44, 562 S.E.2d 64, 65-66 (2002). The defendants presented customer

---

[5] For example, an unscrupulous lender could add an arbitration provision if it was sued by the borrower, but delete the arbitration provision if the lender filed suit claiming a default. If a consumer agreed to an arbitration provision, an unscrupulous entity could later change the terms if there was an enforcement problem with the original language. An unscrupulous entity could also unilaterally add provisions to an electronic contract after a lawsuit was filed, restricting jurisdiction or placing other limitations on suits. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (discussing the need for electronic bargaining "to have integrity and credibility" in order to result in enforceable contracts).

agreements that contained arbitration provisions and contended the plaintiffs were bound by those provisions. *Id.* at 645, 562 S.E.2d at 66. Those customer agreements did not bear the plaintiffs' account numbers or signatures. *Id.* at 646, 562 S.E.2d at 66. The North Carolina Court of Appeals upheld the trial court's finding that there was no evidence of assent and therefore no valid agreement to arbitrate. *Id.* at 646, 562 S.E.2d at 66-67; *see also King v. Owen*, 166 N.C. App. 246, 247-48, 601 S.E.2d 326, 328 (2004) (upholding finding that proponent of arbitration failed to establish a valid arbitration agreement when the arbitration provision appeared only in an unsigned title policy issued after closing); *Britt v. May Davis Grp., Inc.*, 182 N.C. App. 175, 641 S.E.2d 417 (table), 2007 WL 656279 (Mar. 6, 2007) (upholding finding of no agreement to arbitrate where plaintiff testified he had never seen the arbitration clause defendants contended was printed on the back of the signed application that had been faxed to plaintiff).[6]

Additionally, North Carolina courts and federal courts have indicated an unwillingness to rely on purported contracts merely because a copy exists in an electronic file. In *Slaughter*, the plaintiffs introduced affidavits indicating their lack of awareness of the arbitration agreement. 162 N.C. App. 457, 461, 591 S.E.2d 577, 581 (2004). The

---

[6] *See also Supak & Sons Mfg. Co. v. Pervel Indus., Inc.*, 593 F.2d 135, 136 (4th Cir. 1979) (holding that arbitration clause added in confirmation form did not become part of contract because parties did not mutually agree, applying North Carolina and New York Uniform Commercial Code); *Morton v. Ivey, McClellan, Gatton & Talcott, LLP*, No. 12 CVS 1298, 2013 WL 1792516, at *4-5 (N.C. Super. Ct. Apr. 24, 2013) (upholding unsigned written agreement to arbitrate where conduct showed a meeting of the minds as to arbitration, and distinguishing and collecting cases refusing to enforce arbitration provisions where the courts "doubt[ed] whether the plaintiffs . . . ever saw or were aware of the arbitration provision upon which the defendant relied"); *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 335 (D. Md. 2012) (noting insured could not be bound by arbitration provision in policy "never actually presented" to insured).

defendants' sole evidence in favor of an agreement to arbitrate was an employee's testimony that the document containing the arbitration provision had been scanned into an electronic filing system eleven years after it had been allegedly signed. *Id.* at 462, 591 S.E.2d at 581. In affirming the trial court's refusal to find a binding arbitration agreement, the appellate court noted that the employee did not say she witnessed the signing of the agreement or explain why the agreement was scanned into the system years later and that the defendants did not present any evidence about "the general business practices surrounding the signing of similar customer agreements, or whether it was the usual policy . . . to require prospective clients to sign such agreements." *Id.*

Similarly, in *Capps ex rel. Capps v. Blondeau,* the North Carolina Business Court denied a motion to compel arbitration where the alleged arbitration agreement was based on "scanned and electronically stored copies and specimens" and the evidence showed the proponent's record keeping "was sloppy and fragmented at best." No. 07 CVS 16486, 2010 WL 1552048, at *10 (N.C. Super. Ct. Apr. 13, 2010) (unpublished), *aff'd,* 217 N.C. App. 195, 719 S.E.2d 256 (table), 2011 WL 5540086 (Nov. 15, 2011). The documentary evidence submitted by the proponent was "problematic" in part because the original document viewed by the plaintiffs had been destroyed, except for the signature pages. *Id.* at *3, *10. Evidence from the proponent's employee attempting to authenticate the documents was unpersuasive in view of the witness's credibility problems, including a criminal conviction. *Id.* at *10.

