IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JAMES DILLON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-CV-897 |
| | ) | |
| BMO HARRIS BANK, N.A., et al., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

This is a civil RICO lawsuit arising out of online loans the plaintiff, James Dillon, received at predatory interest rates. One of the defendants, Generations Community Federal Credit Union, has moved to sanction plaintiff's counsel pursuant to 28 U.S.C. § 1927 and the Court's inherent authority. (Doc. 188). The Court finds and concludes that three of Mr. Dillon's lawyers acted in bad faith and vexatiously and violated their duty of candor by hiding a relevant and potentially dispositive document from the Court in connection with a long-running dispute over arbitrability. The Court further finds and concludes that their actions multiplied the proceedings, wasted court resources, misled the Court, and caused Generations to incur unnecessary attorney's fees. In the Court's discretion, the Court will grant the motion.

## I.    OVERVIEW

According to the complaint, Mr. Dillon borrowed money at usurious rates from several online lenders between December 2012 and May 2013. He consulted counsel

about these allegedly predatory loans and filed this lawsuit in October 2013 against non-lender banks involved in transferring the loaned amounts into, and repayments out of, Mr. Dillon's bank account.

Soon afterwards, Generations moved to dismiss based on an arbitration provision in a document that it proffered as the loan agreement between Mr. Dillon and one of the lenders—the "Generations Copy." The Generations Copy appeared to be a written contract memorializing a loan agreement between Mr. Dillon and Western Sky Financial, the lender whose banking transactions Generations had handled. The Generations Copy contained personal information about Mr. Dillon, financial information consistent with the loan terms in the complaint, and an arbitration provision. While Generations did not provide any evidence authenticating the Generations Copy, nothing about the document itself raised any red flags as to its authenticity.

Mr. Dillon's attorneys ("Counsel")[1] objected to the Court's consideration of the Generations Copy, contending among other things that there was no evidence the Generations Copy was an authentic copy of the loan agreement. During oral argument on the motion to dismiss, plaintiff's attorney Steve Six made statements implying and leading the Court to believe that Mr. Dillon did not have a copy of any loan agreement.

---

[1] For simplicity, all references to Counsel refer collectively to Mr. Dillon's attorneys, unless otherwise stated. The Court identifies the individual lawyers who signed particular pleadings and briefs and attended particular hearings in footnotes in Section II. The Court evaluates individual and firm responsibility for the misconduct at issue in Section IV.E.

2

After the Court denied Generations' motion to dismiss based on the authenticity challenge, Generations filed a renewed motion to dismiss. Generations supported this renewed motion with evidence authenticating the Generations Copy. Counsel objected to the renewed motion and asked the Court to treat it as a motion to reconsider, contending that Generations had not acted with due diligence in obtaining the new evidence. When the Court agreed that Generations had not shown a basis for reconsideration and denied the renewed motion, Generations appealed. Counsel continued to assert on appeal that the arbitration issue was inappropriate for reconsideration. The Fourth Circuit remanded for consideration of the renewed arbitration motion on the merits.

After remand and during discovery on the renewed motion, Counsel stated in response to an interrogatory that Mr. Dillon no longer disputed authenticity of the Generations Copy. When the defendants deposed Mr. Dillon a few weeks later, he dropped a bombshell: Mr. Dillon testified that he had a copy of the same document in his possession, printed at the same time he borrowed the money.

Counsel did not provide Mr. Dillon's copy to Generations at the deposition. Just shy of two weeks later, Counsel sent Generations a redacted copy of what Mr. Dillon had printed—the "Dillon Copy." Apart from a URL at the bottom of the page, the Dillon Copy and the Generations Copy were identical. Generations eventually obtained an unredacted version of the Dillon Copy after a forensic examination of Mr. Dillon's computer. That unredacted copy showed that Mr. Dillon faxed the Dillon Copy to Counsel on October 1, 2013, before the lawsuit was filed.

These facts, which are largely undisputed, show that during the twenty-two month period from the filing of the first arbitration motion through Mr. Dillon's deposition, Counsel did not disclose the relevant Dillon Copy to the Court or to Generations or mention its existence. Instead, without asking Mr. Dillon how or when he obtained the Dillon Copy, Counsel

- challenged the authenticity of the Generations Copy;

- made misleading arguments implying that Mr. Dillon was not in possession of *any* loan agreements, or failed to correct such arguments;

- resisted reconsideration of the arbitration motion when it was clear such reconsideration would ultimately occur when the Dillon Copy came to light;

- only provided the Dillon Copy to Generations after Mr. Dillon disclosed its existence at his deposition.

Had Counsel disclosed the Dillon Copy at the beginning of the arbitration dispute, its importance could have been explored by Generations and addressed by the Court early in the proceedings. Had Counsel disclosed the Dillon Copy after the Court's initial decision that there was no evidence of authenticity, the authenticity question would almost certainly have been reconsidered before appeal.

Counsel hid the Dillon Copy from the Court and Generations in order to increase the likelihood they would prevail on the arbitration question and in an effort to delay or prevent questioning of their client about the Dillon Copy. Had Mr. Dillon not testified truthfully at his deposition concerning the existence of the Dillon Copy, Counsel likely

4

never would have disclosed it. Counsel acted in bad faith and vexatiously, they violated the duty of candor that Counsel owed to the Court, and they multiplied the proceedings.

For the reasons just summarized and explained in detail below, the Court will grant the motion and impose sanctions in the form of attorney's fees. The Court will determine the specific amount in a future order.

The Court will begin with a detailed statement of the relevant facts, followed by an overview of the law relevant to sanctions under the relevant statute and in the Court's inherent authority. The Court will examine the evidence and explain why it finds Counsel have acted in bad faith and vexatiously. The Court will review Counsel's arguments to the contrary and explain why they are not persuasive. Finally, the Court will discuss how the Counsel's conduct multiplied the proceedings, evaluate the specific role of each of Mr. Dillon's attorneys, and discuss appropriate sanctions.

## II.    FACTS[2]

According to the complaint, Mr. Dillon borrowed money at usurious rates from several online lenders in separate transactions beginning in December 2012. (Doc. 1 at ¶¶ 81-99).[3] One of those transactions was a short-term loan from Western Sky, which he obtained on May 30, 2013. (*Id.* at ¶ 97).

---

[2] The facts that follow are largely undisputed. A few of the stated facts in this section arise as inferences the Court has drawn from undisputed facts.

[3] All references to the record cite the document number added by the CM-ECF system. When paragraph numbers exist in the filed document, the pin citation includes the paragraph numbers. Otherwise, pin citations are to the page numbers added by CM-ECF. For condensed deposition testimony, (*e.g.*, Doc. 180-1), the Court cites the both the CM-ECF page number and the page numbers and line references of the original transcript.

5

Soon thereafter, Mr. Dillon consulted Counsel in connection with these "payday loans," and on September 13, 2013, a paralegal at Stueve Siegel Hanson LLP asked him for "all documents and e-mails in [his] possession relating to the loans, including bank statements." (Doc. 260 at ¶¶ 3, 5). On September 24, Mr. Dillon provided bank statements and said in a note to Counsel that he "only [had] bank statements." (Doc. 260-1 at 2).

After receiving a call from J. Austin Moore, one of Mr. Dillon's attorneys at Stueve Siegel Hanson, Mr. Dillon faxed Mr. Moore a document titled "Western Sky Consumer Loan Agreement" on October 1, 2013. (Doc. 260 at ¶¶ 2, 7-8; Doc. 189-3 at p. 6). The Dillon Copy included Mr. Dillon's name and address, as well as an arbitration provision. (Doc. 189-3 at pp. 6, 8-10). It appeared to be a loan agreement between Mr. Dillon and Western Sky for the May 30 loan. (*See id.* at pp. 6-11). As received by Counsel, the Dillon Copy displayed part of the URL for a web page on the bottom of the last four pages. (*Id.* at pp. 8-11). While part of the URL seems to have been cut off when the document was faxed or copied, it appeared to begin with "http://intranet.delbertservices.com." (*Id.*; Doc. 203 at ¶ 8). According to Counsel, Delbert Services Corporation was a loan servicer and debt collector for Western Sky loans. (Doc. 203 at ¶ 9). None of Mr. Dillon's attorneys asked Mr. Dillon when or how he came to possess the Dillon Copy.[4]

---

[4] In detailing their information and inferences about the Dillon Copy, none of Mr. Dillon's lawyers mentioned asking Mr. Dillon how or when he obtained the Dillon Copy. None testified that they confirmed any facts or otherwise had any discussions with him about the Dillon Copy.

6

Mr. Dillon filed the complaint on October 8, 2013.[5]  (Doc. 1 at p. 84).  As is relevant here, Mr. Dillon alleged that he applied for the May 30, 2013, Western Sky loan online.  (*Id.* at ¶ 97).  He alleged that "pursuant to [his] agreement with Western Sky," the loan amount was $2,525.00, the finance charge was $11,332.12, the entirety of the interest plus principal was $13,859.12, and the annual interest rate was 139.02%.  (*Id.* at ¶¶ 97, 99).  The Dillon Copy had the same date and contained these exact numbers, except that the finance charge is two dollars less in the complaint than on the Dillon Copy.  (Doc. 189-3 at p. 6).

Neither Western Sky nor any other lender is a defendant.  (*See* Doc. 1).  Rather, Mr. Dillon has sued banks, including Generations, which allegedly originate debits and credits on the Automated Clearing House ("ACH") network, providing access for the lenders to deposit loan proceeds and withdraw funds from Mr. Dillon's bank account for repayments.  (*Id.* at ¶¶ 6, 8).  Generations allegedly originated transactions in connection with the May 30 loan Mr. Dillon received from Western Sky.  (*Id.* at ¶¶ 98, 100-02).  The complaint alleges that Generations, by providing this access, violated the Racketeer

_____

(*See* Doc. 246 at 4-6, identifying no communications with Mr. Dillon about the Dillon Copy *after* he provided it; Doc. 246-2 at ¶¶ 7, 19, mentioning a "thorough investigation" but providing no details.  *See generally* Docs. 203, 246-1, 246-2, 246-3, 260).  Given the importance of this issue to the pending motion for sanctions and the extent of the disclosures about their contacts with Mr. Dillon, the Court infers and finds that Counsel did not so inquire.

[5] The complaint was signed by F. Hill Allen (local counsel), Norman E. Siegel, Steve Six, J. Austin Moore, Darren T. Kaplan, Jeffrey M. Ostrow, Jason H. Alperstein, Hassan A. Zavareei, Jeffrey D. Kaliel, and Anna C. Haac.  (Doc. 1 at pp. 84-85).

Influenced and Corrupt Organizations Act. (*Id.* at ¶ 157). Mr. Dillon also asserts claims against Generations under North Carolina law. (*E.g.*, *id.* at ¶ 188).

On November 8, 2013, Generations filed its first motion to dismiss. (Doc. 14).[6] Generations contended that Mr. Dillon's loan agreement with Western Sky contained provisions on venue, arbitration, and choice-of-law that restricted the resolution of his dispute to the Cheyenne River Sioux Tribe's courts, arbitrators, and laws. (*Id.*).

Generations attached the Generations Copy, entitled "Western Sky Consumer Loan Agreement," to the motion. (Doc. 14-1). It included Mr. Dillon's name and address as well as venue, arbitration, and choice-of-law provisions. (*Id.* at 1, 3-5). The Generations Copy was identical to the Dillon Copy, except there was no URL at the bottom of the page of the Generations Copy. (*See id.* at 1-6; Doc. 189-3 at pp. 6-11). The Generations Copy appeared on its face to be the loan agreement at issue. It contained details, including dollar amounts, about the May 30 Western Sky loan consistent with the allegations of the complaint.[7] (*See* Doc. 14-1; Doc. 1 at ¶¶ 97, 99). While Generations asserted in its brief that its copy was Mr. Dillon's loan agreement, it

_____

[6] Two other defendants, BMO Harris Bank, N.A. and Bay Cities Bank, filed motions to compel arbitration based on similar provisions in other purported loan agreements. (*See* Docs. 35, 40). Because those motions are not directly relevant to the pending sanctions issue, the Court will not detail their procedural history.

[7] Compared to the complaint, (Doc. 1 at ¶ 99), the Generations Copy, (Doc. 14-1 at 1), has the same two-dollar disparity for the finance charge as the Dillon Copy. (*See* Doc. 189-3 at p. 6).

provided no testimony authenticating the Generations Copy and no evidence about where or how it had obtained it.  (*See* Doc. 16 at 2; Doc. 14).

