**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 17-1548**

─────────────

STEPHEN SIX; DARREN T. KAPLAN; J. AUSTIN MOORE; STUEVE SIEGEL HANSON LLP; DARREN KAPLAN LAW FIRM, P.C.,

     *Appellants,*

and

JAMES DILLON,

     *Plaintiff,*

v.

GENERATIONS FEDERAL CREDIT UNION,

     *Defendant – Appellee,*

and

BMO HARRIS BANK, N.A.; FOUR OAKS BANK & TRUST COMPANY; BAY CITIES BANK,

     *Defendants.*

--------------------------------

LAW PROFESSORS,

     *Amicus Supporting Appellants.*

─────────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:13-cv-00897-CCE-LPA)

─────────────

Argued:  March 20, 2018                    Decided:  May 31, 2018

———————————

Before DUNCAN, KEENAN, and THACKER, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Keenan and Judge Thacker joined.

———————————

**ARGUED:**  Kannon K. Shanmugam, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellants.  Leslie Sara Hyman, PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP, San Antonio, Texas, for Appellee.  **ON BRIEF:** John S. Williams, William T. Marks, WILLIAMS & CONNOLLY, LLP, Washington, D.C., for Appellants.  Eric A. Pullen, PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP, San Antonio, Texas; Reid C. Adams, Jr., Jonathan R. Reich, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Winston-Salem, North Carolina, for Appellee.  David C. Frederick, Minsuk Han, Jacob E. Hartman, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Amici Curiae.

———————————

2

DUNCAN, Circuit Judge:

This appeal arises out of the district court's order sanctioning three attorneys and their law firms under both its inherent authority and 28 U.S.C. § 1927. Finding no abuse of discretion, we affirm.

I.

The district court based its decision to award sanctions on a comprehensive evaluation of the attorneys' conduct. That conduct was, in many respects, egregious, and it continued throughout the various stages of litigation and appeal. As will be explained in detail below, the sanctioned attorneys challenged the authenticity of a loan agreement for two years before revealing that they possessed an identical copy, obtained from their client, before filing the complaint.

The Appellant attorneys contend that we seek to create a new affirmative duty to disclose documents before the opening of discovery. To the contrary, we simply conclude that the district court did not abuse its discretion in determining that the sanctioned attorneys' behavior below, which was designed to and in fact did mislead the district court and this court and thereby extended the proceedings, should not be countenanced. This case presents at least one clear, affirmative misrepresentation: one attorney asserted under oath that, after two years of litigation over the authenticity of the loan agreement, the plaintiff's attorneys had never challenged authenticity. The remainder of the sanctioned conduct forms a mosaic of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures to correct known

3

misimpressions created by their own conduct that, in their totality, evince lack of candor to the court and disrespect for the judicial process. The district court relied, to its detriment, on these distortions.

To provide full context for the district court's sanctions order, we set forth the factual and procedural background of this case in detail. We first describe the underlying litigation that gave rise to the sanctioned conduct. Next, we highlight the sanctioned attorneys' many misrepresentations, obfuscations, and omissions that the district court determined manifested bad faith. We focus particularly on their statements and omissions that led the court to believe that counsel did not have a copy of the disputed loan agreement and the trial strategies that, in light of these statements and omissions, reinforced the court's misapprehension of relevant facts. Finally, we describe the sanctions proceedings and the sanctioned attorneys' continued misstatements, inconsistencies, and exaggerations that the district court finally concluded "strain[ed] credulity and indicate[d] a continued willingness to say whatever is necessary to win in the moment." *See Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2016 WL 5679190, at *17 (M.D.N.C. Sept. 30, 2016).

## A.

James Dillon borrowed money from online lenders in 2012 and 2013 at interest rates that he alleged were usurious. Of relevance here, one such loan was a $2,525 payday loan from Western Sky, an online lender. To take out the loan, Dillon clicked through an online loan agreement ("the Western Sky loan agreement"). "Pursuant to

4

Plaintiff's agreement with Western Sky," Dillon's loan incurred a finance charge of $11,332.12 on the principal, to be paid over forty-six months.[1]  J.A. 68 (Dillon Compl.). This charge represented an annual interest rate of approximately 139%.  Neither Dillon nor the lender signed a hard copy of the loan agreement.