In *Lorraine*, after surveying the cases and evidence rules governing admissibility of electronically stored information, the court noted that while the standards of Federal

Rule of Evidence 901 are low, they are nonetheless often not met. 241 F.R.D. at 542 (collecting cases). "It is necessary . . . that the authenticating witness provide factual specificity about the process by which the electronically stored information is created, acquired, maintained, and preserved without alteration or change, or the process by which it is produced if the result of a system or process that does so." *Id.* at 545. "[B]oilerplate, conclusory statements" are insufficient. *Id.*; *accord In re Vee Vinhnee*, 336 B.R. 437, 447 (B.A.P. 9th Cir. 2005) (upholding rejection of electronic records where custodial witness was "vague, conclusory, and . . . unpersuasive"). The *Lorraine* court also noted the importance of cross-examination to test the reliability of such evidence and the fact-specific nature of the required foundation. 241 F.R.D. at 543-544.

Here, Mr. Muir does not establish how he acquired personal knowledge about the business practices of an entity that did not employ him, nor does he say that the personal knowledge he does have relates to business practices in effect during the relevant time frame. More importantly, even if one assumes personal knowledge, Mr. Muir says nothing about USFastCash's procedures for creating and maintaining accurate copies of loan agreements. And, while he affirms that borrowers were required to "click on required boxes" confirming they had read various documents, including an arbitration provision, (Doc. 123-1 at ¶¶ 9, 13), he does not testify that the arbitration provision in the proffered document was presented in identical form to Mr. Dillon or even that it is identical to the arbitration provision in use at the time Mr. Dillon borrowed the money. Mr. Muir's testimony is insufficient to authenticate the purported loan agreement.

### B. Mr. Dillon's Deposition

The second piece of evidence on which Bay Cities relies is Mr. Dillon's deposition. (Doc. 183 at 11). Given the lack of credible evidence that the proffered document was ever presented in the same form to Mr. Dillon during the loan application process, and given Mr. Dillon's credible testimony that he did not read the terms presented online, Mr. Dillon could not competently testify to those terms.

In his deposition, Mr. Dillon testified repeatedly that when applying for the loan he simply "clicked" through the boxes. (Doc. 180-1 at 12-13, 41:23-42:20; *see also id.* at 17, 58:20-58:24 (Great Plains loan)). He testified he did not remember seeing an arbitration provision, (*id.* at 13, 42:9-43:25), and did not remember any of the terms of the agreement, except the loan amount, (*id.*; *see also id.* at 11, 36:1-36:7 & 37:21-37:25), because he never read them. (*Id.* at 37, 141:6-141:7). Given Mr. Dillon's lack of knowledge about the terms and conditions presented to him, Mr. Dillon cannot competently identify a document purporting to contain those terms.

Despite his lack of knowledge, Mr. Dillon twice affirmatively answered leading questions asking if the proffered document was his loan agreement. When asked "[D]o you recognize [the document] as your USFastCash loan application and agreement?" he said, "Yeah, I recognize it." (Doc. 180-1 at 12, 38:11-38:14). Later, when asked whether the document "is your USFastCash loan agreement. Correct?" he said, "That's correct." (Doc. 180-1 at 37, 139:13-139:17). Those six words do not establish that Mr. Dillon had the personal knowledge necessary to authenticate a document never presented to him

during the loan application process[7] and containing terms he never read. Nor do those answers outweigh the rest of Mr. Dillon's testimony, where he consistently stated that he did not read the terms and conditions as he clicked through the loan application. Such an authentication is neither competent nor credible. *See Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 634 (D. Md. 2014) (order of Gauvey, Mag. J.) (evaluating purported admission by plaintiff and declining to credit it where plaintiff indicated a lack of personal knowledge); *Hagen v. United States*, 485 F. Supp. 2d 622, 626 (D. Md. 2007) (declining to consider testimony about signature cards where witness admitted that he had no personal knowledge of whether plaintiff signed the cards); *cf. Capps*, 2010 WL 1552048, at *6, *10 (finding a witness with a criminal conviction for fraud and another witness with Alzheimer's not credible to testify about signing of arbitration agreement); *see generally* Fed. R. Evid. 602 (requiring personal knowledge as a condition of testimony).