In opposition to Generations' first motion to dismiss, Counsel[8] objected to the Court's consideration of the Generations Copy because it had no signature, Generations did not explain how it obtained the document, Generations did not explain whether it was authentic, and Generations did not include a declaration or certification to support the admission of the document into evidence.  (Doc. 17 at 4).  Counsel did not disclose the existence of the identical Dillon Copy to the Court or the defense.  (*See generally* Doc. 17).  Thus, at this stage, the Court and Generations were unaware the Dillon Copy existed.

Generations responded that it did not have to produce any evidence authenticating the Generations Copy because the complaint referred to the loan agreement.  (*See* Doc. 52 at 3-4).  Generations further contended that Mr. Dillon did not dispute the authenticity of the agreement.  (*Id.* at 4).

Counsel made similar objections to the arbitration-related motions involving other defendants and other proffered loan agreements.  (*See* Docs. 64, 70).  The Court set all the motions for oral argument.  (Doc. 77).

At the beginning of the hearing on the arbitration motions on March 6, 2014, the Court stated its view that Mr. Dillon had challenged the authenticity of the Generations

---

[8] The brief was signed by Mr. Allen (local counsel), Mr. Siegel, Mr. Six, and Mr. Moore. (Doc. 17 at 21).

Copy and asked defense counsel questions related to this challenge. (Doc. 101 at 4).[9] Upon completion of initial questioning of defense counsel, Mr. Dillon's counsel[10] did not disagree with the Court's interpretation of Mr. Dillon's position on authenticity. (*See id.* at 19-21). Indeed, Steve Six, one of Mr. Dillon's attorneys, began his argument by stating that "I will start with the first issue Your Honor raised." (*Id.* at 19).

After stating his view that the burden was on the defendants to "bring contracts that seek to divest Mr. Dillon's right to appear before this Court," Mr. Six immediately informed the Court that, "for instance," he did not have a copy of the loan agreement between Mr. Dillon and VIN Capital, a payday lender with whom Generations was not involved. (*Id.*). Mr. Six repeated several times that he did not possess the VIN Capital loan agreement: "I drafted the complaint without the loan agreement," (*id.*); "[Mr. Dillon] didn't have, for instance, the VIN Capital . . . loan agreement," (*id.* at 24); "Again, you know, we drafted the complaint again without, for instance, the VIN Capital loan agreement." (*Id.* at 32). Mr. Six also described why it would be impossible for Mr. Dillon to obtain the VIN Capital loan agreement. (*See id.* at 24). Mr. Six discussed a section of the Western Sky loan agreement, (*id.* at 21-22), and went back and forth between specific references to the VIN Capital agreement and general references to all the agreements and claims. (*See id.* at 19-33). He also said near the beginning of his

---

[9] The Court's first question to defense counsel included a statement that the Court "read the plaintiff's briefs as challenging [the loan agreements'] authenticity. It seemed to me to be pretty clear. They said things like there is no proof these are authentic and we object." (Doc. 101 at 4).

[10] Representing Mr. Dillon at the hearing were Mr. Allen (local counsel), Mr. Six, Mr. Kaplan, and Mr. Kaliel. (Minute Entry 03/06/2014).

argument, "[a]s a threshold matter, *they* haven't established *these* are the agreements." (*Id.* at 20, emphasis added). Neither he nor any of Mr. Dillon's counsel disclosed during the hearing that Mr. Dillon possessed a copy identical to the Generations Copy. (*See id.* at 19-37, 42-44, 49-54, 63-73, 86-94, 97, 102-11, 116).

The Court denied Generations' first motion to dismiss, as well as BMO's and Bay Cities' motions to compel arbitration, on March 10, 2014. (Doc. 100 at 7). The Court noted that the documents "are not of unquestioned authenticity," and that "[n]o moving defendant has presented any evidence to support the contention that the documents presented are in fact the loan agreements referenced in the complaint." (*Id.* at 3, 5). The Court held that "the defendants have not met their burden of proof to show that there was an agreement to arbitrate." (*Id.* at 4).

Generations filed a renewed motion to dismiss on April 15, 2014. (Doc. 106). BMO and Bay Cities also filed renewed motions to compel arbitration. (Docs. 102, 123). Generations' renewed motion asserted the same grounds for dismissal as the first motion and included a declaration of Tawny Lawrence, a Western Sky agent and custodian of records, who stated that the Generations Copy was a valid copy of Mr. Dillon's loan agreement. (Doc. 106 at 2-3; Doc. 106-1 at ¶¶ 1-2). Counsel[11] opposed the renewed motion, contending it was in fact a motion for reconsideration under Federal Rule of Civil Procedure 54(b) and that there was no additional evidence that was not previously

---

[11] The response brief was signed by Mr. Allen (local counsel), Mr. Siegel, Mr. Six, Mr. Moore, Mr. Kaplan, Mr. Ostrow, and Mr. Zavareei. (Doc. 113 at 2-3).

available. (*See* Doc. 113 at 2). Nowhere in its opposition did Counsel disclose the existence of the Dillon Copy. (*See generally* Doc. 113).

The Court treated these motions as motions for reconsideration and denied them, concluding the defendants had failed to satisfy the requirements for reconsideration under Rule 54(b). (Doc. 128 at 3-4, 8). Generations and the other defendants appealed. (Doc. 130). Counsel[12] made similar arguments on appeal. (*See, e.g.*, Doc. 189-7 at 7-8, 22:25-25:4). Counsel did not disclose the existence of the Dillon Copy in the briefing or during oral argument. (*See* Doc. 189-3 at ¶ 6, explaining that Generations learned of the Dillon copy for the first time in deposition after remand; *see generally* Docs. 189-5, 189-6, 189-7).

In May 2015, the Fourth Circuit held that the renewed motions were not motions for reconsideration, vacated the denial of those motions, and remanded for a decision on the merits of the arbitration motions. *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 715-16 (4th Cir. 2015); (Doc. 143 at 15-19). Generations then filed a "Second Renewed Motion to Dismiss" on July 15, 2015, again asserting that the case should be dismissed because of venue, arbitration, and choice-of-law provisions in the proffered loan agreement. (Doc. 152). BMO and Bay Cities filed similar renewed motions. (Docs. 149, 154). The parties agreed discovery was appropriate, (Doc. 157), and the Court entered a discovery order. (Doc. 158).

---

[12] At the Fourth Circuit, Mr. Six argued the case for Mr. Dillon; Mr. Kaplan, Mr. Allen, Mr. Siegel, Mr. Moore, Mr. Ostrow, and Mr. Zavareei were on brief. *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 709 (4th Cir. 2015); (Doc. 143 at 1-2).

In interrogatory responses served on or about August 28, 2015, Mr. Dillon disclosed that he no longer contested the authenticity of the Generations Copy. (Doc. 189-9 at p. 5 ¶ 11). At his deposition on September 30, 2015, Mr. Dillon testified that he had a copy of the Western Sky loan agreement in his possession and that he had provided his copy to his counsel. (Doc. 180-1 at 25, 90:22-91:20). In response to a question from Generations' counsel, Mr. Dillon agreed that the Generations Copy—referenced in the deposition as Exhibit 9—was "a true and correct copy of [his] loan with Western Sky." (*Id.* at 25, 90:22-:24). He testified that he printed his copy at the time he borrowed the money, and he then repeated the same answer twice:

> Q.  Okay, where did you get the document that is in your possession?
> A.  I printed it out on the Internet when I took out the loan.
> Q.  So you printed it out at the time you took the loan?
> A.  Yes, I did.
> Q.  Is there some reason you printed out the Western Sky loan
>      agreement and not any other agreement that you have been presented
>      with today?
> A.  There's no reason. That's the only document I printed.
> Q.  And you said you had a copy in your possession when you got the
>      loan?
> A.  That's correct.

(*Id.* at 25, 91:3-:17). Later, he confirmed that he had printed it and testified he "probably" put it in a folder in his home:

> Q.  Okay, but you said you had a copy of what we marked as Exhibit 9,
>      your Western Sky loan agreement. Where – where was that
>      document when you found it?
> A.  I think I printed it directly off the Internet. I didn't get it off my e-
>      mail.
> Q.  Did you put it in a folder and then stick it in a drawer at home?
> A.  It might have been in a folder.
> Q.  Okay, you just – you recall or you don't?
> A.  I don't really recall, but it was probably in a – a folder, more likely.

13

(*Id.* at 28, 104:22-105:9).

After an eleven-minute break in the deposition, (*id.* at 31, 117:25), Mr. Dillon

repeated that he printed the loan agreement when he got the loan and repeated that he

gave a copy to Counsel:

> Q.  Okay.  Now, you told me that you printed a copy of your loan with
> Western Sky when you got the loan?
> A.  Yeah, that's correct.
> Q.  Okay, and I assume at some point you gave a copy of that loan
> agreement to your attorneys?
> A.  That's correct.
> Q.  Okay.  Do you remember where that loan agreement was, your copy,
> right before you handed it over to your attorneys?
> A.  I think it was in a folder.
> Q.  At your house?
> A.  Yeah.

(*Id.* at 33, 122:10-:22).

A few minutes later, after a one-minute break in the deposition, counsel for Bay

Cities began asking questions about the Western Sky agreement.  (*Id.* at 34, 128:8-129:7,

3, 6:24-:25).  Mr. Dillon then denied remembering the exact date on which he printed the

agreement:

> Q.  Okay, what is the – what is the date of that loan application and
> agreement?
> A.  May the 30th, 2013.
> Q.  You testified that you printed that document on your printer?
> A.  That's correct.
> Q.  When did you print it?
> A.  I don't remember the date that I printed it.
> Q.  Was it near in time to the date you took out the loan?
> A.  I don't remember the exact date whenever I printed it.

(*Id.* at 34, 129:8-:20).  Mr. Dillon persisted in his testimony that he did not remember the

exact date he printed it, and he then began to say he did not remember the time frame

when he printed it:

> Q.    The complaint in this action was – was dated October 2013.  Had
>        you printed out the Western Sky agreement at that time?
> A.    I don't remember the exact dates that I printed it out.
> Q.    I understand you don't remember the exact dates, but that's not my
>        question.  My question is do you know if you had printed out the
>        Western Sky agreement as of the time the lawsuit began.
> A.    I don't remember when I printed it out.

(*Id.* at 35, 131:14-:25).  Mr. Dillon became unwilling to say whether or not he had given

his copy to his lawyers in the past calendar year.  (*Id.* at 35, 132:7-:15).  Despite several

opportunities, he never testified that he printed the copy on or around the day he provided

it to his lawyers, repeating that he did not remember.  (*Id.* at 35, 132:16-133:10).

However, he repeated his testimony that he found the agreement in a folder at his home.

> Q.    You testified that you found it on a shelf in a folder, the – the
>        Western Sky agreement?
> A.    That's correct.
> Q.    What room was the shelf in?
> A.    It was in my living room.

(*Id.* at 35, 133:11-:16).

Darren Kaplan, one of Mr. Dillon's attorneys who was present at the deposition,

said during colloquy between counsel that "there's a perfectly good reason why he would

print [the Western Sky loan agreement] out."  (*Id.* at 36, 135:15-:17).  Mr. Moore,

another of Mr. Dillon's attorneys, also spoke up:

> Mr. Moore:   Do you want us to do a brief cross –
> Mr. Kaplan:   – Yeah.  You want us to – to explain it to you?
> Mr. Moore:    – And I think we can get this done in about two minutes?

15

Mr. Kaplan:   You know, yeah, go ahead, Let's – let's do that.
Mr. Moore:    Do you mind if I cross?
Mr. Kaplan:   Let's – let's turn the microphone over to Mr. Moore.

(*Id.* at 36, 135:18-136:3).  In what was thus a self-described effort to explain why Mr.

Dillon would have printed out the Dillon Copy, Mr. Moore asked a few questions:

> Q.   And this is the Western Sky loan agreement.  Correct?
> A.   That's correct.
> Q.   You testified earlier that you printed out this agreement.
> A.   That's correct.
> Q.   And Mr. Pullen asked you is there a reason why you printed out this agreement but not the other agreements we've discussed today.  Do you remember him asking you that question?
> A.   Yeah, I remember.
> Q.   I believe you responded no, you – you don't know the reason you printed out this one and not the other one.  Is that right?
> A.   That's right.
>
> [colloquy between counsel omitted]
>
> Q.   Is it possible that Western Sky required you to fax in a copy of that loan agreement along with your void check and a copy of your driver's license in order to take out the loan?
> A.   Yeah, it's possible.
> Q.   Do you think you could have printed off that loan document in order to fax it in to Western Sky?
> A.   Yeah.