In October 2013, Dillon filed a putative class action on behalf of a class and sub-class of borrowers against several non-lender banks whose only roles were processing loan-related transactions through the Automatic Clearing House network.  Dillon sought to impose liability on these non-lender banks, who were not parties to the loan agreements, for providing aid to online lenders in violation of the Racketeer Influenced and Corrupt Organizations Act as well as several state laws.  Generations Community Federal Credit Union ("Generations") processed debit transactions from Dillon's bank account under the Western Sky loan agreement.  Dillon alleged that Generations "derived a benefit through the receipt of fees" from the allegedly usurious loans by processing these debit transactions.  J.A. 69.

Attorneys Stephen Six, J. Austin Moore, and Darren T. Kaplan, among others, represented Dillon in his suit.  Six and Moore are a partner and associate attorney, respectively, at the Steuve Siegel Hanson LLP law firm.  Kaplan is the principal shareholder of Darren Kaplan Law Firm, P.C.

---

[1] For the analysis that follows, it is significant that Dillon references his loan agreement with Western Sky in his complaint.

B.

Generations promptly moved to dismiss Dillon's complaint, arguing that the Western Sky loan agreement's arbitration, forum-selection, and choice-of-law clauses each justified dismissal.  Generations attached a copy of the Western Sky loan agreement as an exhibit to its motion.

Dillon opposed Generations's motion to dismiss on grounds that can most charitably be described as ambiguous.  Of relevance to the dispute that would follow, Dillon challenged Generations's reliance on the Western Sky loan agreement because it originated online and "does not bear Plaintiff's signature (or any signature) and Defendant fails to offer any explanation as to how it came into possession of the Loan Agreement or *whether it is authentic*."  J.A. 153 (emphasis added).  At some times and for some purposes, Dillon's counsel would characterize this challenge as one to the *authenticity* of the document--a substantive challenge that the document was not in fact what it purported to be.  At other times and for other purposes, Dillon and his attorneys would characterize this challenge as one to the *authentication* of the document--a challenge to Generations's failure to follow proper procedures under Rule 901 of the Federal Rules of Evidence.[2]

---

[2] Rule 901 of the Federal Rules of Evidence requires that a proponent of evidence produce sufficient evidence to support a finding that the evidence is what the proponent claims it to be before it may be admitted into evidence.

6

There is indeed language to suggest that Dillon's attorneys intended the objection to be a challenge to the authentication of the document.  The section of the brief containing this objection is titled "Generations'[s] Exhibit 'A' Is Inadmissible Hearsay." J.A. 153.  The next sentences go on to argue that Generations had failed to provide a declaration under Rules 803(6) or 902(11) of the Federal Rules of Evidence and concluded that the Western Sky loan agreement was therefore "inadmissible hearsay" that "may not be considered in support of Generations'[s] motion" to dismiss.  J.A. 153.

Rebutting the possibility that Dillon was challenging authentication, however, is the fact that such a challenge would have been untenable at the motion-to-dismiss stage. It is well established that a court may "consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  "At the motion to dismiss stage, documents attached to a motion to dismiss need not be accompanied by a formal declaration authenticating them."  *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 409–10 (E.D.N.C. 2015).

Furthermore, of the two possible challenges to the court's consideration of the loan agreements at the motion-to-dismiss phase, Dillon could not plausibly dispute that the documents were intrinsic to the complaint.  Dillon's complaint quoted terms and rates from the Western Sky loan agreement and noted that the allegedly usurious loan was made "[p]ursuant to Plaintiff's agreement with Western Sky."  J.A. 68; *see supra* at 5 n.1. This left authenticity as the only available challenge.  However, because some of Dillon's claims relied on the terms of the loan agreements, Generations questioned whether Dillon

7

actually sought "to dispute the authenticity" of the Western Sky loan agreement.  J.A. 180.  Generations's confusion, which the district court shared, was entirely of Dillon's own making.

At a hearing to consider several pre-trial motions,[3] the district court framed the "main question" for the parties as whether or not Dillon actually challenged the authenticity of the loan agreements.  J.A. 206.  The court explained:

> Everybody said in their reply brief that I can consider [the loan agreements at this stage of litigation] because their authenticity isn't challenged, but I read the plaintiff's briefs as challenging their authenticity.  It seemed to me to be pretty clear.  They said things like there is no proof these are authentic and we object.

J.A. 206.  The court perceived Dillon's challenge as one based on authenticity, not authentication, and Dillon's attorneys made no effort to correct that impression.