While it is black letter law that consumers are bound by the fine print whether they read it or not, it is equally obvious that online sellers cannot insert terms and conditions the consumer did not have an opportunity to review. *See* discussion *supra* p. 10. Mr. Dillon's testimony does not show he had an opportunity to review, and thereafter agree to, any arbitration provision. Mr. Dillon's failure to read or remember the terms does not excuse the proponent from its burden of proof.

---

[7] As noted *supra*, Mr. Dillon consistently testified that he merely clicked on boxes, and Mr. Muir did not credibly testify that the document proffered to the Court was presented in the same form to Mr. Dillon as part of the loan application process.

### C. The Purported Loan Agreement

Finally, Bay Cities relies on the proffered document itself, which includes personal information about Mr. Dillon, and, Bay Cities contends, provides circumstantial evidence the document is what it purports to be.  (Doc. 155 at 21-22; Doc. 183 at 12). Mr. Dillon admits he provided this personal information[8] to USFastCash when he applied for the loan online, (Doc. 180-1 at 12-13, 38:11-43:7), and one may thus infer that the document was created by USFastCash.

However, in the absence of evidence that USFastCash had procedures in place to accurately store and retrieve electronic loan agreements without alteration, *supra* pp. 9, 14, and in view of the Miami Tribe of Oklahoma's history of submitting false statements to courts, *supra* p. 8, the fact that USFastCash created the proffered document, at some unknown time and for some unknown purpose, does nothing to prove credibly that Mr. Dillon agreed to arbitration when he applied for the loan.

### D. Conclusion

The initial burden on a proponent of an arbitration agreement is not high.  But Rule 901 does require that the proponent submit "a satisfactory foundation" from which a jury could "reasonably find that the evidence is authentic."  *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014); *accord* Fed. R. Evid. 901.  Additionally, the FAA requires that the Court be "satisfied" there is an agreement to arbitrate.  9 U.S.C. § 4.

---

[8] This information includes Mr. Dillon's name, contact information, date of birth, driver's license number, Social Security number, employment information, bank account number, and personal references.  (Doc. 180-1 at 12-13, 38:11-43:7).

Here, the evidence is not straightforward or credible, and there are numerous gaps in the foundation going directly to the trustworthiness of the purported record. In making a discretionary evidentiary ruling[9] and in determining whether it is satisfied an arbitration agreement exists, the Court is not required to admit and accept incomplete or untrustworthy evidence merely because the evidence concerns an arbitration agreement. Nor must the Court admit and accept the proffered agreement merely because the proponent obtained a purported electronic copy from an entity neither a party to the loan agreement nor the litigation or because Mr. Dillon does not remember what terms and conditions he accepted when he borrowed money from USFastCash. *See Davis v. BSH Home Appliances Corp.*, No. 4:15-CV-103, 2016 WL 183482, at *5 (E.D.N.C. Jan. 14, 2016) (declining to credit an affidavit purporting to authenticate an arbitration agreement when the affidavit was not consistent with the documents), *amended on reconsideration on other grounds*, 2016 WL 589686 (Feb. 10, 2016); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (noting in the summary judgment context that "[t]he mere existence of a scintilla of evidence" is insufficient to support a ruling in favor of the party with the burden of proof).

In the absence of trustworthy evidence that Mr. Dillon was presented with an arbitration provision when he clicked through the USFastCash website to apply for a loan, the Court is not satisfied there was mutual assent to the proffered arbitration

---

[9] *Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008) (noting that district court rulings on admissibility of evidence for summary judgment are reviewed for an abuse of discretion.)

agreement. Bay Cities' motion to compel arbitration of Mr. Dillon's claims arising out of the USFastCash loan will be denied.[10]

## II. The VIN Capital Loan

In support of its position that there is a written arbitration agreement between Mr. Dillon and VIN Capital, Bay Cities proffers two pieces of evidence: testimony from Richard Knowles, who worked for an entity with an electronic payment origination agreement with VIN Capital, and Mr. Dillon's deposition testimony. (Doc. 183 at 11-13). Bay Cities also points to the purported agreement itself. (*Id.* at 12; Doc. 155 at 20-22). For reasons similar to those discussed in connection with the USFastCash loan, this evidence is insufficient to satisfy the Court.