(*Id.* at 36, 136:10-137:23).[13]

Before Mr. Dillon's deposition testimony, Counsel had not told Generations that

the Dillon Copy existed and they had not provided a copy.  Generations first became

---

[13] Mr. Dillon's memory problems continued at an evidentiary hearing related to the second renewed motion to dismiss.  (*See* Doc. 211 at 17, 21-22, 27, 31, repeating "I don't remember" to several questions).  At that hearing, Mr. Dillon testified that he printed his Western Sky loan agreement, (*id.* at 27), but no one asked any questions about the time frame or date when he printed it.  (*See generally id.* at 13-37).

aware of the Dillon Copy during Mr. Dillon's deposition. (Doc. 189-3 at ¶ 6). Counsel did not provide the Dillon Copy during the deposition, nor did they advise defense counsel about the Delbert Services URL on the Dillon Copy. Counsel provided the Dillon Copy almost two weeks later, on October 12, 2015. (Doc. 203 at ¶ 3; Doc. 213-1). Despite the questions at the deposition about when Mr. Dillon had sent the Dillon Copy to counsel, (Doc. 180-1 at 38, 143:9-:23), Counsel had redacted this version of the Dillon Copy by blacking out the line showing that Mr. Dillon had faxed it to Counsel on October 1, 2013. (*Compare* Doc. 213-1 at 4, *with* Doc. 189-3 at p. 6). Generations did not obtain an unredacted version of the Dillon Copy until the parties agreed to have an expert conduct a forensic examination of Mr. Dillon's computer, (Doc. 189-3 at ¶¶ 7-8; *see* Doc. 203-2), an examination Counsel originally opposed. (Doc. 213-1 at 2).

On January 12, 2016, Generations filed the pending motion for sanctions under 28 U.S.C. § 1927 and the Court's inherent authority, seeking combined attorney's fees and costs of $153,362.54. (Doc. 188).[14] Generations contended that Counsel acted in bad faith by challenging the Generations Copy despite their possession of the identical Dillon Copy. (Doc. 189 at 2, 13).

In opposition to this motion for sanctions, Mr. Dillon requested his own attorney's fees and costs in defending the motion for sanctions. (Doc. 202 at 19-20).

---

[14] Generations also sought to strike Mr. Dillon's arguments in opposition to arbitration raised after March 6, 2014, (Doc. 188 at 2), which the Court has already denied. (Doc. 215 at 3).

The Court required supplemental briefing and allowed submission of additional evidence. (Doc. 239 at 3-5). After this was complete, the Court allowed Counsel a further opportunity to clarify the record. (*See* Text Order 07/13/2016). On September 9, 2016, the Court held a hearing on the matter, (Minute Entry 09/09/2016), which Counsel had requested. (Doc. 240 at 19; Doc. 246 at 15).

The Court denied Generations' second renewed motion to dismiss on March 4, 2016. (Doc. 215). The Court's order did not address authenticity but rather held the contract was unenforceable based on recent Fourth Circuit precedent in *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016). (Doc. 215 at 2). That order, along with orders entered as to other defendants, is now on appeal. (Docs. 220, 223, 227).

## III.    SANCTIONS LAW

### A.  28 U.S.C. § 1927

Congress has stated that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 "aims only at attorneys who *multiply* proceedings." *E.E.O.C. v. Great Steaks, Inc.*, 667 F.3d 510, 522 (4th Cir. 2012) (affirming denial of attorney's fees award). Bad faith is a necessary precondition for § 1927 sanctions. *Id.* The merits of a lawsuit are irrelevant; section 1927 "focuses on the conduct of the litigation" and "is concerned only with limiting the abuse of court processes." *Id.* (quotations omitted).

Courts have awarded attorney's fees under § 1927 for failing to dismiss a lawsuit once it was "abundantly clear" that the plaintiff's attorney "was aware that the plaintiff's case was meritless and required dismissal." *Salvin v. Am. Nat'l Ins. Co.*, No. 2:06cv264, 2007 WL 1097891, at *8 (E.D. Va. Apr. 11, 2007), *aff'd*, 281 F. App'x 222 (4th Cir. 2008) (per curiam) (unpublished); *see also Blue v. U.S. Dep't of Army*, 914 F.2d 525, 537 (4th Cir. 1990) (affirming sanctions for "prolonged maintenance of a frivolous suit"). In *Blue*, the Fourth Circuit affirmed a grant of attorney's fees under Section 1927 where attorneys "act[ed] irresponsibly" by failing to make "a reasonable investigation of their clients' claims or a reasonable inquiry into the materials handed over to them in discovery." 914 F.2d at 542; *see also Lee v. First Lenders Ins. Servs., Inc.*, 236 F.3d 443, 445 (8th Cir. 2001) (affirming attorney's fees sanctions for "baseless class action claims" that "dominated discovery and motion practice for an extended period" before the party withdrew them without explanation).

## B. Inherent Authority

To preserve the integrity of the judicial system, attorneys owe the court a "general duty of candor" as officers of the court. *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993); *see also In re Liotti*, 667 F.3d 419, 429 (4th Cir. 2011). A lawyer violates this duty when he engages in "matters involving deceit that, when not disclosed, undermine the integrity of the process," particularly where the violation "could conceivably have affected the outcome of the litigation." *Shaffer Equip.*, 11 F.3d at 459. Courts have the inherent authority to sanction litigants and attorneys who violate the duty of candor to the court in bad faith, vexatiously, wantonly, or for oppressive reasons.

19

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Shaffer Equip.*, 11 F.3d at 458-59; *see also Andrews v. Am.'s Living Ctrs., LLC*, 827 F.3d 306, 312 (4th Cir. 2016) (in an inherent authority case, adopting definition of "vexatious" from Black's Law Dictionary as "without reasonable or probable cause or excuse").

In *Shaffer Equipment*, the Fourth Circuit remanded the case for the district court to impose a sanction for a violation of the duty of candor by government attorneys. 11 F.3d at 463. Specifically, an important witness attempted to "cover up or minimize his long history of fraud," and the government attorneys "compounded the problem by obstructing the defendants' efforts to uncover this perjury and in failing themselves to reveal it." *Id.* at 461. The government attorneys filed motions dependent on the fraudulent record, and opposing counsel discovered the violation only "after the expenditure of significant time and money." *Id*.

As the Fourth Circuit explained:

> Due to the very nature of the court as an institution, it must and does
> have an inherent power to impose order, respect, decorum, silence, and
> compliance with lawful mandates. This power is organic, without need
> of a statute or rule for its definition, and it is necessary to the exercise of
> all other powers. *See Chambers*, 501 U.S. at [43]. Because the inherent
> power is not regulated by Congress or the people and is particularly
> subject to abuse, it must be exercised with the greatest restraint and
> caution, and then only to the extent necessary. *See id.*; *Roadway
> Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (restraint required
> because the inherent powers of a court are "shielded from direct
> democratic controls"). Under the inherent power, a court may issue
> orders, punish for contempt, vacate judgments obtained by fraud,
> conduct investigations as necessary to exercise the power, bar persons
> from the courtroom, assess attorney's fees, and dismiss actions.

*Shaffer Equip.*, 11 F.3d at 461-62. *Shaffer Equipment* makes clear that in appropriate cases courts have the inherent authority to impose sanctions when attorneys violate their duty of candor.

Other circuits require clear and convincing evidence of misconduct before a court may impose sanctions under its inherent power. *E.g.*, *Cadle Co. v. Moore* (*In re Moore*), 739 F.3d 724, 730 (5th Cir. 2014); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1344 (Fed. Cir. 2013) (applying Seventh Circuit caselaw); *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995). The Court will use that standard here.

## IV. APPLICATION OF SANCTIONS LAW TO THE CONDUCT AT ISSUE

### A. Context of the Conduct

The Court must evaluate Counsel's decisions and omissions in context.

Generations, as a party seeking to dismiss in favor of arbitration under the Federal Arbitration Act, had the burden to prove several elements, including, as was relevant here, a written agreement that includes an arbitration provision that purports to cover the dispute. *See, e.g.*, *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002).[15] When a contract is integral to and relied upon in the complaint, the court may consider it in ruling on a motion to dismiss, so long as the defendant does not contest the authenticity of the written document. *E.g.*, *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *see also Dillon*, 787 F.3d at 715

---

[15] The other elements are: a dispute between the parties, the relationship of the transaction to interstate or foreign commerce, and the failure of the party to arbitrate the dispute. *Adkins*, 303 F.3d at 500-01. These were not in dispute here.

(noting that Generations and the other defendants reasonably maintained that "because Dillon's complaint was based on and incorporated by reference the very loan agreements that the [defendants] sought to introduce, the pleadings themselves established Dillon's agreement to arbitrate"); (Doc. 143 at 17).

When a litigant contests the authenticity of a document, the litigant must have a good faith basis for the objection; a litigant cannot challenge or deny the authenticity of a written agreement that he knows to be authentic. *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003) ("Even if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic."), *aff'd*, 398 F.3d 620 (7th Cir. 2005); *see also* Fed. R. Civ. P. 11(b) (requiring factual contentions to have evidentiary support and denials of factual contentions to be warranted on the evidence); *Baulch v. Johns*, 70 F.3d 813, 816-17 (5th Cir. 1995); *Interstate Steel Setters, Inc. v. A.J. Maggio Co.* (*In re Interstate Steel Setters, Inc.*), 65 B.R. 312, 313 (Bankr. N.D. Ill. 1986).

Once an authenticity objection is raised, the party relying on the written contract must satisfy the court that the written contract containing the arbitration agreement is what it purports to be. *See* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); Fed. R. Evid. 901(a). "The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required," *United States v. Vidacak*, 553 F.3d

344, 349 (4th Cir. 2009), though ultimately it must be sufficient to persuade the Court. (Doc. 217 at 5-6). If this burden is met, the party opposing arbitration then has the burden to unequivocally deny that there was an arbitration agreement and produce evidence to substantiate the denial. *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001).

In litigation between parties to traditional written contracts, application of these rules is often straightforward. Both parties to the agreement usually have copies that at least one party physically signed. They rarely dispute what the written contract says. Disputes more typically center over what terms mean, whether the contract was superseded by a later agreement, or whether a signature was forged.

As the Court has explained in detail in previous orders in this case, electronic contracts often raise special issues. (*See, e.g.*, Doc. 217 at 9-10 & n.5, citing *McMillan v. Wells Fargo Bank, N.A.*, No. C 08-05739, 2009 WL 1686431, at *4 (N.D. Cal. June 12, 2009) and *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)). When an electronic contract is at issue or one of the litigants is not a party to the contract, a litigant may not have a copy, the copy may not be physically signed, or both. Such circumstances may make it impossible for a litigant to know whether a particular copy actually reflects the terms accepted online. (*See* Doc. 217 at 14-15). When an electronic record is in the exclusive control of one party to the contract, there are particular risks of fraud and mistake. (*See id.* at 9-10 & n.5).

These risks disappear or are significantly reduced if the litigant *does* have a copy of the contract. The litigant with a copy is in a position to challenge an inaccurate copy

presented by another litigant or to admit authenticity of an accurate copy. Even if the litigant obtained his copy weeks or months after making the agreement, the risk of fraud or mistake is substantially reduced, especially if the copy is printed from a website of a company that manages ongoing responsibilities under the contract, is consistent with the consumer's memory and financial records, or is printed before a dispute arose.

The fact that a contract is electronic or not physically signed does not excuse litigants from having a good faith basis for objecting to the Court's consideration of a purported copy of a contract. Nor does it allow a litigant who actually has a copy to pretend that he does not.

Here, Generations filed the motion to dismiss in November 2013, (Doc. 14), well before Federal Rule of Civil Procedure 26(a)(1)(A) required any litigant to disclose witnesses and documents and before any party served discovery requests. (*See* Doc. 158, setting discovery schedule beginning in August 2015). The complaint referred to a loan agreement between Mr. Dillon and Western Sky, (Doc. 1 at ¶ 97), and Mr. Dillon would be required to disclose any physical copy of the loan agreement in his possession at some point, if he prevailed on the motion to dismiss.[16]

---

[16] Because Mr. Dillon's claims depended on the existence of a contract with Western Sky, the Court believes disclosure would have been required in connection with Federal Rule of Civil Procedure 26(a)(1)(A)(ii), which requires disclosure of "all documents . . . the disclosing party has in its possession . . . and may use to support its claims." At the March 2014 hearing, Counsel appeared to be laying the groundwork for their non-reliance on the Dillon Copy. (*See* Doc. 101 at 19, where Mr. Six contended that "[t]he claims that we make don't rely on the loan agreement"). Be that as it may, even a basic document request by an inexperienced attorney would have asked Mr. Dillon for copies of all loan agreements in his possession. Mr. Kaplan, one of Mr. Dillon's lawyers, acknowledged that disclosure of the Dillon Copy would be necessary during discovery. (Doc. 246-1 at pp. 11-12 ¶ 29).