Six responded on behalf of Dillon that he would begin with "the first issue Your Honor raised."  J.A. 221.  Six explained that he had "drafted the complaint without the loan agreement" and that "the claims that we make don't rely on the loan agreement." J.A. 221.  Six also asserted that, "[a]s a threshold manner, they haven't established these are the agreements."  J.A. 222.[4]  Without ever directly answering the court's question in

---

[3] Several of the other non-lender banks had filed their own motions to compel arbitration and stay the litigation pursuant to arbitration clauses found in other loan agreements.  The district court held a hearing to consider pending motions to dismiss and/or compel arbitration, including Generations's, on March 6, 2014.

[4] Six further elaborated:

> So I heard your honor's question, and if it's a question that's important to you, it's important to me.  You are saying, doesn't he rely on the loan
(Continued)

8

the affirmative, Six nevertheless repeatedly challenged the authenticity of the loan agreements.

At one point, the court pushed Six to explain whether or not he at least "agree[d] that there is some sort of written agreement somewhere." J.A. 229. When Six evaded the question, the court pressed harder: "I'm not saying you should produce it. I am just saying, based on your allegations in the complaint, you are the one who refers to the loan documents all the time."[5] J.A. 229. Six still avoided answering the court's question directly, instead asserting "[a]gain, you know, we drafted the complaint without, for instance, the Vin Capital loan agreement." J.A. 229–34. The district court interpreted Six's statements as agreeing that Dillon sought to challenge the authenticity of the loan

---

> agreement? You know, it has in there, in the loan agreement, what the APR is, and it says it's 500 or 700 percent; but Mr. Dillon doesn't need that for his claim. He can prove it through other evidence that it's a usurious loan. He didn't have, for instance, the Vin Capital, I think I heard one of them mention, the Vin Capital loan agreement that we would even have to draft the complaint.
> . . . .
> Mr. Dillon clicked through an Internet screen with Vin Capital, and where do we get that? If we need to bring the loan agreement before the Court, where do I find Vin Capital? Where do they exist? What are they? Are they still in business? There is nothing in the papers that shows that. I don't know how Mr. Dillon could go get the Vin Capital loan agreement to see whether or not it is what these folks purport that it is.

J.A. 226.

[5] This is a particularly clear refutation of Appellants' subsequent arguments on appeal that the district court imposed some new duty of production. Here, the district court was not imposing on counsel an obligation to produce the agreement. It was trying to clarify, in the face of Six's staunch resistance, the nature of his argument.

9

agreements.  At the very least, Six "did not disagree with the Court's interpretation of Mr. Dillon's position on authenticity."  *Dillon*, 2016 WL 5679190, at *4.

Under the impression that a good-faith basis existed to challenge the authenticity of the copy of the loan agreement that Generations produced, the district court denied the defendants' various motions to dismiss or to compel arbitration.  *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2014 WL 911950 (M.D.N.C. Mar. 10, 2014).  The district court explained that "Mr. Dillon disputes the authenticity of the documents and objects to their consideration" and further that "Mr. Dillon has not admitted that the proffered documents are in fact the loan agreements."  *Id.* at *1–2.  The court further noted that while "the moving party is not required to present evidence authenticating a purported agreement to arbitrate in the ordinary case," here "Mr. Dillon clearly objected to the authenticity of the documents," and the court was concerned that the "purported agreement was physically signed by no one and the movants are not even parties to it."  *Id.* at *3.  Beyond assertions in the banks' briefs that the loan agreements were authentic, the court believed the record to be "silent."  *Id.* at *2.  The court's opinion and order clearly articulated what it perceived as Dillon's good-faith challenge to the loan agreements on authenticity--not authentication--grounds.  Any misunderstanding on this point was both created and reinforced by Dillon's attorneys.

Generations renewed its motion to dismiss, this time attaching an affidavit from a Western Sky agent authenticating the Western Sky loan agreement.  Other defendants filed similar motions styled as motions to compel arbitration with authenticating affidavits.  Dillon again objected, arguing that Generations's renewed motion was really a

motion to reconsider for which Generations had not shown a basis. If Dillon's attorneys had truly sought to challenge authentication instead of authenticity, this proceeding offered another opportunity to clarify. Yet they declined to do so. The district court agreed with Dillon's characterization of the motions and denied each.