### A. Testimony of Mr. Knowles

Mr. Knowles worked for BillingTree Payment Solutions, an entity with an electronic payment origination agreement with VIN Capital. (Doc. 123-2 at ¶¶ 1-3). Mr. Knowles testified by declaration and in a deposition that BillingTree obtained the proffered document in the regular course of business from CWB, VIN Capital's shared service provider, at the request of Bay Cities for proof of authorization for Mr. Dillon's loan. (*Id.* at ¶¶ 1-2, 4-5; Doc. 174-11 at 15, 52:4-52:18, 13, 43:15-44:9). Mr. Knowles

---

[10] Mr. Dillon contends he can prove the interest rates in the loan agreement and his claims for relief using bank records without resort to the purported written loan agreement created by USFastCash. (Doc. 211 at 82:23-84:20). It remains to be seen if this is possible, and it also remains to be seen how Mr. Dillon can prevail on a motion to certify a class when the evidence in support of class member claims may be no more trustworthy than the written contracts proffered by Bay Cities. If at any point in the litigation Mr. Dillon relies on the written agreement proffered by Bay Cities as the USFastCash loan agreement, the Court will reconsider, upon request, the motion to compel arbitration.

18

testified BillingTree routinely obtains documents this way. (Doc. 123-2 at ¶ 4). At his deposition, Mr. Knowles admitted he lacked personal knowledge of VIN Capital's online loan application process and document retention practices. (Doc. 174-11 at 20, 70:15-73:10). He also testified he was unfamiliar with CWB's document retention practices. (*Id.* at 15, 51:4-51:15).

While his testimony is credible as far as it goes,[11] it is insufficient to establish that the proffered document is an accurate copy of the agreement between Mr. Dillon and VIN Capital. Mr. Knowles had no knowledge about VIN Capital's online loan procedures and document retention procedures, and his testimony does not provide any information as to whether the arbitration provision in the proffered document was presented to Mr. Dillon during the loan application process. Mr. Knowles' testimony does not provide any information as to how VIN Capital created, maintained, and retrieved the electronic documents at issue. Moreover, the loan agreement did not come from VIN Capital, but from yet another entity, CWB, about whose document retention practices Mr. Knowles also had no information. (*Id.* at 15, 51:4-51:12). Mr. Knowles testified that he did not know whether the purported loan agreement was authentic, how CWB obtained the document, or whether the document had been altered. (*Id.* at 19, 66:15-68:16). Finally, Mr. Knowles testified that when he tried to get a copy of Mr.

---

[11] The admissions about his lack of knowledge do not reflect on his credibility, since Mr. Knowles did not claim to have such knowledge in his declaration. (*See* Doc. 123-2). He candidly admitted at his deposition when he lacked personal knowledge, and his deposition testimony was generally consistent with his declaration.

Dillon's agreement directly from VIN Capital, VIN Capital never responded to repeated phone calls and emails. (*Id.* at 12, 39:5-41:2).

As noted *supra* pp. 10, the concerns about Mr. Knowles' testimony are not abstract or unimportant. Mr. Knowles' testimony provides an insufficient basis for the Court to conclude that the document produced to BillingTree by CWB is an accurate copy of the loan agreement between Mr. Dillon and VIN Capital. *See Lorraine*, 241 F.R.D. at 545.

### B. Mr. Dillon's testimony

The second piece of evidence Bay Cities relies on is Mr. Dillon's deposition. (Doc. 183 at 11). Again, Mr. Dillon's testimony is highly equivocal and without foundation.