When Generations filed its renewed motion to dismiss, Counsel contended the Court should treat it as a motion to reconsider under Rule 54(b). (*See* Doc. 113 at 2). As is relevant here, a court should grant reconsideration when "there is additional evidence that was not previously available." *See, e.g.*, *Akeva L.L.C. v. Adidas Am., Inc*., 385 F. Supp. 2d 559, 566 (M.D.N.C. 2005). Counsel cited this exact standard to the Court in opposing Generations' renewed motion. (Doc. 113 at 2).

### B. Counsel violated the duty of candor and acted in bad faith, unreasonably, and vexatiously.

Counsel raised a dispute over the authenticity of a written contract proffered by Generations without disclosing that their client, the plaintiff, possessed an identical copy. *See* Section IV.B.1. The Dillon Copy was material to and potentially dispositive of the authenticity issue. *See* Section IV.B.2. During oral argument, Mr. Six implied to the Court that Counsel had no such copy and that no such copy existed. *See* Section IV.B.3. Mr. Six deliberately misled the Court in an effort to avoid the consequences of an arbitration clause in the contract, and none of his co-counsel corrected this misleading argument. *See* Section IV.B.4. After they prevailed, Counsel resisted efforts by Generations to revisit the arbitration issue and ignored the fact that Generations would be entitled to reconsideration of the arbitration issue if and when Mr. Dillon's hidden copy was disclosed. *See* Section IV.B.5. Counsel never disclosed the existence of the Dillon Copy to the Court or opposing counsel. Counsel provided a copy only after Mr. Dillon revealed at his deposition that he possessed a copy identical to the Generations Copy and had provided it to his lawyers. *See* Section IV.B.6.

25

It is unreasonable and vexatious and a violation of the duty of candor for lawyers to bring a lawsuit referring to a written contract, to then challenge the Court's consideration of a document that appears to be that contract proffered by the defendant without disclosing that their client possesses an identical copy, to then imply in argument to the Court that their client does not possess any copy of the contract, and to then cause an unnecessary side dispute over whether the Court should treat a renewed motion to dismiss as a motion for reconsideration, when it was obvious that a motion to reconsider would be granted if the Court knew of the client's hidden copy.

Considered in a vacuum, Counsel might be able to explain away a specific comment, act, or omission. When the Court evaluates the entirety of the conduct in context, however, bad faith is apparent. The Court finds by clear and convincing evidence that Counsel violated their duty of candor to the Court and acted in bad faith, unreasonably, and vexatiously.

     **1.  Counsel raised a dispute over the authenticity of a written contract proffered by Generations without disclosing that their client possessed an identical copy**.

Mr. Dillon and his counsel brought suit based on the terms of a loan agreement between Mr. Dillon and Western Sky. (Doc. 1 at ¶¶ 97, 99). When Generations filed a motion to dismiss based on an arbitration clause in a document that appeared to be that loan agreement, the Court would have accepted and considered the proffered document in the absence of an authenticity objection by Counsel. *See* discussion *supra* p. 21. In their brief in opposition to the first motion to dismiss, Counsel stated that Generations "fails to offer any explanation as to how it came into possession of the Loan Agreement or

Case 1:13-cv-00897-CCE-LPA   Document 264   Filed 09/30/16   Page 26 of 63

whether it is authentic," and that the Generations Copy was "inadmissible hearsay and may not be considered." (Doc. 17 at 4). At the hearing, Counsel never disagreed with or corrected the Court's stated perception that they had challenged authenticity. (*See* Doc. 101 at 19-21). Counsel did not disclose that they possessed an identical copy.

### 2. The existence of the Dillon Copy was material to and potentially dispositive of the authenticity issue.

Counsel's authenticity challenge created the need for the Court to resolve the factual issue of whether the Generations Copy was an authentic copy of the loan agreement between Mr. Dillon and Western Sky. The Generations Copy appeared on its face to be the loan agreement between Mr. Dillon and Western Sky. (*See* Doc. 14-1). It contained Mr. Dillon's name and address, the date matched the date of the loan as described in the complaint, and the loan amount and total repayment amount were identical to the penny to the amounts in the complaint. (*See id.*; Doc. 1 at ¶¶ 97, 99). The fact that Mr. Dillon himself possessed an identical copy would have provided additional circumstantial support for the proposition that the Generations Copy was what it purported to be.

As Counsel now concede, if Mr. Dillon obtained his copy at the same time he made the loan, they would have had no conceivable factual basis for disputing the authenticity or admissibility of the identical Generations Copy. (Doc. 263 at 45-46). If these were the facts, the Dillon Copy would have been not only relevant, it would have

27

been determinative.[17]  If counsel denied authenticity under these circumstances, they acted in bad faith by definition.  *See Baulch*, 70 F.3d at 816-17; *Fenje*, 301 F. Supp. 2d at 789; *In re Interstate Steel Setters, Inc.*, 65 B.R. at 313.

Even if Mr. Dillon printed his copy on or about the date he gave it to Counsel, as Counsel now contend, (*e.g.*, Doc. 246 at 3), the Dillon Copy is still unquestionably relevant.  Mr. Dillon turned over his copy to Counsel only four months after Western Sky and Mr. Dillon entered into the contract, (*see* Doc. 189-3 at p. 6), before Western Sky, Delbert Services, or Generations had any notice of a potential dispute over Mr. Dillon's loan.  The fact that Mr. Dillon printed his copy himself, (*e.g.*, Doc. 180-1 at 25, 91:3-:6), tends to indicate the correct record was printed and no mistake was made, and the fact that it was printed before there was notice of a dispute significantly reduces the chance of fraud.[18]

_____

[17] It is not necessary to determine when Mr. Dillon actually printed his copy, as discussed *infra*.  However, Mr. Dillon's testimony supports Generations' contention that he printed his copy when he borrowed the money.  (*See* Doc. 180-1 at 25, 91:3-:17, 33, 122:10-:22).  While Counsel attempt to discredit this testimony by pointing to later questions in the deposition where Mr. Dillon said he was not sure of the exact date and to the timing of Mr. Dillon's disclosures to Counsel in 2013, (*see* Doc. 246 at 3-5), neither of these facts are as compelling as Mr. Dillon's straightforward testimony, which he repeated several times.  Moreover, even after Mr. Dillon began to say he did not remember the exact date he printed his copy, (Doc. 180-1 at 34, 129:8-:20, 35, 131:14-:25), he reaffirmed that he got the copy he sent his lawyers from a folder in his living room.  (*Id.* at 35, 133:11-:16).  Despite several questions, he never testified at his deposition that he printed it around the time he gave it to his lawyers.  (*See id.* at 25, 91:3-:17, 34-35, 129:14-130:1, 35, 131:14-133:6, 37, 138:2-139:10, 38, 142:1-:13 & 143:9-:23).  And, as discussed *supra* note 4, Counsel never asked Mr. Dillon when he printed his copy.

[18] This Court has been as open-minded as any court on the need for evidence to support the authenticity of written documents purporting to be copies of click-through agreements and the risks of fraud and mistake when only a non-litigant has a copy of an agreement.  (*See* Doc. 217 at 9-10).  Yet these risks evaporate when the plaintiff himself has a copy of the contested

Thus, regardless of when the Dillon Copy was printed, it was highly probative of authenticity. Indeed, had Counsel disclosed the Dillon Copy, the Court was almost certain to find that the Generations Copy was what it purported to be, absent some affirmative showing that Western Sky or Delbert Services were adding fake arbitration provisions to loan agreements without the knowledge of borrowers. *See Drews Distrib.*, 245 F.3d at 352 n.3. The best Counsel could hope for, had it been disclosed, was discovery similar to what occurred after remand. The Dillon Copy was essentially a smoking gun on authenticity.

### 3. During oral argument, Mr. Six implied to the Court that Counsel had no copies of any loan agreements and that no such copies existed.

During his argument at the hearing in March 2014, Mr. Six repeatedly referred to the fact that he had no copy of the VIN Capital agreement and had no way to obtain a copy. (Doc. 101 at 19, 24, 32). He interspersed this fact into his arguments about all of the loans. (*See id.* at 19-33); *supra* p. 10. The authenticity objection was front and center at the hearing; it was the first question the Court asked defense counsel, and Mr. Six began his argument in the same place. (Doc. 101 at 4, 19). In context, Mr. Six was telling the Court that Mr. Dillon did not have copies of any of the loan agreements, including the Western Sky agreement, and that Mr. Dillon was not in a position to admit the authenticity of any of the agreements.

---

agreement. At a minimum, Generations was entitled to explore the circumstances under which Mr. Dillon came into possession of the Dillon Copy.

29

**4. Mr. Six deliberately misled the Court in an effort to avoid the consequences of an arbitration clause in the contract, and none of his co-counsel corrected this misleading argument.**

Mr. Six couched and designed his argument to mislead the Court to believe that Mr. Dillon had no copies of any loan agreements. This was not true: Mr. Dillon did possess a copy of the Western Sky agreement. The Court concludes that Mr. Six acted deliberately and intended to mislead the Court. The evidence supporting this conclusion falls into four categories, and it is clear and convincing.

**a. The Court directly heard and observed Mr. Six make the misleading argument.**

First, the Court saw and heard Mr. Six make these arguments in the courtroom, remembers his demeanor, and has seen his demeanor again in court as he denied deliberately misleading the Court at a later hearing. (*E.g.*, Doc. 263 at 36). As discussed *supra* p. 29, his argument in context was meant to, and did, lead the listener to believe something that was not true: that Mr. Dillon had no copies of any disputed loan agreements. The Court's own observations support its finding that Mr. Six made these arguments in bad faith.

Counsel say that Mr. Six's argument was "factually accurate." (Doc. 246 at 8). The fact that he did not blatantly lie to the Court does not mean that his argument was not misleading. *See Shaffer Equip*, 11 F.3d at 459 (noting that some matters, "when not disclosed, undermine the integrity of the process"); *cf. State v. Bishop*, 346 N.C. 365, 389, 488 S.E.2d 769, 782 (1997) (noting that omissions in a witness's testimony can be misleading and are subject to exploration on cross-examination); *Ragsdale v. Kennedy*,

30

286 N.C. 130, 138-39, 209 S.E.2d 494, 500-01 (1974) (noting that concealment of a material fact can be a basis for a fraud claim, if other elements are also shown). Factual statements by counsel that are so carefully worded as to be both technically accurate and misleading by omission are of particular concern, as they reflect an intent to lead the Court down the garden path. Courts rely on the candor of counsel and should not have to parse an attorney's language and representations for loopholes, half-stated exceptions, or "truthiness." *See* Bill Haltom, *A Lawyer's Obligation Is to the Truth, Not Truthiness*, 42 Tenn. B.J. 3 (Apr. 2006).

Counsel also contend that Generations is taking "abbreviated statements" from the transcript out of context and unreasonably interpreting them with the benefit of hindsight. (Doc. 246 at 8, 12). The transcript confirms what happened at the time; the Court was present, heard the arguments Mr. Six made to the Court, and was living the context. Hindsight is not necessary.

### b. Counsel offer *post hoc* explanations.

Second, the lack of consistency and credibility in the *post hoc* explanations provided by Counsel to explain their conduct indicates that Counsel acted in bad faith and meant to mislead the Court. The Court will address only a few of these numerous, inconsistent explanations and exaggerations of the record.

The clearest example appears in connection with the dispute over when Mr. Dillon printed his copy of the loan agreement and what his lawyers knew about when he printed it. As noted *supra*, Mr. Dillon initially testified at his deposition that he printed the agreement when he borrowed the money and he repeated this testimony several times.

31

(Doc. 180-1 at 25, 91:3-:17, 33, 122:10-:13). It is undisputed that if Counsel knew this at the time they objected to authenticity, they acted in bad faith. (*See* Doc. 263 at 45-46).

Counsel now contest both this fact and their knowledge of this fact. (Doc. 246 at 3-8; Doc. 246-2 at ¶ 7; Doc. 260 at ¶ 10). Yet two of Mr. Dillon's lawyers, Mr. Kaplan and Mr. Moore, made statements and asked questions at Mr. Dillon's deposition that indicated an understanding that Mr. Dillon had printed his copy of the loan agreement at the time he borrowed the money. (*See* Doc. 180-1 at 36, 135:15-137:23). Despite a specific question at the September 2016 hearing, (Doc. 263 at 7), Counsel provided no explanation for the discrepancy between what Counsel appeared to know before the sanctions motion was filed and what Counsel now contend.