Several defendants appealed. Six demonstrated on appeal the same determination that he had shown before the district court to avoid both answering questions and clarifying misimpressions. In other words, the pattern continued. In response to a question from the panel about how he could simultaneously rely on and reference the loan agreements and challenge their authenticity, Six responded:

> Well, here's the answer to that: Mr. Dillon took out a number of loans, like a lot of these folks who get trapped in a cycle of debt. It's happened in cyberspace somewhere. And the example I used with Judge Eagles was there's one lender called Vin Capital. We have no idea where they exist. They're off in cyberspace. Mr. Dillon doesn't have the loan agreement. He doesn't know if that loan agreement the bank has brought on behalf of Vin Capital is the loan agreement.
> . . . .
> So the claim that Mr. Dillon is one of the signatories [and] is in the best position to say, ["]Yeah, this unauthenticated writing is the one that applies to my loan,["] who knows. Maybe it is, maybe it isn't . . . .

J.A. 548. The panel member responded, "I don't understand your answer at all." J.A. 548. The panel member asked Six directly whether there had "ever been a challenge . . . to the authenticity of the arbitration agreements" within the loan agreements and requested that he "start off with yes or no." J.A. 548. Six finally answered "yes." J.A. 548. Six added: "The banks are complete strangers to the transaction. Mr. Dillon doesn't even have several of these . . . agreements, . . . and so he's not in a position to say, Yes, in

11

fact, this is the loan agreement or no its not."[6]  J.A. 548.  The Fourth Circuit vacated the judgment of the district court and ordered further proceedings on the arbitration issue on the merits.  *See Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707 (4th Cir. 2015).

## C.

On remand, the parties conducted arbitration-related discovery.  Information quickly emerged that led the district court to question the good-faith basis for Dillon's attorneys' authenticity challenges.

In response to requests for admissions on August 28, 2015, Dillon surprised Generations by admitting for the first time "that the [Western Sky loan agreement] is a true and correct copy of the agreement he electronically clicked-through over the Internet."  J.A. 607–08.  At Dillon's deposition the following month, Dillon further revealed for the first time that he had printed a copy of the Western Sky loan agreement, possibly close to the time he took out the loan, and had provided the copy to his attorneys.  An attorney representing one of the other non-lender banks asked Dillon why he had a copy of the Western Sky loan agreement but not of the other loan agreements. In response, Moore educed Dillon's testimony that it was "possible that Western Sky required [him] to fax in a copy of that loan agreement along with [his] void check and a copy of [his] driver's license in order to take out the loan."  J.A. 1350–51.  In other

---

[6] Yet in one of the more gratuitous instances of misrepresentation, as though this court could neither read nor hear, Kaplan would later assert in an affidavit opposing sanctions that "[a]t no time did Plaintiff's counsel ever suggest that any of the copies of the loan agreements proffered by Defendants were not the actual agreements."  J.A. 795.

12

words, Moore elicited testimony that tended to suggest that Dillon had printed the loan agreement in the process of obtaining the loan, and therefore that he had possessed the copy of the Western Sky loan agreement since that time.[7]

Dillon's counsel provided Generations with a partially redacted version of Dillon's copy of the Western Sky loan agreement several weeks after the deposition. The terms in Dillon's copy were identical to those in the copy that Generations had provided in support of its earlier motions to dismiss. Dillon's attorneys had, however, redacted markings around the contractual text under a claim of attorney-client privilege.[8] Dillon's attorneys explained that "[i]n contrast to other loan agreements in this litigation, Plaintiff concedes the authenticity of the [Western Sky loan agreement] because he was able to locate a copy of the agreement in his own files that is identical to the agreement produced by Generations." J.A. 446 n.1. This statement suggests two things. First, it seems to concede that an authenticity challenge could not be sustained in good faith if Dillon had an identical copy of the contested document. Second, the wording intimates that Dillon's attorneys dropped the authenticity challenge as soon as Dillon's copy of the loan agreement was discovered. However, such was not the case.

---

[7] Months later, in his declaration opposing sanctions, Moore would assert that he did "not believe that Mr. Dillon printed a copy of the Western Sky agreement at the time he took out the loan on May 30, 2013." J.A. 818. The internal conflict between Moore's questioning at Dillon's deposition and his later declaration serves as yet another example of the conflicting and misleading statements that formed part of the overall mosaic of half-truths and deception.