While Mr. Dillon agreed the personal information[12] in the proffered document accurately reflected the information he provided during the loan application process, (Doc. 180-1 at 8-10, 24:6-33:2), he did not remember any reference to an arbitration provision as he "clicked through" the loan application. (*Id.* at 10, 31:19-32:2). Given his lack of knowledge about the arbitration provision, it is difficult to understand how Mr. Dillon could competently identify the document as his loan agreement. (*Id.* at 8, 23:6-23:13); *see Webster*, 15 F. Supp. 3d at 634; *Hagen*, 485 F. Supp. 2d at 626; *cf. Capps*, 2010 WL 1552048, at *10; *see generally* Fed. R. Evid. 602 (requiring personal knowledge as a condition of testimony).

---

[12] This information included his name, contact information, employment information, Social Security number, and bank account number. (Doc. 180-1 at 8-10, 24:6-33:2).

The Court concludes Mr. Dillon's testimony does not credibly authenticate the purported loan agreement and does not establish that VIN Capital presented the arbitration provision to Mr. Dillon during the loan process.

### C. The Loan Agreement

Finally, Bay Cities relies on the proffered document itself, which includes personal information about Mr. Dillon, and, Bay Cities contends, provides circumstantial evidence the document is what it purports to be. (Doc. 155 at 21-22; Doc. 183 at 12).

Mr. Dillon admits he provided this personal information to VIN Capital when he applied for the loan online, (Doc. 180-1 at 8-10, 24:6-33:2), so the contents of the document do indicate it came from VIN Capital. That, however, is not enough. That Mr. Dillon's personal information is in the document does not speak to whether Mr. Dillon agreed to arbitration or whether the document was created accurately or maintained without alteration. Nor does the document contain a physical signature, which often is circumstantial evidence of agreement.

In the absence of evidence that VIN Capital accurately stored and retrieved electronic loan agreements without alteration, the fact that VIN Capital created the proffered document, at some unknown time and for some unknown purpose, does nothing to prove Mr. Dillon agreed to arbitration when he applied for the loan.

### D. Conclusion

As noted in connection with the USFastCash document, a court is not required to admit and accept inadmissible, incomplete, or untrustworthy evidence merely because the evidence concerns an arbitration agreement. *See* discussion *supra* pp. 17-18. The Court

21

is not satisfied there is an agreement to arbitrate, and Bay Cities' motion to compel arbitration of Mr. Dillon's claims arising out of the VIN Capital loan will be denied.[13]

## CONCLUSION

There is nothing inherently unfair about arbitration agreements in the consumer loan context or in the Internet contract context. It would be inherently unfair, however, to hold an online consumer to an arbitration provision to which he or she did not agree. *Volt Info. Scis.*, 489 U.S. at 479 (holding arbitration is "a matter of consent, not coercion"). The state and federal policies favoring arbitration do not excuse proponents of such agreements from producing reliable and credible evidence that the parties mutually agreed to arbitration. Documents created by entities of questionable credibility, produced second- or third-hand, and purportedly authenticated by witnesses who are unfamiliar with the lender's online record creation and retention practices are insufficient. Absent credible evidence that Mr. Dillon agreed to the arbitration provisions in the proffered documents, the motions to compel arbitration will be denied.

In view of the Court's finding that Bay Cities has offered inadequate proof of agreements to arbitrate, the Court need not reach Bay Cities' argument that it can enforce the arbitration provisions in the proffered loan agreements, to which it was not a party, via equitable estoppel or as a third-party beneficiary. Nor need the Court reach Mr.

---

[13] If at any point in the litigation Mr. Dillon relies on the written agreement proffered by Bay Cities as the VIN Capital loan agreement, the Court will reconsider, upon request, the motion to compel arbitration. *See supra* note 10.

Dillon's argument that the proffered USFastCash agreement is unconscionable under North Carolina law and unenforceable under *Hayes*, 811 F.3d 666.

It is **ORDERED** that the motion to compel arbitration by Bay Cities Bank, (Doc. 154), is **DENIED.**

This the 23rd day of March, 2016.

_____
UNITED STATES DISTRICT JUDGE

Case 1:13-cv-00897-CCE-LPA   Document 217   Filed 03/23/16   Page 23 of 23