Moreover, while Counsel were willing to tell an expert witness that Mr. Dillon told them he did not print his copy when he first took out the loan, (Doc. 244-3 at ¶ 6 n.1), none of them have so affirmed to the Court, and there is no evidence Counsel asked Mr. Dillon when or how he obtained his copy. *Supra* note 4. This failure to ask suggests that Counsel did not want to hear an answer that could have precluded them from challenging authenticity. Deliberate blindness to relevant facts does not shield Counsel from responsibility for needlessly increasing litigation costs. *See Blue*, 914 F.2d at 537, 542 (noting that sanctions can be appropriate when an attorney "should have learned" a claim had no merit or "acts irresponsibly" by failing to make "a reasonable investigation

32

of their clients' claims or a reasonable inquiry into the materials handed over to them in discovery").[19]

The Court does not believe that Mr. Dillon told his lawyers in the fall of 2013 that he had printed or obtained the loan agreement shortly before he gave them a copy and finds by clear and convincing evidence that this did not occur. This possibility is inconsistent with Mr. Kaplan's statements and Mr. Moore's questions at the deposition, with the absence of testimony from Counsel that they asked Mr. Dillon, and with Mr. Dillon's own testimony.

Finally, in their sanctions briefing, Counsel continue to deny that the existence of the Dillon Copy is relevant to the authenticity issue at all, going so far as to say that "even today there is no evidence" that the Generations Copy and the Dillon Copy are accurate copies of the agreement Mr. Dillon entered into with Western Sky. (Doc. 246 at 2). Circumstantial evidence is still evidence; it can be sufficient to prove a criminal case, where the burden of proof is well higher than the relatively low standard for authenticity. *United States v. Wesseh*, 531 F.3d 633, 636 (8th Cir. 2008) ("Direct or circumstantial evidence can provide the basis for a conviction."); *United States v. Taylor*, 482 F.2d 1376, 1377 (4th Cir. 1973) (per curiam) ("[C]ircumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent

---

[19] Had Counsel asked Mr. Dillon, it is possible—even likely—that Mr. Dillon would have told them he printed the agreement when he borrowed the money, just as he told counsel for Generations at his deposition many months later.

with innocence.") (quotation omitted); *United States v. Bonner*, 735 F. Supp. 2d 405, 406-07 (M.D.N.C. 2010) (collecting cases), *aff'd*, 648 F.3d 209 (4th Cir. 2011).

All of Counsel's inconsistencies and exaggerations are highly suspect. They support the conclusion that Counsel are willing to say whatever seems helpful in the moment, without adequate investigation, and are essentially making it up as they go along.

### c. Counsel remained silent and failed to disclose the Dillon Copy.

Third, the conduct of all Counsel indicates an agreement to hide the Dillon Copy. None of Mr. Dillon's other attorneys corrected Mr. Six's misleading argument during the March 2014 hearing, (*see* Doc. 101), and Counsel failed to clarify the record after the Court issued its decision a few days later. (Doc. 100). Throughout those proceedings and an unnecessary appeal, as discussed *infra*, Counsel remained silent about the existence of the Dillon Copy. After that appeal, they withdrew their authenticity objection without disclosing the existence of the Dillon Copy, (*see* Doc. 189-9 at p. 5 ¶ 11), and only provided the Dillon Copy to Generations after Mr. Dillon himself spilled the beans at his deposition. (*See* Doc. 213-1).

### d. Counsel's conduct resulted in a temporary victory on Generations' motion to dismiss.

Finally, the proof is in the pudding: by failing to disclose the Dillon Copy to the Court and Generations and by implying it did not exist, Counsel prevailed on the motion to dismiss and avoided the consequences of the arbitration provision contained in the Dillon Copy. They prevailed without the need to develop evidence through discovery

from Western Sky and Delbert Services to show that the Dillon Copy did not accurately reflect Mr. Dillon's agreement to an arbitration provision. They prevented Generations from knowing that Mr. Dillon had relevant testimony to give about the authenticity of the Generations Copy. They delayed the time until their client was questioned about the Dillon Copy for well over a year, increasing the chances that his memory would fade.

**5. After they prevailed, Counsel resisted efforts by Generations to revisit the arbitration issue even though they knew Generations would be entitled to reconsideration when the hidden Dillon Copy was disclosed.**

After the Court ruled in favor of Mr. Dillon on Generations' initial arbitration motion, (Doc. 100), Generations filed a renewed motion to dismiss, this time supported by evidence authenticating the Generations Copy. (Docs. 106, 106-1). In their response objecting to the renewed motion, Counsel contended that the Court should treat Generations' motion as a motion for reconsideration. (Doc. 113, adopting Doc. 112 at 4-5). Counsel recognized that courts should grant motions to reconsider when a litigant has located new, previously unavailable evidence, and they asserted that Generations should not get the benefit of this rule because Generations had not acted with due diligence in obtaining such evidence. (*Id.*). Counsel did not disclose the existence of the Dillon Copy to the Court or Generations.

When they objected to reconsideration, Counsel knew that disclosure of previously unavailable evidence was an appropriate basis for reconsideration, because they cited that rule in their own briefing. (*See* Doc. 113 at 2, citing *Akeva*, 385 F. Supp. 2d at 566). At the time, the Dillon Copy was unavailable to Generations and would

35

constitute new evidence once it was disclosed; its relevance is beyond question. *Supra* pp. 27-29. Counsel knew or should have known that the Dillon Copy would inevitably be disclosed if they met their professional obligations, *supra* note 16; (Doc. 246-1 at pp. 11-12 ¶ 29), and they knew or should have known that when this happened, any favorable decision on the arbitration motion would have to be reconsidered.

Instead of disclosing the Dillon Copy and consenting to reconsideration, Counsel opposed the renewed motion and continued to keep the existence of the Dillon Copy a secret. They created the need to litigate an unnecessary side issue: whether the Court could consider the renewed arbitration motion on its merits only if Generations met the requirements of Federal Rule of Civil Procedure 54(b). After the Court, still unaware of the secret Dillon Copy, agreed that Generations' motion was a motion for reconsideration and consequently denied it, (Doc. 128 at 3-4, 8), Counsel repeated these contentions about reconsideration during the defendants' appeal. (*See* Doc. 189-5 at 6-7; Doc. 189-6 at 5; Doc. 189-7 at 8-9, 28:17-29:7).

The Court finds and concludes that Counsel acted for tactical advantage, with the goal of preventing or delaying disclosure of the Dillon Copy. The only reasonable explanation for their conduct, in context, is that Counsel did not intend to ever voluntarily disclose the Dillon Copy.[20] And, as discussed *infra*, they never did.

---

[20] Counsel stated at the September 2016 hearing that they intended to disclose the Dillon Copy at the Rule 26 conference. (Doc. 263 at 27-28). Given Counsel's failure to disclose the Dillon Copy for almost two years under circumstances when it should have been disclosed, the Court finds this assertion to be another *post hoc* attempt to avoid responsibility and concludes it is not credible.

**6. Counsel never disclosed the existence of the Dillon Copy to the Court or opposing counsel, providing a copy only after Mr. Dillon testified that he had such a copy and had provided it to his lawyers**.

After the Fourth Circuit remanded the case, all parties agreed that discovery was appropriate on the arbitration issues. (Doc. 157). When Counsel responded to the resulting interrogatories, they finally admitted authenticity of the Generations Copy but they did not tell Generations that the Dillon Copy existed. (*See* Doc. 189-9 at p. 5 ¶ 11). Even if the Court accepts the explanations offered by Counsel for the decision to admit authenticity,[21] Counsel have not explained why they did not produce the Dillon Copy before or during Mr. Dillon's deposition.[22] Indeed, they delayed almost two weeks *after* the deposition to provide a copy, and when they did, they redacted the fax line so that Generations would not know that Mr. Dillon gave his copy to his attorneys before the suit was filed. (*See* Doc. 213-1). This evidence is consistent with the rest of the evidence: Counsel were trying to hide the Dillon Copy from Generations and the Court.

**7. Conclusion**

When one examines this largely undisputed conduct in the context of the case and in light of the Court's direct observations of Counsel, the conclusion is clear. Counsel acted unreasonably, vexatiously, and in bad faith, in violation of their duty of candor to

---

[21] Generations challenges the credibility of these *post hoc* explanations, (Doc. 255 at 5-7), but it is not necessary for the Court to evaluate them. For purposes of this section, the Court assumes Counsel had a reason for admitting authenticity other than to avoid disclosure of the Dillon Copy.

[22] Mr. Dillon has not yet been questioned about the URL on his copy, since the defendants did not have the Dillon Copy when Mr. Dillon was deposed. (*See* Doc. 180-1 at 35, 130:2-:17).

the Court. They repeatedly passed up opportunities to be candid with the Court by disclosing the relevant and potentially dispositive Dillon Copy. They misled the Court by implying that such a document did not exist. They objected to reconsideration on grounds that Generations would easily satisfy if and when Counsel disclosed the hidden Dillon Copy, causing unnecessary motions practice and an appeal. They have provided inconsistent *post hoc* explanations for their actions and made exaggerated statements and arguments, several of which strain credulity and indicate a continued willingness to say whatever is necessary to win in the moment.

All of the conduct, taken together, leads the Court to find by clear and convincing evidence that Counsel intended to hide and did hide relevant facts from the Court and opposing counsel for almost two years. Counsel intentionally misled the Court about the relevant facts to gain a tactical advantage and prevail on pending arbitration motions. *Cf. Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001) (holding that mere recklessness combined with an improper purpose is sufficient to justify sanctions in the court's inherent authority). Counsel acted with the hope and intent of avoiding disclosure of the Dillon Copy altogether. The Court finds by clear and convincing evidence that Counsel acted in bad faith, unreasonably, and vexatiously and violated their duty of candor to the Court.

### C. None of the explanations and excuses offered by Counsel are persuasive.

Counsel contend they acted in good faith when they objected to authenticity, that they had no duty to disclose the Dillon Copy, and that they did not intend to mislead the

Court.  They offer their own testimony and testimony from three law professors to support these explanations and excuses for their conduct.

These excuses and explanations are often not credible.  They do not address the entirety of their conduct within the context of this case.  Even if the Court accepts the key factual underpinnings of these excuses and explanations, Counsel's conduct was in bad faith.

### 1. Counsel contend they had a good faith basis for their authenticity objection.

Counsel contend their objection was in good faith because they did not know or believe that Mr. Dillon printed his copy when he borrowed the money and because they had good reasons to be suspicious of a document printed from a Delbert Services website. (Doc. 202 at 13-18).  Counsel implicitly base this argument on a flawed assumption, and this contention is largely beside the point.

Implicit in this contention is the unstated and incorrect belief that Counsel were the unilateral arbiters of when Mr. Dillon printed his copy of the loan agreement and whether his copy was authentic.  Regardless of whether Mr. Dillon printed the Dillon Copy at the time of the loan agreement, four months later, or somewhere in between, and regardless of whether Counsel suspected that Western Sky was surreptitiously adding or changing arbitration provisions to loan agreements, the Dillon Copy was relevant and potentially dispositive as to authenticity and admissibility.  *See* discussion *supra* at pp. 27-29.  Counsel's beliefs about when and how Mr. Dillon obtained the Dillon Copy and their suspicions about authenticity did not give them unilateral authority to conceal the

39

fact that Mr. Dillon possessed an identical copy of the loan agreement.  *See Fenje*, 301 F. Supp. 2d at 789.

In any event, Counsel's *post hoc* efforts to convince the Court that they acted based on these good faith doubts as to authenticity are not credible.  For example, Counsel now say they believed Mr. Dillon printed his copy shortly before he turned it over to Counsel on October 1, 2013.  (Doc. 246 at 6).  They point out that Mr. Dillon did not provide the Dillon Copy to them when he was initially asked for relevant documents, telling Counsel he "only ha[d] bank statements," (Doc. 260 at ¶¶ 5-6; Doc. 260-1 at 2), and that he provided the Dillon Copy only after Mr. Moore asked him to look elsewhere for documents.  (Doc. 260 at ¶¶ 7-8).

These contentions might possibly have some weight if Counsel had actually asked Mr. Dillon when and how he came into possession of the loan agreement; as it is, Counsel did not conduct even a basic inquiry into their client's own knowledge.  *See* discussion *supra* note 4 & pp. 32-33.[23]  Moreover, this contention is inconsistent with statements made by Mr. Moore and Mr. Kaplan at Mr. Dillon's deposition, where they appeared to believe that Mr. Dillon printed the agreement on the day he borrowed the money.  *See* discussion *supra* p. 32.  Finally, the investigation into the Delbert Services

---

[23] Counsel's sanctions brief continues to exaggerate the evidence.  They contend that after inquiry from Mr. Moore, Mr. Dillon "track[ed] down the purported Western Sky agreement," but the sections of Mr. Moore's affidavit merely state Mr. Moore's purported belief to that effect. (*See* Doc. 246 at 5, citing Doc. 246-3 at ¶ 8).

website took place after Generations filed the sanctions motion and long after Counsel made the authenticity challenge in 2013. (*See* Doc. 203 at ¶¶ 10-12).