[8] Appellants' counsel later added that the redactions were also justified on relevance grounds. Appellants' Br. at 53.

13

At this stage, Generations knew that (1) Dillon and his attorneys no longer challenged the authenticity of the loan agreement, and that (2) a copy of the agreement had been in *Dillon's* possession for some time. However, Generations did not know that Dillon's *attorneys* had also possessed the same document since before filing the complaint. A forensic investigation of Dillon's laptop computer revealed that Dillon had provided his copy of the Western Sky loan agreement to his attorneys on October 1, 2013--one week before the original complaint in the suit was filed. Moore later confirmed that Dillon had faxed the document to Moore's attention on October 1, 2013. J.A. 818. Even more damning, the portions of Dillon's copy of the loan agreement that had been redacted by his attorneys before production to Generations included markings indicating that Dillon had submitted the document to his attorneys in 2013. In other words, Six stood before the district court and this court challenging the authenticity of the loan agreement, describing at length how he "drafted the complaint without the loan agreement," how the loan agreements were somewhere "in cyberspace," and how "[a]s a threshold manner, they haven't established these are the agreements," all while his law firm had a copy identical to the one that Generations claimed was genuine.

## D.

On January 12, 2016, Generations moved for sanctions under the district court's inherent authority and 28 U.S.C. § 1927. Generations argued that the existence of the Dillon copy rendered Dillon's attorneys' authenticity arguments disingenuous and in bad faith, misleading to the court, and calculated to obstruct and multiply the proceedings.

14

Generations sought compensation for the attorney's fees and costs incurred because of the added years of litigation stemming from Dillon's attorneys' bad-faith challenges to the authenticity of the Western Sky loan agreement.  Dillon's attorneys also moved for sanctions against Generations, but the court determined that this motion was entirely "lacking in merit."  *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2017 WL 564501, at *4 (M.D.N.C. Feb. 10, 2017).

During the sanctions hearing process, Dillon's attorneys' attempts to explain their prior conduct were marked by behavior the district court would later characterize as manifesting the same level of bad faith.  Remarkably, Kaplan's affidavit in opposition to the motion for sanctions argued that there had *never* been a challenge to authenticity:

> At no time did Plaintiff's counsel ever suggest that any of the copies of the loan agreements proffered by Defendants were not the actual agreements . . . . Plaintiff's counsel only argued (correctly) that Defendants had failed to *properly authenticate* the loan agreements they were offering as required by the Federal Rules of Evidence.

J.A. 795–96 (emphasis added).  Kaplan made this assertion under penalty of perjury, despite Dillon's attorneys' numerous assertions that they sought to challenge the authenticity of the loan agreement, orally and in writing, before the district court and this court.

Six, on the other hand, argued that he *still doubted* the authenticity of the Western Sky loan agreement.  He asserted in his affidavit that "[a]t the time of the two arguments and through to today, I continue [to] hold reasonable and significant doubts about the Western Sky loan agreement located by Mr. Dillon." J.A. 812.  This assertion is particularly astonishing because he was one of the attorneys who submitted Dillon's

15

responses to Generations's requests for admissions, which admitted "that the [Western Sky loan agreement] is a true and correct copy of the agreement [Dillon] electronically clicked-through over the Internet." *See* J.A. 607–08. At a hearing on the sanctions motion, Six also told the court that he "didn't know that [Dillon would testify that he had a copy] on March 6th [2014] when I appeared before you, and I didn't know it in the couple of months before when we were writing these briefs. Everything he told us was, he did not have the document." J.A. 899. But as we have described above, this statement is directly contradicted by Moore, an associate at Six's firm, who confirmed that the firm received the document by fax from Dillon on October 1, 2013.

Moore's affidavit asserted that he did "not believe that Mr. Dillon printed a copy of the Western Sky agreement at the time he took out the loan on May 30, 2013." J.A. 818. This directly contradicts Moore's proffered explanation of why Dillon had the Western Sky loan agreement (but not others) during Dillon's deposition. Moore had pushed Dillon to explain that "Western Sky required [him] to fax in a copy of that loan agreement along with [his] void check and a copy of [his] driver's license" when such testimony seemed helpful to his case. *See* J.A. 1350–51. However, when it became more favorable to deny that Dillon printed the loan at that time, Moore asserted to the contrary that he believed Dillon must have printed the document much later. Such behavior supported the district court's conclusion that the attorneys would say whatever produced the necessary result at the moment regardless of its veracity.