Counsel contend that because the URL indicates the source of the Dillon Copy was Delbert Services, not Western Sky, Mr. Dillon's testimony that he printed the Dillon Copy when he borrowed the money is untrustworthy, and he must have printed the document much later.  (Doc. 246 at 3-5; Doc. 246-2 at ¶¶ 9-10).  Their assertion that it was "impossible" for Mr. Dillon to print the Dillon Copy when he said he did, (Doc. 263 at 24-25), is significantly overstated.[24]  In one brief, they inaccurately imply that Mr. Dillon only testified once that he printed his copy when he borrowed the money, (*see* Doc. 202 at 15), and in another, they call this testimony—which occurred over the course of a number of pages of the deposition—a "snippet."  (Doc. 246 at 3).

---

[24] The "objective evidence" upon which Counsel relies, (Doc. 246 at 4-5; Doc. 263 at 25), is limited and far from unambiguous.  For example, the fact that Western Sky changed its "Choice of Arbitrator" provision in similar loan agreements at some point after 2011, (Doc. 202 at 14; Doc. 203 at ¶ 16), hardly suggests that Western Sky inserted fake provisions into agreements. Counsel did not mention all of these "objective facts," (Doc. 246 at 8), in their first brief on sanctions.  (*See* Doc. 202 at 13-18).  Counsel's declarations establish that they identified some of these "objective facts" only after the sanctions motion was filed.  (*See* Doc. 203 at ¶¶ 14-16). For instance, counsel rely on facts from *Hayes v. Delbert Services Corp.*, an appellate opinion in an entirely different lawsuit involving a Western Sky loan.  (Doc. 246 at 6, citing 811 F.3d at 669).  However, *Hayes* involved a loan made in 2012, almost a year before Mr. Dillon's loan. *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258, 2015 WL 269483, at *1 (E.D. Va. Jan. 21, 2015), *rev'd*, 811 F.3d 666 (4th Cir. 2016).  Further, the Fourth Circuit issued *Hayes* long after Counsel decided to hide the Dillon Copy, and *Hayes* indicated only that Delbert Services would not have access to new Western Sky loan documents until "sometime later."  811 F.3d at 669; (*see* Doc. 246 at 6).  *Hayes* does not establish how long Delbert Services took to obtain loan documents, or when such documents became available to borrowers.

They identify reasons why they might not trust a document from Delbert Services,[25] but these suspicions are non-specific and far from compelling.[26] They have provided no evidence that Western Sky or Delbert Services ever added a fake arbitration provision to a loan agreement or provided inaccurate copies to consumers.

The Court does not mean to say that an authenticity objection accompanied by disclosure of the Dillon Copy would have violated Rule 11 or been in bad faith. As noted *supra* note 18, this Court has been open-minded about the need for evidence to support the authenticity of written documents purporting to be copies of click-through agreements. But having a basis for an authenticity objection does not mean Counsel is entitled to hide evidence directly contrary to that objection, mislead the Court about the existence of that evidence, and delay and obstruct the Court's fact-finding responsibilities at unnecessary cost to the opposing party.

If Counsel thought at the time that their arguments against authenticity of the Generations Copy had merit, Counsel should have disclosed the Dillon Copy to the Court and opposing counsel and made those arguments to the Court. Instead, Counsel looked the Court in the eye and made affirmative statements implying that Mr. Dillon did not

---

[25] Among their reasons is that Delbert Services was an affiliate of Western Sky, which is "notoriously unscrupulous." (Doc. 203 at ¶ 17); *see also supra* note 24.

[26] Counsel themselves acknowledge as much, saying that the fact that the Dillon Copy came from a Delbert Services website "*leaves open the possibility* that the loan agreement Western Sky transferred to Delbert Services was not the same document that Plaintiff clicked through when he took out the loan." (Doc. 202 at 14, emphasis added). This is a far cry from proof that Western Sky or Delbert Services were fraudulently inserting fake arbitration provisions into loan agreements or negligently transferring inaccurate copies.

42

have a copy of the loan agreement.  Counsel then resisted reconsideration and caused an

unnecessary appeal in an effort to further delay or prevent disclosure of the Dillon Copy.

Rather than presenting their purportedly good faith arguments on the merits, Counsel hid

the ball and kept it hidden.

### 2.  Counsel contend they had no duty to disclose the Dillon Copy.

Counsel next contend that they had no duty to disclose the Dillon Copy because

discovery had not begun.  (Doc. 246 at 8; *see also* Doc. 202 at 9-10, discussing

"Generations' failure to seek discovery").  Essentially, Counsel contend that when a

litigant objects to the Court's consideration of an arbitration agreement on authenticity

grounds, that litigant can hide his own identical copy and imply it does not exist, merely

because the litigant was not yet required by rule to disclose it.  That is shocking.  It is

equally shocking for lawyers to object on procedural grounds to reconsideration of an

arbitration agreement's authenticity when the lawyer's very brief establishes that

reconsideration will be necessary if and when the lawyers disclose an identical secret

copy in their client's possession.  (*See* Doc. 113 at 2, adopting Doc. 112 at 4-5).  Such

cynical gamesmanship and deliberate obfuscation wastes the Court's time, virtually

ensures duplicative proceedings will be necessary, is inconsistent with Counsel's duty of

candor, and constitutes bad faith.

The Court does not suggest that attorneys must disclose every damaging document

in their possession any time a motion is pending.  Here, however, Counsel created the

authenticity dispute by objecting to the Court's consideration of the Generations Copy.

*See supra* p. 21.  At the same time, Counsel did not disclose that their client possessed an

identical copy. Counsel thus unilaterally prevented Generations from being able to timely investigate the facts as to when and from what source Mr. Dillon came into possession of his copy, from conducting its own investigation into relevance, and from offering compelling evidence to the Court in support of its factual assertions. Counsel also hid this unfavorable and potentially dispositive evidence from the factfinder. On top of failing to disclose the document initially, Counsel implied to the Court that it did not exist and continued to keep its existence a secret for many months thereafter. There may be cases where the line is hard to draw, but this is not one of them.

### 3. Counsel say they did not intend to mislead the Court.

Mr. Six has repeatedly asserted that he did not intend to mislead the Court in his oral argument. (Doc. 246-2 at ¶ 21; Doc. 263 at 36, 56). Mr. Kaplan makes similar representations. (Doc. 246-1 at p. 12 ¶ 31). In a nutshell, the Court does not believe these lawyers for all the reasons discussed in this opinion.

The Court recognizes that there were a number of issues for argument in March 2014, (*see* Doc. 96), and that authenticity may not have seemed the most important issue before the hearing began. Nonetheless, the Court was present and heard the misleading argument when it was made. Mr. Six's presentation was not confusing, as he would prefer the Court to find. (*See* Doc. 246-2 at ¶ 14).

One can imagine innocent explanations for overlooking the Dillon Copy during oral argument, but Counsel have not made them. Moreover, the omissions and misleading argument cannot be examined in a vacuum. Counsel hid the Dillon Copy for a total of almost two years, most of that time after the misleading argument. The

44

inconsistent and suspicious explanations for particular decisions and exaggerated arguments are inconsistent with good faith.

### 4. Counsel rely on the testimony of three professors.

Finally, Counsel rely on three declarations from law professors who opine that the authentication objection was proper and no sanctionable conduct occurred. (Docs. 244-1 to -3). While the Court appreciates the legal expertise of these witnesses, their declarations are of little assistance.

First, the professors draw inferences from the underlying facts as to when the Dillon Copy was printed and other factual disputes on which they have no particular expertise. As discussed *supra* pp. 27-29, these underlying factual disputes are largely beside the point. Moreover, the professors' opinion testimony about the facts is not helpful. For example, they give significant weight to Mr. Dillon's loss of memory as to when he printed his copy of the loan agreement while glossing over his initial unambiguous testimony, repeated several times, that he printed his copy at the time he got the loan. (*See* Doc. 244-1 at ¶¶ 17, 28; Doc. 244-2 at ¶¶ 11-12, 21; Doc. 244-3 at ¶ 11). Professor Donald Beskind ignores this testimony completely when he says that he finds "nothing" to suggest that the Dillon Copy could have been printed on the day Mr. Dillon entered into the loan agreement. (Doc. 244-2 at ¶ 6).[27] The professors do not

---

[27] There are other reasons the factual conclusions of these witnesses are not helpful. In reaching their factual conclusions based on a cold and partial record, (*see, e.g.*, Doc. 244-1 at ¶ 4), the professors did not have the benefit of seeing Mr. Dillon testify in connection with other matters, (Doc. 211), and they were not present when Mr. Six implied in open court that Mr. Dillon did not have a copy of the Generations loan agreement. They rely on facts and events discovered after the fact, such as a Fourth Circuit decision issued some years later, even though

mention that, at the time of Mr. Dillon's deposition, two of his attorneys, Mr. Moore and Mr. Kaplan, appeared to believe that Mr. Dillon printed his copy when he entered into the loan agreement. (*See* Doc. 180-1 at 36, 135:15-137:23. *See generally* Docs. 244-1 to -3).

Professor Beskind admits he does not know what, if anything, Mr. Dillon told his lawyers about when he printed the document, and Professor Beskind does not seem to think that Counsel had any duty to investigate this important fact. (*See* Doc. 244-2 at ¶ 12). Since the answer to such an inquiry could have destroyed any good faith basis for an authenticity objection, *see* discussion *supra* pp. 27-28, the Court sees the matter differently.

Professor Stephen Saltzburg explicitly relied on a representation from Counsel that Mr. Dillon informed them he did not print the loan agreements at the time he took out the loans. (Doc. 244-3 at ¶ 6 n.1). Much of Professor Saltzburg's opinion is dependent on this assertion, yet no attorney for Mr. Dillon has testified to this fact. *Supra* note 4.

Neither Professor Kathryn Bradley nor Professor Beskind address or acknowledge the totality of the conduct at issue here. Counsel asked Professor Bradley to opine on the issue of whether the conduct "that is the subject of [the motion] meets the legal standards

---

there is no indication that Counsel knew those facts at the time. (Doc. 244-1 at ¶ 14; Doc. 244-2 at ¶ 7). They rely on statements of Counsel in a brief and allegations in the complaint as evidence. (*E.g.*, Doc. 244-1 at ¶ 16). There is also some spin, even on unimportant points. For example, Professor Kathryn Bradley says that Counsel made "repeated requests" for documents, (*see id.* at ¶ 15, citing Doc. 203 at ¶ 7), but the evidence cited does not support that contention, and the other evidence shows there were only two requests. (*See* Doc. 260 at ¶¶ 5, 7). Finally, the professors do not acknowledge that by hiding the Dillon Copy, Counsel prevented Generations from presenting an opposing interpretation of the evidence. (*See, e.g.*, Doc. 244-2 at ¶ 22; Doc. 244-3 at ¶¶ 19, 25 n.5).

required for the imposition of sanctions," (Doc. 244-1 at ¶ 2), but she did not discuss Mr. Six's statements to the Court implying that Mr. Dillon had no copy of any loan agreement.  (*See id.* at ¶¶ 26, 28-29).  Counsel asked Professor Beskind to address whether the authenticity objection "was made in good faith" and whether Counsel's evidentiary arguments "were misleading or lacked candor."  (Doc. 244-2 at ¶ 3).  While he says that Mr. Six's argument about VIN Capital was "completely accurate," (*id.* at ¶ 16), he ignores Mr. Six's repeated use of VIN Capital as an example interspersed with references to all of the loan agreements taken as a group.  *See supra* p. 10.  The clear implication of Mr. Six's argument taken as a whole—an argument the Court heard and Professor Beskind did not—was that Mr. Dillon had no copies of *any* loan agreement. Mr. Six made his argument in the context of specific questions from the Court, and, in the light of other facts discussed *supra* pp. 30-34, it was misleading.

Counsel asked Professor Saltzburg to opine as to the narrow question of whether the authentication objection was "reasonable," (Doc. 244-3 at ¶ 4), though his proffered opinions are more wide-ranging.  (*See id.* at ¶ 31).  Professor Saltzburg acknowledges that Mr. Six's argument "could have been more focused and nuanced," but opines that his "reading of the transcript does not reveal that Plaintiff's counsel was endeavoring to mislead the Court."  (*Id.* at ¶ 25).  While the Court appreciates Professor Saltzburg's extensive legal knowledge, his legal experience does not make him an expert in determining intent from reading a transcript.  The Court was present at the hearing when Mr. Six made the argument, is fully apprised of all the circumstances, and is in a much better position to evaluate this factual issue.