On September 30, 2016, the district court granted Generations's motion for sanctions, finding that Six, Kaplan, and Moore "acted in bad faith and vexatiously and

16

violated their duty of candor by hiding a relevant and potentially dispositive document from the Court in connection with a long-running dispute over arbitrability." *Dillon*, 2016 WL 5679190, at *1. Their conduct "multiplied the proceedings, wasted court resources, misled the Court, and caused Generations to incur unnecessary attorney's fees." *Id.* The district court did not purport to impose a duty to compel any particular document before discovery, nor did it impose sanctions based on any single misrepresentation. Rather, the court held that "[a]ll of the conduct, taken together" led it to conclude that sanctioned counsel "intended to hide and did hide relevant facts from the [district court] and opposing counsel for almost two years," and that sanctioned counsel "acted in bad faith, unreasonably, and vexatiously and violated their duty of candor to the [district court]." *Id.* at *17.[9]

In an order dated February 10, 2017, the district court calculated the amount of sanctions to be awarded. It concluded that the three attorneys' bad faith conduct had

---

[9] The district court adopted a "clear and convincing evidence" standard to evaluate whether misconduct occurred before imposing sanctions under its inherent authority but did not state whether any heightened burden applied to evidence of bad faith for sanctions under § 1927. *Id.* at *9. Both parties contend that this heightened burden is required both for sanctions imposed under a court's inherent authority and under § 1927, despite citing no circuit precedent supporting these assertions. *See* Appellants' Br. at 48; Appellee's Br. at 11, 37.

This circuit's precedent does not require a heightened evidentiary burden on a court's finding of bad faith before compensatory sanctions, such as attorney's fees, may be imposed. Here, even if the district court's application of an unnecessarily high standard of proof to its bad-faith analysis were legal error, it would be harmless because the district court's conclusions would nevertheless stand under a lower standard. Accordingly, we decline to decide whether a clear-and-convincing evidence standard might apply to a finding of bad faith before awarding sanctions in the form of compensatory attorney's fees.

17

generated "attorney's fees and expenses of $70,147.70 in connection with [Generations's] renewed motion to dismiss and the first appeal." *Dillon*, 2017 WL 564501, at *8. Sanctioned counsel and Generations agreed that this figure represented a "reasonable amount for the attorney's fees and expenses associated with the renewed motion to dismiss and the first appeal." *Id.* at *2.

The district court also concluded that the sanctioned attorneys' bad-faith conduct had continued through their defense of the sanctions motion. This conduct, the court found, increased Generations's attorney's fees by $118,417.33. *Id.* at *5, *8. However, because of "the Fourth Circuit's admonition in *Blue* [*v. U.S. Dep't of the Army*, 914 F.2d 525 (4th Cir. 1990),] that attorneys should be allowed to present a fair defense to a sanctions motion without fear of additional sanctions," the district court only awarded $79,852.50 of this amount. *Id.* at *6. The court reasoned that this reduced amount would "mak[e] Generations whole while not punishing sanctioned counsel for asserting matters of legitimate consideration relevant to the sanctions motion." *Id.* at *7; *see also Blue*, 914 F.2d at 548–49.

The court also found that the law firms "fully participated in this case and in the violation of the duty of candor." *Id.* at *1. Six and Moore's firm "had primary responsibility for the factual investigation--or lack thereof--that led to the suppression of the Dillon copy." *Id.* at *8. Furthermore, both law firms had "ratified the conduct" of the three attorneys. *Id.* Thus, the firms were held jointly liable for the sanctions. In total, the court held Six, Kaplan, and their law firms jointly liable for $150,000 in attorney's fees. The court held Moore jointly liable for only $100,000 of that amount because it

18

reasoned that as an associate attorney Moore performed a lesser role in the bad-faith conduct.

The sanctioned attorneys appealed the orders imposing sanctions. Dillon has since settled the underlying case with Generations.

## II.

We review for abuse of discretion a district court's award of sanctions, both pursuant to its inherent authority, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991), and under 28 U.S.C. § 1927, *EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 522 (4th Cir. 2012). We will not find an abuse of discretion unless "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III.

We consider whether the district court abused its discretion in awarding compensatory sanctions totaling $150,000 pursuant to its inherent authority and 28 U.S.C. § 1927. We conclude that it did not.