The professors do not appear to understand the entirety of the legal context. All mention or assume that Generations had the burden of proof to show an agreement to arbitrate. (Doc. 244-1 at ¶ 12; Doc. 244-2 at ¶¶ 17, 26; *see* Doc. 244-3 at ¶¶ 15-18). However, they do not acknowledge that the proffer of the Generations Copy met that burden unless Counsel made an authenticity challenge. *See supra* at p. 21. They do not mention that a successful challenge to the Generations Copy at the motion to dismiss stage was virtually certain to result in re-examination of that issue by the Court once the Dillon Copy necessarily came to light. *See supra* note 16, *infra* note 28. Even if one assumes that Counsel had a potential good faith basis for objecting to authenticity, that does not excuse their surrounding bad faith actions.

Finally, two of the professors rely in part on the fact that at the time Counsel objected to consideration of the Generations Copy, discovery had not begun, and conclude that Counsel had no duty to disclose the Dillon Copy. (Doc. 244-1 at ¶ 28; Doc. 244-2 at ¶ 15). Professor Bradley says the Dillon Copy was not material and seems to imply that Counsel's doubts about authenticity meant there was "no basis" to disclose the Dillon Copy. (*See* Doc. 244-1 at ¶ 28). The Court has considered and rejected these arguments, which ignore the context of the case and make Counsel the unilateral arbiters of relevance. *See* discussion *supra* pp. 43-44. The fact that it was not time for Rule 26 initial disclosures and that no discovery had been served did not give Counsel license to mislead the Court and to delay disclosing highly relevant and unfavorable evidence on a factual dispute they caused, all while forcing an unnecessary appeal.

### 5. Conclusion

The effort by Counsel to chop down a few trees does not mean there is no forest. The totality of the evidence, viewed in context, establishes bad faith and vexatious conduct that violated the duty of candor to the Court.

### D. Counsel's conduct multiplied the proceedings.

Before attorney's fees can be awarded under Section 1927, the unreasonable and vexatious conduct must have multiplied the proceedings. *Great Steaks*, 667 F.3d at 522. There is little doubt that this occurred here. While the situation could have played out in several ways had Counsel acted consistently with their duty of candor and in good faith, at a minimum Generations' reply brief to the renewed motion to dismiss would have been unnecessary and only one appeal would have been needed to this point, instead of two.

Had Counsel been candid about the existence of the Dillon Copy during the proceedings related to Generations' initial motion to dismiss, it is highly likely that the Court would have reached the merits of the motion rather than denying the motion based on authenticity. A rational investigation by Counsel would have led to a clearer understanding of when Mr. Dillon obtained his copy and, most likely, to a withdrawal of the authenticity objection to the Generations Copy. Even if Counsel had learned that Mr. Dillon printed his copy a few months after borrowing the money and had continued with the authenticity challenge based on their argument that the Dillon Copy did not come from a reputable source, discovery on this issue would have proceeded before the first appeal, not after. Thus, the renewed motion to dismiss and the first appeal, both of which were based on whether the Court should re-examine the authenticity issue, would have

been unnecessary. Any appeal of the Court's decision on the merits of the initial motion to dismiss would have been analogous to the appeal currently pending.[28]

Counsel multiplied the proceedings, resulting in a renewed motion to dismiss and an appeal of the denial of that motion that would otherwise not have been necessary.

### E.  Conduct by Specific Attorneys

There is overlapping conduct here that, taken together, was vexatious and violated the duty of candor. A number of attorneys engaged in parts of this conduct: Mr. Moore, Mr. Six, Mr. Kaplan, Mr. Kaliel, Mr. Siegel, Mr. Ostrow, Mr. Zavareei, and local counsel Mr. Allen. Upon examination of their individual roles, actions, inactions, and knowledge, the Court finds by clear and convincing evidence that Mr. Moore, Mr. Six, Mr. Kaplan, and their firms are responsible for the misconduct and will be sanctioned.

All of these attorneys signed the complaint.[29]  Mr. Moore, Mr. Six, and Mr. Siegel are all at the firm of Stueve Siegel Hanson LLP; Mr. Kaplan is at the Darren Kaplan Law Firm, P.C.;[30] Mr. Ostrow is at Kopelowitz Ostrow P.A.; Mr. Kaliel and Mr. Zavareei are

---

[28] If Generations had not filed its renewed motion to dismiss and had not appealed, it is difficult to imagine that the Court would not have let Generations re-open the arbitration issue once the Dillon Copy came to light. The same is true if Counsel had disclosed the Dillon Copy after the renewed motion was filed. One can hardly imagine a more important piece of new evidence than the plaintiff's identical copy of the loan agreement that contains the same arbitration provision Generations sought to enforce. *See* discussion *supra* pp. 27-29. By failing to disclose the fact that Mr. Dillon possessed a copy of what appeared to be the loan agreement, Counsel virtually insured repetitive proceedings.

[29] Several other attorneys signed the complaint but were not part of any of the sanctionable conduct. (*See* Doc. 1 at pp. 84-85).

[30] Mr. Kaplan appears to have changed law firms around August 2015, in the middle of this conduct. (*See* Doc. 159). When the complaint was filed, and when he signed the opposition to

at Tycko & Zavareei LLP; and Mr. Allen is at Tharrington Smith, L.L.P. (*See* Doc. 202 at 20-21).

Mr. Moore supervised the paralegal responsible for gathering documents from Mr. Dillon and spoke with Mr. Dillon by phone to request relevant documents. (Doc. 260 at ¶¶ 3, 7). Mr. Dillon also faxed his copy of the contract to the attention of Mr. Moore. (*Id.* at ¶ 8). Mr. Moore knew all of the facts and signed the opposition brief to Generations' initial motion to dismiss, (Doc. 17 at 21), without asking Mr. Dillon when and how he obtained his copy of what appeared to be the loan agreement. *See supra* note 4. While he did not attend the March 2014 hearing on that motion and was not present when Mr. Six misled the Court, (*see* Minute Entry 03/06/2014), Mr. Moore did nothing to correct Mr. Six's misleading comments thereafter. Mr. Moore signed the opposition to the renewed motion objecting to reconsideration, (Doc. 113 at 3), and is listed on the brief to the Fourth Circuit. *Dillon*, 787 F.3d at 709; (Doc. 143 at 2). At Mr. Dillon's deposition, Mr. Moore made statements indicating his knowledge that Mr. Dillon printed the agreement when he took out the loan, (*see* Doc. 180-1 at 36, 135:15-137:23), and Mr. Moore has offered no explanation for this contradictory position.

Mr. Six signed the opposition brief to the initial motion to dismiss and presented oral argument at the March 2014 hearing on the motion to dismiss; he was the only

---

the renewed motion to dismiss, Mr. Kaplan was with Chitwood Harley Harnes LLP. (*E.g.*, Doc. 113 at 3). From the Fourth Circuit briefing in Spring 2015 onward, Mr. Kaplan was at the Darren Kaplan Law Firm. (*E.g.*, Doc. 143 at 2). No other attorneys from the earlier firm were involved in the case, and that firm will not be sanctioned.

attorney to do both. (Doc. 17 at 21; Doc. 101 at 19). Mr. Six testified that he was aware of the Dillon Copy at the time he made the oral argument, (Doc. 246-2 at ¶ 10), and Mr. Six made the misleading argument to the Court. (*See, e.g.*, Doc. 101 at 19-20). Mr. Six also signed the opposition to the renewed motion objecting to reconsideration, (Doc. 113 at 3), and argued the case before the Fourth Circuit. *Dillon*, 787 F.3d at 709; (Doc. 143 at 1).

Mr. Kaplan identifies himself as co-lead counsel in this case. (Doc. 246-1 at p. 3 ¶ 6). He did not sign the opposition brief, but he attended the March 2014 hearing and argued other aspects of the motion unrelated to authenticity. (Doc. 101 at 49-54). In his declaration, Mr. Kaplan seems to suggest that it would have been appropriate to challenge authenticity even if he had known the Generations Copy was accurate. (*See* Doc. 246-1 at pp. 4-5 ¶ 9). He has also switched sides on the issue of authenticity and has attempted to rewrite the history of the proceedings in a way that is inaccurate and indicates bad faith.[31] While Mr. Kaplan is silent about when he learned his client possessed an identical copy, (*see* Doc. 246-1 at pp. 10-11 ¶¶ 27, 29), Mr. Kaplan, like

---

[31] Mr. Kaplan now takes the position that defense counsel were correct back in March 2014 in stating that Counsel did not deny the authenticity of the loan agreement. (Doc. 246-1 at p. 5 ¶ 11). He did not say so to the Court at the March 2014 hearing; if he had, Mr. Dillon would have immediately lost his challenge to the Court's consideration of the Generations Copy. *See supra* p. 21. The plaintiff's own briefing on this motion acknowledges that he challenged authenticity. (Doc. 246 at 10 & n.5). Mr. Six stated the same at the September 2016 hearing. (Doc. 263 at 39-40). Even the plaintiffs' own experts read the record as an assertion of an authenticity objection. (Doc. 244-2 at ¶ 17; *see* Doc. 244-1 at ¶ 29). In this case, there was no difference between denying authenticity, challenging authenticity, or disputing authenticity, and Mr. Kaplan's most recent testimony appears to be yet another *post hoc*, about-face effort to avoid responsibility for misleading the Court.

52

Mr. Moore, made statements at Mr. Dillon's deposition indicating his knowledge that Mr. Dillon printed the Dillon Copy when he borrowed the money, (*see* Doc. 180-1 at 36, 135:15-137:23), and he has offered no explanation for this contradictory position. Mr. Kaplan signed the opposition to the renewed motion objecting to reconsideration, (Doc. 113 at 3), and is listed on the brief to the Fourth Circuit. *Dillon*, 787 F.3d at 709; (Doc. 143 at 2).

Mr. Kaliel did not sign the opposition brief, (*see* Doc. 17 at 21), but he attended the March 2014 hearing and argued parts of the motion unrelated to authenticity. (Doc. 101 at 102-11). He did not sign the opposition to the renewed motion objecting to reconsideration, (*see* Doc. 113 at 3), nor is he listed on the brief to the Fourth Circuit. *See Dillon*, 787 F.3d at 709; (Doc. 143 at 2). Mr. Kaliel has not filed a declaration and none of the other declarations indicate he was involved in making the decisions related to the Dillon Copy.

Mr. Siegel signed the opposition brief to the original motion to dismiss, (Doc. 17 at 21), but he did not attend the March 2014 hearing. (*See* Minute Entry 03/06/2014). While he also signed the opposition to the renewed motion objecting to reconsideration, (Doc. 113 at 3), and he is listed on the brief to the Fourth Circuit, *Dillon*, 787 F.3d at 709; (Doc. 143 at 2), he has not appeared in court and he has not filed a declaration. None of the other declarations indicate he had any substantive involvement.

Mr. Zavareei did not sign the opposition brief, (*see* Doc. 17 at 21), or attend the March 2014 hearing. (*See* Minute Entry 03/06/2014). He did sign the opposition brief

to the renewed motion to dismiss, (Doc. 113 at 3), and he is listed on the brief to the Fourth Circuit. *Dillon*, 787 F.3d at 709; (Doc. 143 at 2). His only appearance in court was at the September 2016 hearing on this sanctions motion. (*See* Minute Entry 09/09/2016). Mr. Zavareei has not filed a declaration, and none of the other declarations indicate he had any substantive involvement.

Mr. Ostrow's participation is the same as Mr. Zavareei's, except that Mr. Ostrow has not appeared in court at all. (Doc. 113 at 3; Doc. 143 at 2); *Dillon* 787 F.3d at 709; (*see* Doc. 17 at 21; Minute Entry 03/06/2014).

Mr. Allen served as local counsel and signed the opposition brief. (Doc. 17 at 21). He also attended the March 2014 hearing, although he did not present any argument. (Minute Entry 03/06/2014). He signed the opposition to the renewed motion objecting to reconsideration, (Doc. 113 at 2), and is listed on the brief to the Fourth Circuit. *Dillon*, 787 F.3d at 709; (Doc. 143 at 2). While there is no evidence that he had any substantive participation in any decision-making relevant to the case, he vouched for the good faith of all his co-counsel at the September 2016 hearing. (Doc. 263 at 57).