The district court imposed a single sanctions award pursuant to both its inherent authority and § 1927. We first explain the legal standard for each source of sanctioning authority and the court's application of each standard. We then explain why we find no abuse of discretion.

19

First, federal courts have inherent authority to sanction. This authority derives from courts' "certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). Among their other affirmative duties, "[a]ttorneys are obligated to act with candor in presenting claims for judicial resolution." *McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S. 429, 440 (1988). In particular, "[a] lawyer shall not knowingly . . . make a false statement . . . or fail to correct a false statement" of material fact to the tribunal, nor shall a lawyer "offer evidence that the lawyer knows to be false." N.C. R. Prof'l Conduct 3.3; *see* M.D.N.C. Local R. of Practice & P. 83.10e(b) (adopting North Carolina State Bar's Rules of Professional Conduct, including the requirement of candor toward the tribunal). Courts are empowered "to fashion an appropriate sanction for conduct which abuses the judicial process," such as "an order . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear Tire*, 137 S. Ct. at 1186 (quoting *Chambers*, 501 U.S. at 44–45).

Here, the court invoked its inherent authority to create a remedy to address bad-faith behavior that abused the judicial process. As the court explained:

> Counsel raised a dispute over the authenticity of a written contract proffered by Generations without disclosing that their client, the plaintiff, possessed an identical copy. The Dillon Copy was material to and potentially dispositive of the authenticity issue. During oral argument, Mr. Six implied to the Court that Counsel had no such copy and that no such copy existed. Mr. Six deliberately misled the Court in an effort to avoid the

20

consequences of an arbitration clause in the contract, and none of his co-counsel corrected this misleading argument.

*Dillon*, 2016 WL 5679190, at *11 (citations omitted). The court noted that "[w]hen a litigant contests the authenticity of a document, the litigant must have a good faith basis for the objection; a litigant cannot challenge or deny the authenticity of a written agreement that he knows to be authentic." *Id.* at *10 (citing *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003)). Under its inherent authority, the district court found that the attorneys acted in bad faith and that through this conduct the attorneys "intended to hide and did hide relevant facts from the [district court] and opposing counsel for almost two years" and "intentionally misled the [district court] about the relevant facts to gain a tactical advantage and prevail on pending arbitration motions." *Id.* at *17. In short, the sanctioned attorneys' objections to authenticity abused the judicial process both because they lacked a good faith basis and because the attorneys made repeated misrepresentations to the court in order to sustain these objections. The district court found that this conduct justified sanctions imposed under the court's inherent authority.

The court also imposed sanctions under 28 U.S.C. § 1927, which provides that an "attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Section 1927 addresses a narrower field of conduct than that which may be addressed under the court's inherent authority because § 1927 permits sanctions only for bad-faith conduct that wrongfully multiplies proceedings. An award of costs, expenses, and attorney's fees pursuant to

21

§ 1927 is compensatory in nature--not punitive.  It requires the court to show a causal link between wrongful conduct and an unreasonable and vexatious multiplication of proceedings, then to connect the costs wrongfully incurred as a result of the sanctioned attorney's conduct to the amount awarded to the moving party.  *See Goodyear Tire*, 137 S. Ct. at 1186 n.5 (noting that the "because of" language in § 1927 required a court "to find . . . a causal connection before shifting fees").

Under § 1927, the court found that the attorneys engaged in bad-faith conduct and that this conduct multiplied the proceedings unreasonably and vexatiously.  First, the court explained that throughout the proceedings related to Generations's renewed motion to dismiss:

> Counsel knew or should have known that the Dillon Copy would inevitably be disclosed if they met their professional obligations, and they knew or should have known that when this happened, any favorable decision on the arbitration motion would have to be reconsidered.  Instead of disclosing the Dillon Copy and consenting to reconsideration, Counsel opposed the renewed motion and continued to keep the existence of the Dillon Copy a secret.  They created the need to litigate an unnecessary side issue: whether the Court could consider the renewed arbitration motion on its merits . . . .

*Dillon*, 2016 WL 5679190, at *16 (citations omitted).  The attorneys' continuing conduct also generated additional, unnecessary costs of appeal to the Fourth Circuit.  The court tailored the award of "attorney's fees and expenses of $70,147.70 in connection with a renewed motion to dismiss and the first appeal" directly to those costs incurred due to the three attorneys' "bad faith and vexatious conduct . . . in multiplying the proceedings and violating their duty of candor to the Court."  *Dillon*, 2017 WL 564501, at *8.