Because the Court bases its conclusions on the entirety of the conduct, the Court concludes that only Mr. Kaplan and his law firm and Mr. Moore, Mr. Six, and their law firm should be sanctioned. Mr. Moore had the contact with Mr. Dillon and Mr. Six made the misleading argument. They are with the same firm, which all the evidence shows had primary responsibility for the factual investigation or lack thereof. Mr. Moore and Mr. Six signed the brief objecting to the Court's consideration of the Generations Copy, despite their knowledge that Mr. Dillon possessed an identical copy. Mr. Kaplan is co-

54

lead counsel, and he attended the hearing where Mr. Six made the misleading argument. None of the three disclosed the existence of the Dillon Copy to the Court or opposing counsel, even after the Court's March 2014 ruling. All three attorneys signed the brief arguing against reconsideration of the Court's decision based on authenticity grounds, all three signed the brief to the Fourth Circuit, and Mr. Six argued the case to the Fourth Circuit. Mr. Moore and Mr. Kaplan attended Mr. Dillon's deposition and indicated at the time their belief that Mr. Dillon printed his copy when he borrowed the money—a position opposite to the one they now take in Court and an inconsistency they have not explained. None of these three lawyers made the Dillon Copy available before the deposition or during the deposition when its existence was finally uncovered. Mr. Kaplan's *post hoc* rewriting of history, *see supra* note 31, is offensive and further indicative of his bad faith.

The evidence is clear and convincing that Mr. Kaplan and his firm and Mr. Moore, Mr. Six, and their firm acted in bad faith. While other attorneys may have been involved and at this point have ratified the misconduct, the Court finds the evidence is not as clear that these other attorneys were responsible for the vexatious conduct and lack of candor to the Court.

### F. Appropriate Sanctions

In its initial motion, Generations suggested attorney's fees were appropriate and that the Court should strike all arguments in opposition to arbitration raised after the March 2014 hearing. (Doc. 188.) In supplemental briefing, Generations also suggested that dismissing class allegations might be appropriate. (Doc. 242 at 6).

### 1. Attorney's Fees, Costs, and Expenses

"[C]osts, expenses, and attorney's fees which are the proximate result of an attorney's misconduct are recoverable" under § 1927. *Chosin Few, Inc. v. Scott*, 209 F. Supp. 2d 593, 603-05 (W.D.N.C. 2002) (awarding attorney's fees for costs resulting from frivolous second suit filed in another jurisdiction that was removed to federal court and consolidated with original suit). Courts decline to impose sanctions for attorney's fees that would have been incurred regardless of the offending conduct. *Collum v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:07cv534, 2010 WL 1838170, at *6 (W.D.N.C. Apr. 13, 2010) (Cayer, M.J.), *adopted by* 2010 WL 1838091 (May 6, 2010).

"Even though an attorney has engaged in conduct which is otherwise sanctionable, a district court should reflect upon equitable considerations in determining the amount of the sanction." *Blue*, 914 F.2d at 546 (quotation omitted). "A district court may, in its discretion, refuse to award attorney's fees even where it finds the existence of bad faith, if, in balancing the equities, it nevertheless determines that an award in a particular case would not serve the interests of justice." *Id.* (quotation omitted).

As previously found, the renewed motion to dismiss and the appeal of the denial of that motion would not have been necessary but for the vexatious and bad faith conduct of Mr. Six, Mr. Moore, and Mr. Kaplan. Moreover, had Generations and the Court been aware of the Dillon Copy at the time of the first motion to dismiss, the matter almost certainly would have been decided on the merits rather than on technical authenticity grounds, and therefore the first appeal concerning authenticity and reconsideration would not have been needed. Generations' costs and attorney's fees in connection with the

renewed motion and the first appeal were all "excess" costs that are recoverable under § 1927. *See In re Itel Sec. Litig.*, 596 F. Supp. 226, 234 (N.D. Cal. 1984), *aff'd*, 791 F.2d 672 (9th Cir. 1986).

To the extent that Generations contends that all the proceedings since the motion to dismiss resulted from the vexatious conduct, (*see* Doc. 189 at 9-10), the Court is unable to so find. The Court concludes that any costs other than those associated with the renewed motion to dismiss, (*e.g.*, Doc. 106), and the first appeal, (*e.g.*, Doc. 130), are too speculative to be recovered under § 1927. Had Counsel disclosed the existence of the Dillon Copy and continued with their authenticity challenge at the beginning, it is possible that the Court would have allowed some discovery related to authenticity; this probably would have resulted in more briefing such as that which eventually occurred in relation to the second renewed motion, after the first appeal. Moreover, other challenges to the arbitration agreement unrelated to authenticity would still have required a decision and, most likely, an appeal, as has now happened. (Docs. 215, 220). Therefore, the Court will not award attorney's fees related to discovery, the second renewed motion, or the current appeal.

Generations has not provided specifics that allow the Court to determine what fees and costs arise from the renewed motion and first appeal. (*See* Doc. 189-3 at ¶ 11). While identifying which costs are excess is "inherently difficult, and precision is not required," *Lee*, 236 F.3d at 446, the Court would prefer to have a better record of the amount of attorney's fees Generations incurred in these aspects of the proceedings. It also seems appropriate to allow the sanctioned lawyers to be heard as to the amount.

The Court directs Generations to share this information with the sanctioned lawyers no later than October 11, 2016, and directs Generations and the sanctioned lawyers to confer to see if they can narrow or resolve any disputes as to amount. If the parties resolve the amount by agreement, they shall so report no later than October 20, 2016. If disagreements remain, Generations shall submit any supplemental evidence[32] concerning the amount of fees and costs Generations incurred related to the renewed motion and the first appeal no later than October 21, 2016. The evidence may be accompanied by a brief no longer than five pages. The sanctioned attorneys may respond with a brief no longer than ten pages and any evidence in opposition no later than October 31, 2016. Generations may reply, limited to five pages, no later than November 4, 2016. These briefs are limited to the question of an appropriate fee amount, and counsel shall not address any other issue.

Attorney's fees may also be appropriate, pursuant to the court's inherent authority, for violations of the duty of candor. *See Chambers*, 501 U.S. at 45-46; *Shaffer Equip.*, 11 F.3d at 461-62. The "compensatory aspect [of such an award] is only incidental" to the real purpose of sanctions in the Court's inherent authority: "to penalize bad faith abuses of the litigation process." *See* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 28A (5th ed. 2013 & Supp. 2015). The Court will reserve a decision on whether a monetary sanction larger than the attorney's fees incurred by the renewed

---

[32] The larger the amount requested, the more detailed the fee request should be. The Court would find it helpful to have some independent evidence as to the reasonableness of the fee request.

motion and first appeal would be appropriate until after the Court learns the amount of those fees. The amount of attorney's fees awarded for multiplying the proceedings likely will be sufficient to punish and deter.

### 2. Other Sanctions

When a litigant or attorney acts in bad faith, the Court must exercise its discretion to determine an appropriate sanction. Other than attorney's fees, courts have approved imposition of a fine; preclusion of claims, defenses, or evidence; and even dismissal. *See* Joseph, *supra*, at §§ 28A, 28B (collecting cases). When an attorney has acted in bad faith, courts have also imposed sanctions specific to the attorney, such as disqualification of counsel and suspension of counsel from practice before the Court. *See id.* at § 28B(4) (collecting cases); *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 954 (5th Cir. 2001) (affirming sanction prohibiting lawyer from representing future plaintiffs against the defendant in cases with the same subject matter without court approval and reducing counsel's attorney's fee). *See generally Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245 (11th Cir. 2009) (affirming trial court's decision not to award attorney's fees to counsel in FLSA case because of counsel's lack of civility).

Sanctions are appropriate under the court's inherent authority where a party hides evidence during discovery. *E.g.*, *Projects Mgmt. Co. v. Dyncorp Int'l LLC,* 734 F.3d 366, 377 (4th Cir. 2013) (affirming dismissal based on discovery abuses); *Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1246, 1254 (9th Cir. 2016) (affirming sanctions, including attorney's fees, under inherent authority for "a bad faith attempt to hide responsive documents," including inculpatory test results, during discovery); *Advanced*

59

*Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1289 (Fed. Cir. 2000) (granting sanction of a new trial and strongly encouraging magistrate judge to impose additional sanctions where party "deliberately and repeatedly flouts discovery requests and disregards the Federal Rules of Civil Procedure"). While Counsel did not hide evidence during discovery, their misconduct is in some ways similar.

The Court has already determined that striking all of Mr. Dillon's arguments against arbitration is not appropriate. (Doc. 215 at 3). Mr. Dillon is not the one who decided to hide his copy of the loan agreement from the Court and opposing counsel, and he made no misleading argument. While there is a possibility he was mistaken, the Court has no reason to think that Mr. Dillon deliberately testified falsely at his deposition concerning when he printed the loan agreement. It would not be fair or equitable to punish him for his counsel's bad faith and lack of candor.[33]

The Court has seriously considered, as a sanction, striking the request for class certification and disqualifying Mr. Kaplan, Mr. Six, Mr. Moore, and their firms from serving as class counsel. However, the innocent absent class members are not the ones who acted in bad faith, so striking the request for class certification in its entirety seems unfair to them. Whether these lawyers are appropriate candidates to provide legal representation to these absent class members is a question best left for another day. The

---

[33] That is not to say that Mr. Dillon's suitability as a class representative is a foregone conclusion. Rule 23(a)(4) "call[s] for scrutiny of the proposed class representative," and Mr. Dillon has at least once forgotten facts at a convenient time. Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment; *see supra* p. 15.

test for determining whether Counsel are appropriate to provide representation for absent class members is different from the sanctions inquiry,[34] and the question of class certification may never reach the Court.[35]  The Court finds that a monetary sanction is appropriate and sufficient.

### G. Mr. Dillon's Request for Attorney's Fees

Counsel contend that they are entitled to attorney's fees pursuant to the Court's inherent authority for defending the sanctions motion filed by Generations.  (Doc. 202 at 19-20).  They make this argument even though Mr. Dillon himself repeatedly testified that he printed his copy of the loan agreement at the time he borrowed the money.  They make this argument even though it is undisputed that Mr. Dillon provided his copy to his lawyers before they filed suit.  They make this argument even though it is undisputed that his lawyers did not disclose the Dillon Copy to opposing counsel or the Court for almost two years.  They make this argument even though Counsel agree that if Mr. Dillon printed his copy at the time he borrowed the money, an authenticity objection would be

---

[34] Rule 23 says that when appointing class counsel, a court "must consider . . . the work counsel has done in identifying or investigating potential claims in the action."  Fed. R. Civ. P. 23(g)(1)(A).  A court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  "[C]areful scrutiny of the character, competence and quality of counsel retained" is appropriate.  *Walter v. Palisades Collection, LLC*, No. 06-378, 2010 WL 308978, at *9 (E.D. Pa. Jan. 26, 2010) (quotation omitted).  "[T]he ethical competence of attorneys desiring to represent a class is relevant to the question of adequacy of representation."  *Brame v. Ray Bills Fin. Corp.*, 85 F.R.D. 568, 577 (N.D.N.Y. 1979).  Courts should evaluate the seriousness of a particular ethical breach and the possibility of prejudice to the class.  *Id.*

[35] If it does, the Court may consider sanctioned counsel's actions and inactions and the ratification of that misconduct by other counsel even if it did not rise to the level of a violation of § 1927 or the duty of candor to the Court.

meritless. This request is so lacking in merit that it lends further support to the Court's conclusion that Counsel are acting in bad faith.

In any event, Generations' sanctions motion has merit and is not, as Counsel contend, "unfounded," "frivolous," or "abusive." (*Id.* at 19). Because sanctions against Counsel are appropriate, the Court will deny Mr. Dillon's request for attorney's fees for the costs of defending this motion.

## V.     CONCLUSION

By objecting to the Court's consideration of the Generations Copy in connection with an arbitration motion, Counsel put the document's authenticity at issue. By then hiding the existence of the identical Dillon Copy for almost two years, by misleading the Court about its existence, and by causing an unnecessary appeal, Mr. Six, Mr. Moore, Mr. Kaplan, and their firms acted unreasonably, in bad faith, vexatiously, and in violation of their duty of candor to the Court. Their conduct foreseeably resulted in a multiplication of the proceedings and wasted the time and resources of the Court and the defendant Generations. Sanctions are appropriate.

It is **ORDERED** that:

1.  The defendant Generations Community Federal Credit Union's motion for sanctions, (Doc. 188), is **GRANTED**.

2.  Steve Six, J. Austin Moore, Darren T. Kaplan, and the firms Stueve Siegel Hanson LLP and Darren Kaplan Law Firm, P.C. are **SANCTIONED** for acting vexatiously, in bad faith, and in violation of their duty of candor to the

Court and will be required to pay attorney's fees incurred by Generations as a result of their misconduct.

3. Generations and the sanctioned lawyers shall confer about the amount of attorney's fees and report jointly on that amount or, if they disagree about the amount, brief that issue in accordance with the schedule established herein on p. 58.

4. The plaintiff James Dillon's request for attorney's fees, (Doc. 202), is **DENIED**.

This the 30th day of September, 2016.

_____
UNITED STATES DISTRICT JUDGE