22

Next, the district court explained how the attorneys' pattern of unreasonable and vexatious conduct had continued through the sanctions proceedings in a way that further "increased Generations'[s] attorney's fees." The court listed several examples of this continuing bad faith conduct through the sanctions proceedings. First, the sanctioned attorneys' reciprocal motion for sanctions against Generations had been "so lacking in merit" that it suggested that it had been made in bad faith. *Id.* at *4. Second, the attorneys' continuing misrepresentations and exaggerations of the record, post hoc explanations for conduct that the court found "not credible," and especially Kaplan's brazen "attempt to rewrite history" by asserting "a version of the facts that was inconsistent with the record and with the contentions of his co-counsel" all supported a finding of continued bad faith. *Id.* at *4–5. The court also noted that sanctioned counsel had presented "shocking" arguments demonstrating "willingness to defend cynical gamesmanship and deliberate obfuscation." *Id.* at *5 (internal citations and quotation marks omitted). The court found sanctioned counsels' actions to have been vexatious and made in bad faith and held that these actions also wrongfully increased Generations's attorney's fees. The court accordingly awarded a portion of Generations's attorney's fees incurred through the sanctions proceedings to account for the increase in costs directly caused by this behavior.

We conclude that the district court correctly articulated the applicable legal standards, made appropriate factual findings, and supported its conclusions with ample evidence from the record. In sum, the district court explained:

23

> It is unreasonable and vexatious and a violation of the duty of candor for lawyers to bring a lawsuit referring to a written contract, to then challenge the Court's consideration of a document that appears to be that contract proffered by the defendant without disclosing that their client possesses an identical copy, to then imply in argument to the Court that their client does not possess any copy of the contract, and to then cause an unnecessary side dispute over whether the Court should treat a renewed motion to dismiss as a motion for reconsideration, when it was obvious that a motion to reconsider would be granted if the Court knew of the client's hidden copy.

*Dillon*, 2016 WL 5679190, at *12.  The district court also tailored the amount of sanctions to compensate only for costs caused by wrongful conduct.  Therefore we find that the district court did not abuse its discretion.

The sanctioned attorneys argue that neither the rules of ethics nor the Federal Rules of Civil Procedure imposed an affirmative duty to disclose the Dillon copy of the Western Sky loan agreement before discovery commenced.  Appellants' Br. at 39–44.  These arguments miss the point.  Counsel are not being sanctioned for their failure to disclose the Dillon copy of the Western Sky loan agreement.  Rather, counsel are being sanctioned for raising objections in bad faith--simultaneously questioning (and encouraging the district court to question) the authenticity of a loan agreement without disclosing that the Plaintiff provided them a copy of that loan agreement before the complaint was filed.

Appellants provide alternative, occasionally conflicting justifications for their conduct.  For example, they assert that it was "clear" that sanctioned counsel sought merely to object to Generations's failure "to carry its initial burden of producing evidence authenticating the document."  Appellants' Br. at 52.  They go on to explain Six's constant refrain about drafting the complaint without loan agreements as "simply using

24

the fact that he did not have the Vin Capital agreement as anecdotal support for why the claims did not rely on the agreement." *Id.* But they also continue to challenge the authenticity of the Western Sky loan agreement by noting that Dillon's testimony about when he printed his copy was "equivocal and contradictory" and that there are still "objective reasons to believe that Mr. Dillon did not print the document until later." *Id.* at 54–55. Each of these arguments has been considered and rejected by the district court.

As the district court rightly noted, "[t]he effort by counsel to chop down a few trees does not mean there is no forest." *Dillon*, 2016 WL 5679190, at *22. Under our standard of review, the question presented on appeal is not whether the sanctioned attorneys can now piece together a plausible good-faith rationale for their conduct, but instead whether the district court exercised its authority reasonably. Without losing the forest for the trees, we conclude that the district court reasonably described sanctioned counsels' conduct as evincing a multi-year crusade to suppress the truth to gain a tactical litigation advantage.

## IV.

For the foregoing reasons, we find that the district court did not abuse its discretion in imposing sanctions on Dillon's attorneys. We therefore affirm.

*AFFIRMED*